IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VALEO SISTEMAS ELECTRICOS S.A. DE C.V. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-627-KAJ |
| | ) | |
| CIF LICENSING, LLC, D/B/A GE LICENSING | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STMICROELECTRONICS, INC. | ) | |
| | ) | |
| Cross-Claim Defendant. | ) | |

## STMICROELECTRONICS, INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS

YOUNG CONAWAY STARGATT & TAYLOR, LLP
John W. Shaw (No. 3362)
Adam W. Poff (No. 3990)
Monté T. Squire (No. 4764)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
apoff@ycst.com

*Attorneys for STMicroelectronics, Inc.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................ii

NATURE AND STAGE OF PROCEEDINGS .......................................................1

SUMMARY OF ARGUMENT ...............................................................................2

BACKGROUND .....................................................................................................4

      A.     The Nature of the Dispute.................................................................4

      B.     The Potentially Applicable Governing Provisions ...........................5

      C.     GE Licensing's Texas Action ...........................................................7

ARGUMENT

      I.     Applicable Legal Standard.................................................................9

      II.    All Potentially Applicable Indemnity Provisions Limit the
             Scope of STMicroelectronics' Obligation to Indemnify
             VSE to Third-Party Infringement Claims Accusing
             STMicroelectronics' Product Alone ................................................10

      III.   VSE's Complaint Does Not (and Cannot) Allege That
             Any STMicroelectronics Product Alone Has Been
             Accused of Infringement..................................................................13

CONCLUSION......................................................................................................15

## TABLE OF AUTHORITIES

Page

**Cases**

*Caddy Products, Inc. v. Greystone Int'l, Inc.,*
    Civil No. 05-301 (JRT/FLN), 2006 U.S. Dist. LEXIS 58441
    (D. Minn. Aug. 17, 2006) ..................................................................... 11, 12

*Chemtron, Inc. v. Aqua Products, Inc.,*
    830 F. Supp. 314 (E.D. Va. 1993) ..................................................... 9, 12, 13

*Eames v. Nationwide Mutual Ins. Co.,*
    412 F. Supp. 2d 431 (D. Del. 2006)............................................................. 9

*Enex Resources Corp. v. Texas Crude, Inc.,*
    No. 05-94-00641-CV, 1994 Tex. App. LEXIS 4112
    (Tex. App. Dec. 30, 1994) ...................................................................... 9, 10

*GE Capital Bus. Asset Funding Corp. v. S.A.S.E. Military Ltd.,*
    SA-03-CA-189-RF, 2004 U.S. Dist. LEXIS 26083
    (W.D. Tex. Dec. 22, 2004) ......................................................................... 10

*Ideal Lease Service, Inc. v. Amoco Production Co., Inc.,*
    662 S.W.2d 951 (Tex. 1983)........................................................................ 10

*In re Rockefeller Ctr. Properties, Inc.,*
    184 F.3d 280 (3d Cir. 1999) ......................................................................... 9

*JR Development Co. v. Hamame,*
    No. 246598, 2004 Mich. App. LEXIS 1289
    (May 20, 2004) ............................................................................................ 11

*Lambers v. Wheels, Inc.,*
    No. 187787, 1996 Mich. App. LEXIS 2230
    (Mich. App. Dec. 6, 1996)........................................................................ 9, 12

*Oatway v. Am. Int'l Group, Inc.,*
    C.A. No. 01-033-GMS, 2002 U.S. Dist. LEXIS 1771
    (D. Del. Feb. 5, 2002) ................................................................................. 9

*Pension Benefit Guar. Corp. v. White Cons. Inds. Inc.,*
    998 F.2d 1192 (3d Cir. 1993) ...................................................................... 10

*Pursuit Athletic Wear, Inc. v. Save Power Limited,*
    Civil Action No. 96-40 MMS, 1996 U.S. Dist. LEXIS 8158
    (D. Del. June 7, 1996)................................................................................. 14

**Rules**

Fed. R. Civ. P. 12(b)(6).................................................................... 2, 9, 13, 15

Defendant STMicroelectronics, Inc. ("STMicroelectronics") moves this Court pursuant to Federal Rule of Civil Procedure 12(b)(6) for dismissal of the claim against it on the ground that the Complaint fails to allege facts sufficient to require STMicroelectronics to indemnify plaintiff Valeo Sistemas Electricos S.A. DE C.V. ("VSE"). More specifically and as detailed below, VSE has failed to allege that an STMicroelectronics product alone, and not in combination with any other items, has been accused of infringement, as required for indemnification under any potentially applicable contracts or other law. Moreover, VSE cannot so allege because no such specific infringement claim has been asserted against STMicroelectronics or any STMicroelectronics product in the related infringement action pending before the District Court for the Eastern District of Texas.

## NATURE AND STAGE OF PROCEEDINGS

On August 30, 2006, Delaware defendant GE Licensing filed suit against Valeo, Inc., among others, in the District Court for the Eastern District of Texas (the "Texas Action"), asserting claims for patent infringement based on U.S. Patent No. 4,733,159 (the "'159 patent"). On October 17, 2006, GE Licensing amended its Texas complaint to add an infringement claim against Delaware plaintiff VSE based on the same patent.

On October 10, 2006, VSE filed this declaratory judgment action against GE Licensing and STMicroelectronics. VSE seeks declarations that it does not infringe the '159 patent and that STMicroelectronics must indemnify VSE for any judgment with respect to any VSE product accused of infringement by GE Licensing. VSE also seeks

an order requiring STMicroelectronics to defend it against GE Licensing's claim of infringement in the Texas Action.

VSE's allegations fail to state a claim upon which relief may be granted under any applicable agreement or law. STMicroelectronics now moves on that basis to dismiss VSE's claims pursuant to Fed. R. Civ. P. 12(b)(6). This is STMicroelectronics' opening brief in support of that motion.

## SUMMARY OF ARGUMENT

1.    It is well-established that dismissal of an indemnification claim is appropriate as a matter of law where the applicable contract or law governing the alleged indemnity relationship demonstrates that no recovery is possible.

2.    Here, each of the potentially applicable indemnification provisions (whether derived from contract terms exchanged by the parties, the UCC, or the CISG) limits the scope of STMicroelectronics' obligation to indemnify VSE to third-party infringement claims accusing STMicroelectronics' product alone, and not in combination with any other items, including those manufactured by VSE.

3.    VSE's complaint does not (and cannot) allege that any STMicroelectronics product has been accused of infringement. In fact, VSE's complaint affirmatively alleges that GE Licensing has accused one or more VSE products ("certain alternators") of infringement. VSE's complaint makes this affirmative allegation because the complaint filed by GE Licensing in the Texas Action does not name STMicroelectronics as a party or even mention STMicroelectronics or STMicroelectronics' product, much less set forth allegations against STMicroelectronics.

2

4.      Because VSE's complaint does not allege facts sufficient to give rise to underlying liability, VSE's indemnity claim against STMicroelectronics is not viable and ought to be dismissed.

## BACKGROUND

The following facts are drawn from the Complaint and documents incorporated and relied upon therein.   It is proper for the Court to consider such documents in the context of a motion to dismiss.   *See infra* pp. 8-9

### A.    The Nature of the Dispute

STMicroelectronics is a Delaware corporation with a place of business in Carrollton, Texas.[1]  (Compl.    ¶ 10)    STMicroelectronics manufactures various semiconductor component parts for use in other products, including a semiconductor component part characterized as a "voltage regulator" in VSE's complaint (the "Complaint").   (*Id.* ¶ 11)    VSE is a Mexican corporation with a principal place of business in San Luis, Mexico. (*Id.* ¶ 1 )    VSE manufacturers automotive motor vehicle parts, including alternators, including "the product accused of infringement in the Texas suit." (*Id.* ¶ 11)  *See also* ¶ 3 ("GE has asserted that certain alternators infringe the '159 patent"); ¶¶ 4, 5 (referring to same product).   GE Licensing is a Delaware company with a principal place of business in Princeton, New Jersey. (*Id.* ¶ 3)   GE Licensing owns the '159 patent. (*Id.*)

Complaint paragraph 12 asserts that:

---

[1]    Carrollton is located in the Northern District of Texas.

> STMicroelectronics is obligated to defend Valeo CV and to
> indemnify it for any judgment entered against it with
> respect to the product accused of infringement in the Texas
> suit.

VSE does not allege the source of this purported obligation, but the only possible source

is the contract governing sale of the STMicroelectronics component part to VSE.[2] VSE's

allegations rely upon this contractual obligation.[3]

   As might be expected with a transaction for the sale of goods,

STMicroelectronics and VSE have different terms and conditions, and at this stage of the

proceedings it is impossible to tell which terms and conditions govern the parties

relationship – or even if default contractual provisions of the Uniform Commercial Code

("UCC") or the Convention for the International Sale of Goods ("CISG") apply. This

uncertainty, however, is immaterial to this motion, as both parties' terms and conditions,

along with the UCC and CISG, are consistent on the one key point – STMicroelectronics'

indemnity obligations arise *only* where the product sold by STMicroelectronics alone is

accused of infringement.

**B.  The Potentially Applicable Governing Provisions**

   The indemnification provision in STMicroelectronics' set of terms and

conditions provides:

> With respect to products manufactured solely to
> [STMicroelectronics'] designs and specifications and
> which are not modified by [VSE] … [STMicroelectronics]
> will defend any suit or proceeding brought against [VSE]

---

[2] It is proper to consider the contract in evaluating whether VSE's complaint states a claim upon which relief may be granted. *See infra* pp. 8-9.

[3] There are no common law, non-contractual bases on which VSE may assert an indemnity claim.

> insofar as it is based upon a claim that any such product furnished to [STMicroelectronics] hereunder, <u>by itself and not in combination with other items not manufactured solely</u> to [STMicroelectronics'] designs and specifications …. [A]nd [STMicroelectronics] shall pay all damages and costs not to exceed the aggregate sum paid to [STMicroelectronics] by [VSE] for the infringing product.

(Ex. B, STMicroelectronics' Terms and Conditions of Sale, ¶ 13) (emphasis added) STMicroelectronics' terms and conditions further provide that the foregoing provision "states the sole and exclusive liability of the parties hereto for patent infringement …." (*Id.*)    For purposes of this motion, STMicroelectronics assumes that the STMicroelectronics product referenced in the complaint was "manufactured solely to [STMicroelectronics'] designs …."    In fact, if the product was manufactured solely to VSE's specifications and designs, there can be no liability under this contract, but that inquiry is unnecessary on this motion to dismiss.

The indemnification provision in VSE's terms and conditions is also limited in scope to third-party infringement claims against STMicroelectronics products alone, and not in combination with items not manufactured by STMicroelectronics.    It specifically provides that:

> [STMicroelectronics] will indemnify … losses, damages, and expenses …  asserted by a third party regarding the Supply based on the third party's industrial or intellectual property rights.

(Ex. A, VSE's General Terms and Conditions of Purchase, ¶ 12)  The term "Supply" is defined as the "purchases made by [VSE] from the supplier indicated on the purchase order ("Supplier") whether for tooling, machines, parts, raw materials, other various products, goods or services …." (*Id.*)  Because the provisions are of the same legal effect, the Court need not determine which applies for purposes of this motion.

5

Discovery may also reveal that neither of the two foregoing provisions applies and that either UCC or CISG provisions govern this issue. They are, however, to the same effect. UCC § 2-312(3) states:

> Unless otherwise agreed a seller who is a merchant regularly dealing in goods of the kind warrants that the goods shall be delivered free of the rightful claim of any third person by way of infringement or the like but a buyer who furnishes specifications to the seller must hold the seller harmless against any such claim which arises out of compliance with the specifications.

The defined term "Goods" is the equivalent of the term "Supply" in the STMicroelectronics terms and conditions. The applicable CISG provision is materially the same.[4]

## C.      GE Licensing's Texas Action

On August 30, 2006, GE Licensing filed patent infringement claims against VSE and others in the District Court for the Eastern District of Texas, and later amended its complaint. (Ex. C, Tex. Compl. ¶ 23; Ex. D, Tex. Amend. Compl. ¶ 32) The operative Texas complaint clearly, unambiguously, and repeatedly alleges that it is VSE's alternator product that is accused of infringement by GE Licensing. (*Id.*) GE Licensing specifically alleges that VSE infringed and continues to infringe the '159 patent by manufacturing and selling "motor vehicle parts, including alternators containing voltage regulator units." (*Id.*) The Texas complaint nowhere so much as mentions STMicroelectronics. VSE nevertheless now seeks indemnification on the part of STMicroelectronics based on the general allegations of the Texas Action and

---

[4]    Article 42(1) of the CISG states: "The Seller must deliver <u>goods</u> which are free from any right or claim of a third party based on … intellectual property …." (emphasis added).

notwithstanding the limited scope of the potentially applicable contracts and law governing STMicroelectronics indemnity obligations. (Compl. at ¶ 12)

DB02:5636565.1                                    065770.1001

**ARGUMENT**

## I.   Applicable Legal Standard

It is well-established that dismissal of an indemnification claim is appropriate as a matter of law where the contract language or applicable law governing the alleged indemnity relationship demonstrates that no recovery is possible as a matter of law. *See Chemtron, Inc. v. Aqua Products, Inc.*, 830 F. Supp. 314, 316 (E.D. Va. 1993) (dismissing indemnification claim under UCC § 2-312(3) where there was no possibility of recovery); *Lambers v. Wheels, Inc.*, No. 187787, 1996 Mich. App. LEXIS 2230, at *5 (Mich. App. Dec. 6, 1996) (affirming dismissal of indemnity claim based on unambiguous contract language); *Enex Resources Corp. v. Texas Crude, Inc.*, No. 05-94-00641-CV, 1994 Tex. App. LEXIS 4112, at *6-7 (Tex. App. Dec. 30, 1994) (concluding that appellee was not entitled to indemnification because it could not recover based on clear and unambiguous language of indemnity provision).

In determining whether a contract claim, such as the claim at issue here, ought to be dismissed pursuant to Fed. R. Civ. P. 12(b)(6), this Court routinely considers relevant contract language and documents outside of the complaint without converting the motion to one for summary judgment. *See Eames v. Nationwide Mutual Ins. Co.*, 412 F. Supp. 2d 431, 434, 437 n.3 (D. Del. 2006) (granting motion to dismiss where defendants attached and relied upon contracts upon which plaintiff's claims were based); *Oatway v. Am. Int'l Group, Inc.*, C.A. No. 01-033-GMS, 2002 U.S. Dist. LEXIS 1771, at *2 n.2 (D. Del. Feb. 5, 2002) (granting motion to dismiss after considering agreements referenced in complaint). *See also In re Rockefeller Ctr. Properties, Inc.*, 184 F.3d 280, 287 (3d Cir. 1999); *Pension Benefit Guar. Corp. v. White Cons. Inds. Inc.*, 998 F.2d

065770.1001

1192, 1196 (3d Cir. 1993). This Court may and should therefore consider the materials upon which VSE's indemnification claim is based, namely the operative complaint in the Texas Action and the terms and conditions (whether arising from an express contract provision, the UCC or the CISG) that govern the alleged indemnity relationship between STMicroelectronics and VSE.

## II.     All Potentially Applicable Indemnity Provisions Limit the Scope of STMicroelectronics' Obligation to Indemnify VSE to Third-Party Infringement Claims Accusing STMicroelectronics' Product Alone

The Court need not determine which set of terms and conditions or whether other law applies for purposes of this motion because the viablity of VSE's claim (or lack thereof) is the same under all possibilities. Under Texas law, the scope of a party's indemnity rights is governed by the language of the applicable contract provision. *See Ideal Lease Service, Inc. v. Amoco Production Co., Inc.,* 662 S.W.2d 951, 952 (Tex. 1983) (holding that obligation to indemnify is limited by "clear language" of indemnity provision); *Enex Resources Corp.*, 1994 Tex. App. LEXIS 4112, at *6-7 (concluding that appellee was not entitled to indemnification as a matter of law based on clear and unambiguous language of indemnity provision). Under Texas law, a contract provision is clear and unambiguous if it is subject to only one reasonable interpretation. *GE Capital Bus. Asset Funding Corp. v. S.A.S.E. Military Ltd.*, SA-03-CA-189-RF, 2004 U.S. Dist. LEXIS 26083, at *22 (W.D. Tex. Dec. 22, 2004).

There can be no reasoned dispute here that the indemnification provision in STMicroelectronics' terms and conditions requires an accusation of infringement against the STMicroelectronics product as a condition precedent to any indemnity obligation. It provides:

9

> With respect to products manufactured solely to [STMicroelectronics'] designs and specifications and which are not modified by [VSE] … [STMicroelectronics] will defend any suit or proceeding brought against [VSE] insofar as it is based upon a claim that any such product furnished to [VSE] hereunder, <u>by itself and not in combination with other items not manufactured solely to [STMicroelectronics']</u> designs and specifications …. [A]nd [STMicroelectronics] shall pay all damages and costs not to exceed the aggregate sum paid to [STMicroelectronics] by [VSE] for the infringing product.

(Ex. B, STMicroelectronics' Terms and Conditions of Sale, ¶ 13)   This clear and unambiguous language limits the scope of STMicroelectronics' indemnity obligation under Texas law to third-party claims against STMicroelectronics products alone.   There can be no other reasonable interpretation.

VSE's terms and conditions provide the same result.   Under Michigan law, a contract provision will be considered clear and unambiguous if it is subject to only one reasonable construction. *JR Development Co. v. Hamame*, No. 246598, 2004 Mich. App. LEXIS 1289, at *6 (May 20, 2004).   Here, the indemnification provision in VSE's terms and conditions provides:

> "[STMicroelectronics] will indemnify … losses, damages, and expenses … asserted by a third party regarding the [STMicroelectronics voltage regulators] based on the third party's industrial or intellectual property rights."

(Ex. A, VSE's General Terms and Conditions of Purchase, ¶ 12)

Under circumstances very similar to those here, the District Court for the District of Minnesota, applying Michigan law, dismissed indemnity claims based on liability arising from patent infringement claims.   *Caddy Products, Inc. v. Greystone Int'l, Inc.*, Civil No. 05-301 (JRT/FLN), 2006 U.S. Dist. LEXIS 58441, at *7 (D. Minn. Aug. 17, 2006).   The court reasoned that the clear and unambiguous language of the

10

applicable contract provision did not provide for indemnification of the specific type of patent infringement claims asserted. *Id. See also Lambers*, 1996 Mich. App. LEXIS 2230, at *5 (affirming dismissal of indemnity claim based on unambiguous contract language). As in *Caddy Products*, the plain language of the indemnity provision limits STMicroelectronics' indemnity obligation under Michigan law to claims against STMicroelectronics products alone. There is no other reasonable construction of the provision.

Moreover, even if neither set of terms and conditions applied to the subject transactions between STMicroelectronics and VSE, the scope of STMicroelectronics' indemnity obligation would not change. This is so because other potentially applicable law, namely UCC § 2-312(3), similarly limits the scope of that obligation. Section 2-312(3) states:

> Unless otherwise agreed a seller who is a merchant regularly dealing in goods of the kind warrants that the goods shall be delivered free of the rightful claim of any third person by way of infringement or the like but a buyer who furnishes specifications to the seller must hold the seller harmless against any such claim which arises out of compliance with the specifications.

In circumstances similar to those here, courts have concluded that the implied warranty of § 2-312(3) does not extend to products that constitute a mere component of another product accused of infringement, provided the component product alone has not been accused of infringement. In *Chemtron*, for example, third-party defendant Viking sold products to defendant Aqua for use as part of Aqua's combination detergent dispenser/container. 830 F. Supp. at 315. Aqua's product was subsequently accused of infringement, and it asserted an indemnification claim against Viking based

11

on that action. In dismissing Aqua's claim on Fed. R. Civ. P. 12(b)(6) grounds, the Court

applied UCC § 2-312(3), the functional equivalent of the indemnification provisions at

issue here, and concluded:

> At the time of the sale [the Viking products] were delivered free from any third-party complaints against infringement. Aqua was sued by [plaintiff] for direct infringement of the [patent] and for inducement of infringement based upon its infringing apparatus, which was assembled from non-infringing component parts, some of which were obtained from Viking .... [T]he UCC's warranty against infringement should not apply in such a situation.

*Id.* at 316 (internal citations omitted).

The facts of *Chemtron* are virtually the same as those here. Both cases

involve a misplaced indemnity claim targeting a mere component that is not alone

accused of infringement, but that is a part of a larger product accused of infringement.

Accordingly, the result here should be no different than the result in *Chemtron*.

Because there are no substantive differences between the contracts or

other law that may govern this dispute, the Court need not determine which law applies

for purposes of this motion. Regardless of which law or provision controls,

STMicroelectronics' indemnity obligation is limited to third-party infringement claims

against STMicroelectronics' products alone. It does not extend to general claims against

a combination of items that may include an STMicroelectronics product. (*See* Exs. A and

B)

## III.    VSE's Complaint Does Not (and Cannot) Allege That Any STMicroelectronics Product Alone Has Been Accused of Infringement

Nowhere in VSE's Complaint is there any allegation that an

STMicroelectronics product alone has been accused of infringement, as would be

required to give rise to liability. To the contrary, VSE concedes that it "makes and sells

the product accused of infringement in the Texas suit." (Compl. ¶¶ 5, 7)  VSE further concedes that STMicroelectronics supplied only a part of the product specifically accused of infringement.  (*Id.* ¶ 11)

VSE's most specific allegation relating to STMicroelectronics is that STMicroelectronics' product is the "basis" for the lawsuit in Texas. (*Id.* ¶ 11)  This allegation is not the same as alleging that an STMicroelectronics product alone has been accused of infringement.

Furthermore, VSE cannot re-characterize its "basis" allegation to relate to a claim against an STMicroelectronics product alone because no such claim exists.  The operative Texas complaint[5] focuses exclusively on VSE's product, alleging that VSE manufactures alternators containing voltage regulator units and in doing so infringes GE Licensing's '159 patent. (Ex. D, Tex. Amend. Compl. ¶ 32-33)  The complaint does not name STMicroelectronics as a party or even mention STMicroelectronics, much less assert that one of its products alone infringes the '159 patent.  Indeed, VSE's Delaware allegations acknowledge this reality.  Because VSE has not asserted a claim sufficient to give rise to STMicroelectronics' indemnity obligation, its indemnity claim against STMicroelectronics must be dismissed.

---

[5]    The Court may consider the operative Texas complaint in the context of a motion to dismiss. *See Pursuit Athletic Wear, Inc. v. Save Power Limited*, Civil Action No. 96-40 MMS, 1996 U.S. Dist. LEXIS 8158, at *8 n.2 (D. Del. June 7, 1996) (taking judicial notice pursuant to Federal Rule of Evidence 201 of complaint filed in different proceeding)

DB02:5636565.1                                                                065770.1001

## CONCLUSION

For the reasons set forth above, STMicroelectronics respectfully requests that the Court dismiss VSE's "Cross-Claim" pursuant to Federal Rule of Civil Procedure 12(b)(6).

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____

John W. Shaw (No. 3362)
Adam W. Poff (No. 3990)
Monté T. Squire (No. 4764)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
apoff@ycst.com

*Attorneys for STMicroelectronics, Inc.*

Dated:  December 4, 2006

14

065770.1001

## CERTIFICATE OF SERVICE

I, Adam W. Poff, hereby certify that on December 4, 2006, a true and correct copy of the

foreging document was filed with the Clerk of the Court using CM/ECF which will send

notification that such filing is available for viewing and downloading to the following counsel of

record.

Jack B. Blumenfeld, Esquire
Karen Jacobs Louden, Esquire
MORRIS NICHOLS ARSHT &
    TUNNELL LLP
1201 North Market Street
Wilmington, DE 19801

Seven J. Balick, Esquire
John G. Day, Esquire
ASHBY & GEDDES
222 Delaware Avenue, 17th Floor
Wilmington, DE 19801

I further certify that on December 4, 2006, I caused copies of the foregoing document to

be served by hand delivery on the above-listed counsel and on the following counsel of record as

indicated.

BY FEDERAL EXPRESS

Arthur I. Neustadt
OBLON, SPIVAK, MCCLELLAND, MAIER
   & NEUSTADT, P.C.
1940 Duke Street
Alexandria, VA 22314

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Adam W. Poff (No. 3990)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
apoff@ycst.com

Attorneys for STMicroelectronics, Inc.

# Exhibit A

## General Terms and Conditions of Purchase

### Scope

These General Terms and Conditions are applicable to all purchases made by Valeo Sistemas Electricos, S.A. de C.V., subsidiaries divisions ("Valeo") from the Supplier indicated on the purchase order (the "Supplier") whether for tooling, machines, parts, raw materials, other various products, goods or services (hereinafter individual or collectively called "Supply").

These General Terms and Conditions shall constitute the only, agreement applicable to all purchases of Supply by Valeo and expressly exclude the application of the Suppliers general terms of sale as well as any documents now or in a future issued by the Supplier in relation to purchase order or the Supply.

Any additional or different terms in the Suppliers form are hereby deemed to be material alterations and Valeo hereby gives notice of objection to them and rejection.

These Terms and Conditions may only be modified by an express written provision signed by Valeo.

### Order

All purchases made by Valeo shall take the form of a purchase order issued by Valeo.

In the event of an emergency, the Supply can be delivered or furnished against a collection note issued by Valeo or against a purchase order number provided by Valeo.

The Supplier shall acknowledge receipt of the purchase order within five (5) calendar days of the date of the release order by mail or fax, by returning a duly signed copy of the purchase order to Valeo. Where no such acknowledgement of receipt is issued, the commencement of the completion of the purchase order shall be evidenced an acceptance of these General Terms and Conditions by the Supplier.

Where deliveries are specified to be in accordance with Valeo's written releases, the Supplier will not fabricate, assembly or ship ready, or procure required materials, except to the extent authorized by a written release issued by Valeo or provisions of the purchase order specifying fabrication or delivery quantities.

### Compliance

Without prejudice to the provisions of article 3.2, the Supply shall be in compliance with all drawings and specifications. Characteristics of the Supply not detailed shall be in compliance with samples or typical parts which have been accepted by Valeo.

Any technical Modification, however minor, shall be made without the prior consent of Valeo in the form of a numbered addendum issued by Valeo.

In providing the Supply the Supplier will comply with any and all applicable federal, state and local laws, regulations and standards in force in the United States and in the country of manufacture and sale, including but not limited to the occupational Safety and Health Act, the Fair labor Standards Act and any order pertaining to discrimination, the National Traffic and Motor Vehicle Safety Act all hygiene and safety constraints on restricted, toxic and hazardous material and provisions pertaining to environmental, electrical and electromagnetic considerations.

Any quotations or prices submitted in reference to the Supply shall be in compliance with all applicable laws and governmental regulations.

The Supplier shall defend, indemnify and hold Valeo harmless from and against any and all claims, losses, damages, costs and expenses, including attorney fees, resulting from or arising out of any failure of the Supplier to comply with any applicable governmental laws, regulations or standards.

At the request of Valeo, the Supplier will provide an appropriate certificate stating the country of manufacture of the Supply.

The Supplier shall strictly adhere to the requirements of the Valeo Quality System plan, a copy of which the Supplier hereby acknowledges receipt and The Supplier will comply with all current QS-9(XX) quality requirements.

### Industrial and Intellectual property Rights

1 The Supplier shall be responsible for confirming the validity of its Industrial and or Intellectual property rights relates to a manufacture and the sale of the Supply. The Supplier shall specifically identify in writing to Valeo any patented component or processes, tooling, machines or equipment used in the manufacture of the Supply.

2 The Supplier shall indemnify, defend and hold harmless Valeo from and against any and all claims, losses damages and expenses, including reasonable attorney fees, asserted by a third party regarding the Supply based on the third party's industrial or intellectual property rights.

The Supplier or a third party asserts a claim against Valeo for an alleged infringement of intellectual or industrial property rights, Valeo may immediately terminate all orders in progress by written notice, without prejudice to Valeo's rights or any legal action Valeo may take against the Supplier.

The Supplier authorizes Valeo to finalize and produce the Supply, including any tooling or equipment upon a breach the Supplier of these General Terms and Conditions of the purchase order, even where the Suppliers Intellectual and/or industrial property rights are utilized for the design and manufacture of tool in s or equipment, The Supplier will provide to Valeo all information necessary for the manufacture of the tooling or equipment upon such breach and grants to Valeo a royalty free license on the intellectual or industrial property rights in order to finalize or produce the Supply.

### Delivery

1 Time and quantity are of the essence.  Delivery shall be at the Valeo facility, unless otherwise specified on the purchase order, or as specified by the Valeo facilities where the delivery is to be made.  Delivery terms may be edited from time to time.

2 The Supplier shall take all measures necessary to meet 100% the deliveries date for the Supply and comply with all chemical, administrative and shipping documents.

3 The Supplier shall be entitled to deliver the Supply before the due date without Valeo's written authorization, nor will bear all costs related to any unauthorized advance delivery, including return shipping costs.

4 In the event of a late delivery, all damages suffered by Valeo and any transportation or other costs incurred by Valeo meet the specified delivery schedule will be paid by the Supplier. The Supplier will be responsible for any extraordinary cost incurred by Valeo from its customer due to late delivery of the Supply by the Supplier. Valeo may apply late delivery penalties as specified in the purchase order.

In the event of late delivery, Valeo may purchase the Supply from a third party immediately without notice.  Any extra cost arising from this repayments order shall be borne by the defaulting Supplier.

5 The Supplier will notify to Valeo immediately of any actual or potential labor dispute delaying or threatening to delay timely performance of the purchase order, and will provide Valeo with all relevant information.  The Supplier will notify Valeo six (6) months in advance of the expiration of any current labor contract(s).  Prior to the expiration of any such labor contract the Supplier will store, at its expense, a minimum thirty (30) day inventory of finished Supply at a warehouse unaffected by the labor contract.

6 For deliveries where a written release is required, the Supplier shall adhere to the Valeo Production System Plan, a copy of which shall be made available to the Supplier.  The Supplier shall harmonize its administrative and production systems to correspond to the requirements of the Valeo Production System Plan. The Supplier will acknowledge receipt of the Valeo Production System Plan in writing.

7 The Supply shall be subject to Inspection by Valeo for a reasonable period, which shall in no event be less than thirty (30) days after receipt thereof by Valeo, except that Valeo may reject the goods and hold the Supplier in default at any time after Valeo has inspected the goods. Valeo discovers a defect not normally discoverable by visual inspection or Valeo or its customer discovers a defect upon integration of the Supply into production.  Payment shall not constitute final acceptance of the Supply not waiver of Valeo's right to inspect and reject the Supply.

### Price, Invoicing and Condition* of Payment

1 All prices as shall be as stated in the purchase order. The Supplier shall be solely responsible for all transport and unloading costs, customs charges, taxes and insurance costs, unless otherwise specified on the purchase order.

2 The Invoice and bill of lading shall include all the information appearing on the purchase order necessary for the identification and the control of the Supply. The invoice shall be sent to the invoicing address written on the face of the purchase order.

6.3 Unless otherwise stated on the purchase order, the invoice shall be payable on the first Friday, sixty (60) days from the date of delivery of the Supply to Valeo.

6.4 In addition to any right of setoff provided by law, Valeo may automatically deduct from payments to made to the Supplier any and all sums due or to become due by the Supplier for whatever reason.

6.5 The Supplier may not assign any accounts receivable from Valeo to third parties without Valeo's prior written approval.

6.6 The Supplier warrants that the prices for the Supply sold to Valeo are no less favorable than those that the Supplier currently extends to any other customer for the same or similar Supply in similar quantities. If the Supplier reduces its prices to third parties during the term of the purchase order for the Supply, the Supplier will correspondingly reduce the prices charged to Valeo.  The Supplier warrants that the prices on the purchase order are complete and that no other charges will be added without Valeo's written consent.

### 7. Packaging and Delivery Documents

7.1 The Supply shall be packed in accordance with Valeo purchasing and packaging specifications or purchase orders, and also in accordance with the norms and standards of common carriers in the United States, unless otherwise requested by Valeo. Valeo shall have the right at any time to change any purchase order as to specifications, delivery, packaging or means of shipment.

The Supplier will provide all necessary Material Safety Data Sheets and ensure that all hazardous material fully meets federal, state and local shipping requirements.

7.2 The exterior of each unit of packaging shall bear in a clearly conspicuous and legible manner the markings required under federal and state regulations in force in the United States, any special conditions for storage, the Valeo purchase order number, a description of the Supply, the quantity delivered and the gross or net weight in accordance with AIAG standards.

7.3 The Supplier shall attach to the shipment a bill of lading consisting of a detailed delivery order together with the information appearing on the purchase order necessary to identify the Supply and to facilitate quantitative control.

### 8. Receipt - Warranty

8.1 Unless otherwise stated on the purchase order or requested in writing by the receiving Valeo facility, Valeo will only accept delivery to the premises of Valeo on working days during normal business hours.

Both Valeo and its customers reserve the right to inspect the Supply and manufacturing process used at the Suppliers premises prior to delivery and at Valeo premises after delivery. Any inspection shall not limit the warranties pertaining to the Supply.

8.2  Valeo reserves the right to reject or revoke acceptance of a non-conforming Supply, which includes but is not limited to non compliance with the purchase order or non compliance with the date and hours of delivery.

8.3 At its option, Valeo may return non-conforming Supply to the Supplier at the Supplier's own risk and expense.

Alternatively, at Valeo's instruction, the Supplier must retrieve the non-conforming Supply at its expense within eight (8) days of notification of rejection or revocation of acceptance. Valeo shall be permitted to dispose of the Supply upon the Suppliers failure to retrieve the non-conforming Supply.

The Supplier shall be liable for all costs (including scrap, storage, sorting out alterations, tool breaks, breakdowns, production stoppage, local campaigns and administrative costs) incurred by Valeo as a result of the non-conformity of the Supply.

In the event of delivery of non-conforming Supply, Valeo may terminate the purchase order pursuant to article 14 below and/or purchase the Supply from a third party. The Supplier shall be responsible for any additional cost incurred by Valeo under this paragraph.

8.4 The Supplier shall be responsible for the design and/or manufacture of the Supply to the extent designated in the purchase order or as agreed to in writing, regardless of any assistance provided by Valeo throughout the development phase or approval by Valeo during initial sample review.

8.5 The Supplier warrants that the Supply shall be free from defects in material, design, workmanship, operating defects or title and will be merchantable and fit for the intended purpose.  The Supplier will indemnify, defend and hold harmless Valeo for all claims, losses, damages costs and expenses, including attorney fees, arising from defects in proportion to its liability and for the duration of Valeo's warranty obligations to the purchaser of the products in which the Supply is integrated, provided that such limitation as to time shall not apply to concealed defects.

At its option, Valeo may provide additional governing warranty terms.

8.6 If Valeo its customer recalls the Supply or a product incorporating the Supply, the Supplier shall reimburse Valeo in proportion to the Supplier's responsibility, for actual expenses borne by Valeo.

8.7 The Supplier shall obtain comprehensive general liability insurance in amounts and scope to cover all claims under this article 8 and shall provide proof of insurance and proof of payment of insurance premiums upon the request of Valeo.  Such insurance shall provide thirty (30) day written notice to Valeo of cancellation or material change.

### 9. Risk of losses

Risk of loss with respect to the Supply delivered shall not be transferred to Valeo until the actual receipt of the Supply at the address indicated on the purchase order.

### 10. Subcontractors

10.1 The purchase order shall not be assigned, in whole or in part by the Supplier to a subcontractor without Valeo's prior written approval.

10.2 If Valeo agrees to the assignment of the purchase order, in whole or in part, to a subcontractor, the Supplier shall remain solely liable to Valeo for the adherence of the subcontractor to these General Terms and Conditions.

### 11. Confidentiality

All Information provided to the Supplier by Valeo under this purchase order and for the Supply not publicly available shall be considered confidential by the Supplier. The Supplier shall take all necessary measures to ensure that neither the Supplier or its employees, agents, suppliers or authorized subcontractors, communicate such confidential information to any third party and that the information is used only for the purpose submitted.

These confidentiality requirements shall be maintained for the duration of performance under the purchase order and for a period of five (5) years thereafter.

Immediately upon completion of the performance of the purchase order, any termination of the purchase order or upon request of Valeo, the Supplier agrees to return to Valeo all information, including all copies thereof, confidential or otherwise, related to the purchase order.

### 12. The Supplier Employees and Agents

With respect to the performance of any purchase order, the Supplier shall be responsible for the acts and omissions of its Supplier and as employees, agents or representatives and shall indemnify, defend and hold harmless Valeo from liability for any property damage or personal injuries, including death arising out of any act or omission of the Supplier, its employees, agents or representatives.

### 13. Ownership

13.1 Notwithstanding article 9 above, ownership of the Supply shall be transferred to Valeo immediately upon its identification to the purchase order on the premises of the Supplier. The Supplier agrees to acknowledge and defend Valeo's property interests at all times.

13.2 The Supplier shall not impose nor permit to be imposed any lien, or encumbrance or security interest or similar reservation of title on the Supply.

3 If Valeo finances all or part of the raw Materials or semi-finished products to be procured by the Supplier for corporation into the Supply, the raw materials and semi-finished products will become the property of Valeo mediately upon payment. The Supplier, as before, will identify the raw materials and semi-finished products by plainly arking Valeo ownership.

.4 Molds, tooling or machines made by the Supplier on behalf of Valeo, together with the intellectual or industrial roperty rights related thereto, will become the property of Valeo, regardless of whether payment is received and as ay are made and shall be neither withheld by the Supplier or pledged to any third party. The Supplier, as before, will ainly mark all such molds, tooling and machines, with a metal label stating "Non Transferable, Property of Valeo". e Supplier shall provide   Valeo with equipment and tooling drawings, technical specifications, FMEA's and control ans for each component and for the purchase of capital equipment.

.5 If Valeo deposits molds, tooling or machines with the Supplier in connection with a subcontracting agreement:

- The molds, tooling and machines shall remain the exclusive property of Valeo, which may recover the molds, tooling and machines at any time; and,

- The molds, tooling and machines shall be exclusively used for the performance of Valeo orders; and.

- The Supplier shall be responsible for the preventive or curative maintenance necessary for the correct operation of the molds, tooling and machines; and.

- Except as otherwise agreed, the Supplier shall be liable for all damages included in connection with the molds, tooling and machines as well as all damages arising from their use. The Supplier shall insure the molds, tooling and machines for damage or loss (including theft) in an amount not less than replacement value and shall maintain general liability insurance regarding the operation of the molds, tooling and machines in amounts and coverage reasonable in the circumstances and acceptable to Valeo, the Supplier shall also comply with the provisions listed in section 8.7 regarding insurance.

. Termination

he Supplier fails to perform any of its contractual obligations under these General Terms and Conditions, Valeo may ncel any and all purchase orders upon eight (8) days written notice, without prejudice to any damages Valeo may >im.

. Year "2000" Bug

ller, and any goods and services supplied by the seller, under take to be Year "2000" compliant and compatible, d shall function without error or fault in the processing of dates and date-related for the year 2000 and beyond cluding, without being exhaustive, as to calculating, manipulating, managing, comparing and sequencing).

. Applicable Law and Jurisdiction

ese General Terms and Conditions of Purchase shall be governed by the laws of the State of Michigan without gard to rules pertaining to conflicts of law. The federal, state and local courts located in the State of Michigan shall ive exclusive jurisdiction of any dispute relating to these General Terms and Conditions of Purchase. The United tions Convention on Contracts for the International Sale of Goods shall not apply to these General Terms and onditions of Purchase or any transaction pursuant hereto.

any provision herein is or becomes invalid or unenforceable under any law of mandatory application, such provision II be deemed severed and omitted. The remaining provisions will remain in full force and effect as written.

> action or inaction taken pursuant to these General Terms and Conditions shall constitute a waiver of compliance th any covenants or agreements herein.

# Exhibit B

ST101/1

# STMICROELECTRONICS, INC.
## TERMS AND CONDITIONS OF SALE

1. ORDERS: ALL ORDERS ARE SUBJECT TO ACCEPTANCE BY CONFIRMATION IN WRITING BY SELLER'S AUTHORIZED OFFICERS. These terms and conditions apply to all quotations made and purchase orders accepted by Seller; they are an integral part of the sale contract between Seller and Buyer. Whenever these terms and conditions conflict with or are expanded or added to by any terms and conditions of Buyer's order, these terms and conditions shall govern and supersede the terms and conditions of Buyer's order. Seller's failure to object to provisions contained in any communications from Buyer shall not be deemed a waiver of these terms and conditions. Any changes in the terms and conditions of sale contained herein must be specifically agreed to in writing signed by an authorized officer of Seller before becoming binding on Seller.

2. QUOTATIONS: Subject to the provisions hereof, all quotations submitted are firm for thirty (30) days from the date of the quotation unless indicated differently on the face of the quotation, and thereafter Seller may change the quotation without notice. Price quotations, including any applicable quantity break prices, apply only to quantities shipped within twelve (12) months from date of quotation.

3. PRICES: Applicable prices are those specified in Seller's quotation or, if the quotation has expired, those specified in Seller's confirmation, and do not include applicable destination charges or taxes. Seller reserves the right to quote and or adjust prices involving precious metal content of products to reflect fluctuations in precious metal prices. Prices are subject to revision when interruptions, delays, engineering changes or changes in the quality are caused or requested by Buyer. Prices are also subject to revision based on changes in economic and financial conditions after the date of quotation or confirmation over which Seller has no control. All prices quoted and confirmed are subject to correction for clerical errors.

4. TAXES: In addition to the applicable prices, Buyer agrees to pay an amount equal to any and all applicable federal, state, and local taxes, duties and other levies, which amounts shall be an additional charge to Buyer hereunder.

5. PACKAGING: Standard packaging for domestic commercial shipment is included in the quoted price. When special packaging is specified or required involving expense exceeding that for standard domestic commercial shipment, Buyer will reimburse Seller for the additional expense. Reasonable care is exercised in packaging goods for shipment and no responsibility is assumed by Seller for delay, breakage or damage after delivery to the carrier. Buyer will file any claims for breakage or damage with the carrier, but Seller will render reasonable assistance in securing satisfactory adjustment of such claims.

6. COUNTRY OF ORIGIN MARKING: All container and packages will be marked with country of origin in accordance with applicable Customs regulations. If the products are resold and subject to repacking, Buyer will ensure that subsequent containers are marked with country of origin.

7. TITLE & DELIVERY:
(a) All sales are F.O.B. point of shipment. Title and risk of loss pass to Buyer upon delivery of items to carrier at shipping point, which delivery shall constitute delivery to Buyer for all purposes. Unless otherwise specified by Seller, the point of shipment shall be Seller's plant. Unless specific instructions form Buyer specify which method of shipment is to be used, Seller will exercise its own discretion. Shipping dates are approximate and are based upon prompt receipt by Seller from Buyer of all necessary information. If the sale contract involves, in whole or in part, an international delivery of products, the portion thereof involving an international delivery shall be EX-WORKS, according to INCOTERMS 1980.

(b) If the quotation calls for delivery by installments, each such installment will be deemed sold under a separate and independent contract, and default in any shipment or delivery shall not invalidate this contract as it pertains to any other shipments or deliveries. Delay in delivery of any installment will not relieve Buyer of its obligation to accept remaining deliveries.

(c) Seller reserves the right to allocate production and deliveries among its various customers at Seller's sole discretion under any circumstances. Seller may vary quantities of custom products to be delivered by up to ten percent.

(d) Buyer will be deemed to have waived any and all claims for shipments containing less than the number of items indicated on the shipping documents unless written notice of such claim is given to Seller within ten (10) days after receipt of shipment.

(e) In the event of any default by Buyer, Seller may decline to make further shipments or may elect to continue to make shipments notwithstanding such default, and such action shall not constitute a waiver of such default or otherwise affect Seller's remedies for Buyer's default.

8. PAYMENT:
(a) Where Seller has extended credit to Buyer, terms of payment shall be net thirty (30) days from date of invoice. The amount of credit may be changed, or credit withdrawn, or terms of payment changed, by Seller at any time. Unless credit is extended, payment will be required in full prior to shipment. In the event Buyer becomes the subject of a bankruptcy or other insolvency proceeding, or fails to pay Seller's invoices as they become due, Seller may cancel any order then outstanding and receive reimbursement for its cancellation damages.

(b) Each shipment shall be considered a separate independent transaction, and payment therefor shall be made accordingly. If shipments are delayed by Buyer, Seller may invoice on the date when Seller would have made shipment but for the delay.

(c) In case of a partial return of goods by Buyer owing to defects covered by warranty, the relevant invoice shall be paid within the term stated, for the amount corresponding to the products accepted. Buyer is in no event entitled to make reductions on the invoice unit prices or quantities without prior written approval of Seller. If invoiced amounts are not paid when due, Buyer will pay, in addition to all amounts otherwise due Seller and without limiting any remedies available to Seller at law or in equity, a delinquency charge in the amount of one and one-half percent per month (eighteen percent per annum) on such overdue amounts.

(d) Buyer grants to Seller a security interest in all items purchased by Buyer from Seller to secure payment in full of all amounts due from Buyer to Seller. Buyer will cooperate with Seller to do all acts deemed necessary or advisable by Seller to perfect said security interest.

9. CANCELLATION/RESCHEDULE:
(a) No cancellation for Seller's default shall be effective unless Seller shall have failed to correct such alleged default within thirty (30) days after receipt by Seller from Buyer of written notice of default.

(b) Orders accepted by Seller are firm and noncancellable. Seller will not accept cancellations or reschedule of orders, other than for default of Seller or upon payment of all Seller's costs incurred for, and reasonably allocated to, the portion of the work already terminated and/or work in process, in accordance with generally accepted accounting principles, and together with gross profit to Seller at the rate included in the prices set forth in the sale contract with Buyer.

(c) If the termination involves custom products, such as but not limited to, ROM based products, cancellation charges for such products shall equal the order price for the total number of units representing work in process. Unless otherwise agreed and confirmed in writing by Seller, items scheduled for shipment are not subject to revision, reschedule or termination within sixty (60) days prior to date quoted by Seller.

(d) Seller reserves the right to cancel the remaining quantity of an item or an order when the value of the remaining quantity is below minimum item or order value accepted by Seller.

(e) Seller reserves the right to cancel all or part of any order accepted if inaccurate or incorrect information is supplied by Buyer which, in Seller's judgment, affects Seller's financial risk or ability to perform its obligations under the order, or otherwise materially changes the rights and or responsibilities of Buyer and/or Seller under the order.

10. CHANGES TO SPECIFICATIONS: Seller reserves the right to change the specifications of any product manufactured by Seller (including all statements and data appearing in Seller's catalogs, data sheets and advertisements) without notice. If specifications are changed, Seller assumes no obligation to provide the change on products previously purchased or to continue to supply discontinued products or versions. Seller may substitute products manufactured to such modified specifications for those specified herein provided such products substantially conform to the products described in the sale contract.

11. INSPECTION & ACCEPTANCE: Within thirty (30) days after delivery to Buyer of products sold by Seller, Buyer will inspect them and give written notice to Seller of any products rejected, describing the product or products rejected and specifying in detail the reason or reasons why the rejected products do not conform to the sale contract. Upon receiving authorization and shipping instructions from authorized personnel of Seller, Buyer may return rejected products, transportation charges prepaid, for replacement. Buyer will be deemed to have irrevocably accepted any and all products with respect to which Buyer has failed to give Seller written notice of rejection by registered or certified mail within the 30-day period. Buyer's inspection and/or acceptance tests shall not exceed the inspection and/or test procedures customary in the industry for the products delivered to Buyer and as shall be at Buyer's expense. Seller may charge to Buyer any costs resulting from the testing, handling, and disposition of any products returned by Buyer which are not found by Seller to be non-conforming.

12. SELLER'S WARRANTY
(a) LIMITED WARRANTY: IT IS EXPRESSLY AGREED THAT NO WARRANTY OF MERCHANTABILITY, WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, NOR ANY OTHER WARRANTY (EXPRESS, IMPLIED OR STATUTORY) IS MADE BY SELLER, EXCEPT THAT SELLER WARRANTS GOODS TO BE FREE FROM DEFECTS IN MATERIALS AND WORKMANSHIP IN NORMAL USE AND SERVICE. THE LIABILITY OF SELLER UNDER THIS WARRANTY IS LIMITED SOLELY TO THE REPAIR, REPLACEMENT OR ISSUANCE OF CREDIT (AT THE SOLE OPTION OF SELLER) FOR SUCH PRODUCTS THAT BECOME DEFECTIVE WITHIN SIX (6) MONTHS AFTER DELIVERY TO BUYER (THE "WARRANTY PERIOD"), PROVIDED THAT SELLER WILL NOT BE LIABLE UNDER THIS WARRANTY UNLESS (1) SELLER IS NOTIFIED IN WRITING OF SUCH DEFECTS BY BUYER PRIOR TO THE EXPIRATION OF THE WARRANTY PERIOD, (2) THE DEFECTIVE ITEMS ARE RETURNED TO SELLER, TRANSPORTATION CHARGES PREPAID BY BUYER AND (3) SELLER'S EXAMINATION OF SUCH ITEMS DISCLOSES TO SELLER'S SATISFACTION THAT SUCH DEFECTS HAVE NOT BEEN CAUSED BY IMPROPER HANDLING, STORAGE, TESTING OR INSTALLATION, MISUSE, NEGLECT, REPAIR, ALTERATION OR ACCIDENT. SELLER WILL CHARGE BUYER WITH ALL EXPENSES INCURRED

1

FOR THE REPAIR OF DEFECTS OR REPLACEMENT OF ITEMS NOT COVERED BY THE WARRANTY. THE REPAIR OR REPLACEMENT BY SELLER OF ANY ITEM SHALL NOT BE DEEMED TO EXTEND THE WARRANTY PERIOD OF ANY ITEM WHICH HAS BEEN REPAIRED OR REPLACED OR TO CREATE ANY NEW WARRANTY PERIOD. NOTWITHSTANDING THE FOREGOING PROVISIONS, THE WARRANTY PERIOD FOR PROCESSED SEMICONDUCTOR CHIPS AND WAFERS IS LIMITED TO THIRTY (30) DAYS FROM DATE OF SHIPMENT. IN NO EVENT SHALL SELLER BE LIABLE FOR LOSS OF PROFITS, LOSS OF USE, INCIDENTAL DAMAGES,CONSEQUENTIAL DAMAGES OR ANY LOSS, COSTS OR DAMAGES OF ANY KIND BASED UPON A CLAIM FOR DEFECTIVE PRODUCTS OR BREACH OF WARRANTY.

(b) DEVELOPMENTAL ITEMS: DEVELOPMENTAL, EXPERIMENTAL, OR PROTOTYPE ITEMS DELIVERED HEREUNDER SHALL BE SUBJECT TO ALL OF THE PROVISIONS OF THE FOREGOING WARRANTY, EXCEPT THAT SUCH ITEMS ARE WARRANTED TO BE FREE FROM DEFECTS IN MATERIALS AND WORKMANSHIP AND TO MEET THE APPLICABLE PRELIMINARY SPECIFICATIONS ONLY AT THE TIME OF RECEIPT BY BUYER AND FOR NO LONGER PERIOD OF TIME.

(c) NONSTANDARD ITEMS: SELLER MAKES NO WARRANTY OR GUARANTEE OF ANY KIND WITH RESPECT TO SALES OR ORDERS FOR NONSTANDARD OR SUB-GRADE ITEMS. ITEMS SOLD UNDER SUCH SALES OR ORDERS ARE FURNISHED "AS IS."

(d) LIFE SUPPORT DEVICES: SELLER'S PRODUCTS ARE NOT AUTHORIZED FOR USE AS CRITICAL COMPONENTS OF LIFE SUPPORT DEVICES OR SYSTEMS. SELLER DISCLAIMS ANY WARRANTY OR RESPONSIBILITY FOR SUCH USAGE, WHICH SHALL BE AT BUYER'S SOLE RISK, EVEN IF SELLER HAS BEEN PREVIOUSLY NOTIFIED OF SUCH USAGE. AS USED HEREIN, "LIFE SUPPORT DEVICES OR SYSTEMS" ARE DEVICES OR SYSTEMS WHICH ARE INTENDED FOR IMPLANT INTO THE BODY TO SUPPORT OR SUSTAIN LIFE, OR TO ASSIST THEREIN, AND WHOSE FAILURE TO PERFORM CAN BE REASONABLY EXPECTED TO RESULT IN SIGNIFICANT INJURY TO THE USER. A "CRITICAL COMPONENT" IS ANY COMPONENT OF A LIFE SUPPORT DEVICE OR SYSTEM WHOSE FAILURE TO PERFORM CAN REASONABLY BE EXPECTED TO CAUSE OR RESULT IN THE FAILURE OF PERFORMANCE OF A LIFE SUPPORT DEVICE OR SYSTEM OR TO ADVERSELY AFFECT ITS SAFETY OR EFFECTIVENESS.

(e) TECHNICAL ADVICE: SELLER'S WARRANTIES AS HEREIN ABOVE SET FORTH SHALL NOT BE ENLARGED, DIMINISHED, OR OTHERWISE AFFECTED BY, NOR SHALL ANY OBLIGATION OR LIABILITY OF SELLER ARISE OUT OF SELLER'S RENDERING OF TECHNICAL ADVICE OR SERVICE IN CONNECTION WITH BUYER'S ORDER OR THE PRODUCTS FURNISHED HEREUNDER.

**13. PATENTS:**
(a) Buyer shall indemnify, defend and hold Seller harmless against any expenses, damages, cost or losses, including attorneys' fees, resulting from any suit or proceeding instituted, or claim asserted (including settlement of any of the foregoing), for infringement of patents, copyrights, trademarks or other intellectual property rights or for unfair competition arising from compliance with Buyer's designs or specifications or instructions or arising from use of products furnished hereunder in any manufacturing or other process, or the combination of such products with items not supplied by Seller.

(b) With respect to products manufactured solely to Seller's designs and specifications and which are not modified by Buyer or used other than in the manner for which they are designed, Seller will defend any suit or proceeding brought against Buyer insofar as it is based upon a claim that any such product furnished to Buyer hereunder, by itself and not in combination with other items not manufactured solely to Seller's designs and specifications, constitutes infringement of any duly issued United States or foreign patent, provided that Seller is notified promptly of such claim in writing and given complete authority, information and assistance (at Seller's expense) for the defense of same, and Seller shall pay all damages and costs not to exceed the aggregate sum paid to Seller by Buyer for the infringing product.

(c) The obligation of Seller under subparagraph (b) is conditioned upon Buyer's agreement that if a product or the operation thereof becomes, or in Seller's opinion is likely to become, the subject of such a suit or proceeding, Buyer will permit Seller, at its sole discretion and at its own expense
either (1) procure for Buyer the right to continue to use such product, (2) replace such product with a noninfringing product, (3) modify such product so it becomes noninfringing, or (4) redeem such product and refund the purchase price and the transportation costs thereof.

(d) The sale of products or any parts thereof hereunder confers upon Buyer no license, express or implied, under any patent rights of Seller.

(e) The forgoing states the sole and exclusive liability of the parties hereto for patent infringement and is in lieu of all warranties or other obligations, express, implied, or statutory, with respect thereto.

**14. LIMITATION OF LIABILITY:** LIABILITY OF SELLER TO BUYER FOR DAMAGES FOR ANY CAUSE WHATSOEVER, AND REGARDLESS OF THE FORM OF ANY ACTION, WHETHER IN CONTRACT OR IN TORT, INCLUDING, BUT NOT LIMITED TO, NEGLIGENCE, SHALL BE LIMITED TO THE GREATER OF $10,000 OR THE PRICE SPECIFIED IN THE SALE CONTRACT FOR THE SPECIFIC PRODUCT OR PRODUCTS

THAT CAUSED THE DAMAGES OR THAT ARE THE SUBJECT MATTER OF, OR ARE DIRECTLY OR INDIRECTLY RELATED TO, THE CAUSE OF ACTION. IN NO EVENT SHALL SELLER BE LIABLE TO BUYER OR OTHERS FOR LOSS OF GOODWILL, LOSS OF PROFITS, LOSS OF USE OR OTHER SPECIAL, COLLATERAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, REGARDLESS OF THE FORM OF ACTION THEREFOR, WHETHER IN CONTRACT OR IN TORT, INCLUDING, BUT NOT LIMITED TO, NEGLIGENCE, EVEN IF SELLER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, OR, EXCEPT AS PROVIDED FOR ANY CLAIM AGAINST BUYER BY ANY THIRD PARTY. BUYER ASSUMES ALL LIABILITY FOR ANY AND ALL DAMAGES ARISING FROM OR IN CONNECTION WITH, THE USE OR MISUSE OF THE PRODUCTS BY BUYER, ITS EMPLOYEES, OR OTHERS.

15. FORCE MAJEURE: Seller will not be responsible or liable for any delay or failure in performance arising as a result of fire, accident, Acts of God, acts of the public enemy, war, labor disputes, failure of or delays in transportation, inability to secure product, raw materials or machinery for the manufacturing process, requirements or acts of any government or agency thereof, judicial action or other causes beyond Seller's control. In such event, Seller may defer performance for a period equal to the time lost by reason of the delay. If such time exceeds thirty (30) days, Seller may by written notice to Buyer cancel the affected order(s) as to any products then undelivered, without liability to Buyer.

16. CONFIDENTIAL INFORMATION: All drawings, diagrams, specifications, software, firmware, technical information, and
other material and information furnished by Seller and identified as confidential (hereinafter collectively called "Confidential Information") are proprietary to Seller and contain trade secrets. Buyer shall not use, reproduce, distribute or disclose such Confidential Information, except that Confidential Information may be disclosed, with appropriate safeguards against redissemination, to employees of Buyer with respect to who such information is necessary in the performance of their duties hereunder. Buyer recognizes that such proprietary information is unique and consents to the remedy of injunction in addition to damages for a violation of this provision.

17. PROPERTY USED: Unless otherwise agreed in writing, all tooling, dies, equipment, drawings, tapes fixtures and documentation, whether supplied by Seller or Buyer, used by Seller in furnishing items hereunder shall be and remain the property of Seller. Seller shall not be liable for any loss or damage to property of Buyer in Seller's possession unless caused solely by Seller's gross negligence.

18. ASSIGNMENT: Buyer shall not assign or subcontract its order or any interest therein or any right thereunder without the prior written consent of Seller.

19. GOVERNING LAWS: This contract will be governed by and construed in accordance with the laws of the State of Texas, and, in the case of an international sale of goods with respect to which the Convention on Contracts for the International Sale of Goods ("CISG") or any other law would otherwise apply, the Uniform Commercial Code as adopted in the State of Texas, and not CISG or any such other law, shall apply. Buyer agrees that it will submit to the personal jurisdiction of the competent courts of the State of Texas and of the United States sitting in Dallas County, Texas, in any controversy or claim arising out of the sale contract, and that service of process mailed to it at the address appearing on the reverse side hereof by registered mail, return receipt requested, shall be effective service of process in any such court.

20. EXPORT CONTROL:
(a) With respect to the resale, export or any other disposition of products or technical information furnished hereunder, Buyer will comply fully with all export control laws and regulations of the United States Government and with any applicable laws and regulations of any other country.

(b) Buyer agrees not to export or re-export, either directly or indirectly, any technical data furnished hereunder or the direct product of such technical data to any country which, as set forth in the Export Administration Regulations of the United States Department of Commerce, is prohibited.

21. U.S. GOVERNMENT CONTRACTS: If this sale contract is entered into in connection with or under a U.S. Government contract or subcontract, the subcontract clauses mandatorily required by applicable U.S. Government procurement regulations to be included in subcontracts of the same type, amount and tier as this sale contract shall be incorporated herein by reference, unless Seller takes exception thereto or receives a waiver therefrom. Unless Seller specifically agrees otherwise in writing, Seller takes exception to any and all requirements for certification in writing of cost and pricing data, and compliance with Cost Accounting Standards.

22. SEVERABILITY OF PROVISIONS: In the event any one or more of the provisions contained herein shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and this contract will be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

23. COMPLETE AGREEMENT: This quotation, confirmation (acknowledgement) or invoice including these terms and conditions and all attachments and documents incorporated by reference herein, constitute the complete and exclusive statement of the terms and conditions of the sale contract between Seller and Buyer and supersede all prior or contemporaneous agreements, representations and or communications, either oral or written, between the parties hereto or any representative of such parties with respect to the subject matter hereof. No change to this contract or waiver of any provision hereof will be binding on Seller unless made in writing and signed by a duly authorized officer of Seller. No field representative of Seller has authority to sign such a writing.

G:TermsandConditions                                2

# EXHIBIT C



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

FILED CLERK
U.S. DISTRICT COURT

2006 AUG 30  PM 4: 36

TEXAS EASTERN

BY_____

| | | |
|---|---|---|
| CIF Licensing, LLC, d/b/a<br>GE Licensing, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | Case No. 2:06 CV 345 |
| v. | § | |
| | § | JURY TRIAL DEMANDED |
| DENSO CORPORATION,<br>Remy International, Inc., and<br>Valeo, Inc. | § | |
| | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff CIF Licensing, LLC, d/b/a GE Licensing ("GE Licensing"), brings this action

against Defendants DENSO CORPORATION ("DENSO"), Remy International, Inc. ("Remy"),

and Valeo, Inc. ("Valeo"), alleging as follows:

### The Parties

1.      Plaintiff GE Licensing is a limited liability company organized and existing

under the laws of the State of Delaware, with its principal place of business in Princeton, New

Jersey 08540. GE Licensing is the owner of all right, title, and interest in and to United States

Patent No. 4,733,159 (the "Patent") by assignment, with the right to recover damages for all past

infringement of the Patent. The Patent was duly and legally issued on March 22, 1988 by the

United States Patent and Trademark Office. The invention of the Patent concerns a voltage

regulator system for automobile alternators, including a unique high frequency charge pump. A

copy of the Patent is attached hereto as Exhibit A.

2.      Upon information and belief, Defendant DENSO is a Japanese corporation with

its principal place of business and home office at 1-1 Showa-cho, Kariya Aichi 448-8661, Japan.

Although DENSO does business in Texas by, among other things, committing acts that constitute the tort of infringement of the Patent (*see,* TEX. CIV. PRAC. & REM. CODE § 17.042), upon information and belief, DENSO does not maintain a regular place of business in Texas, has not registered to do business in Texas, and does not maintain a designated agent for service of process in Texas. Therefore, DENSO may be served with process by serving the Texas Secretary of State, who is deemed to be DENSO's agent for service of process. TEX. CIV. PRAC. & REM. CODE § 17.044.

3.     Upon information and belief, Defendant Remy is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business and home office located at 2902 Enterprise Drive, Anderson, Indiana 46013. Although Remy does business in Texas by, among other things, committing acts that constitute the tort of infringement of the Patent (*see,* TEX. CIV. PRAC. & REM. CODE § 17.042), upon information and belief, Remy does not maintain a regular place of business in Texas, has not registered to do business in Texas, and does not maintain a designated agent for service of process in Texas. Therefore, Remy may be served with process by serving the Texas Secretary of State, who is deemed to be Remy's agent for service of process. TEX. CIV. PRAC. & REM. CODE § 17.044.

4.     Upon information and belief, Defendant Valeo is a corporation organized and existing under the laws of the State of New York, with its principal place of business and home office located at 3000 University Drive, Auburn Hills, Michigan 48326. Upon information and belief, Valeo maintains branch offices in El Paso, TX, Fort Worth, TX, and Pharr, TX. Valeo also does business in Texas by, among other things, committing acts that constitute the tort of infringement of the Patent and recruiting Texas residents for employment (*see,* TEX. CIV. PRAC. & REM. CODE § 17.042). Valeo has not registered to do business in Texas, and does not maintain

2

a designated agent for service of process in Texas. Therefore, Valeo may be served with process by serving the person in charge of its business in Texas. TEX. CIV. PRAC. & REM. CODE § 17.043.

### Jurisdiction and Venue

5.      This action for infringement arises under the patent laws of the United States, Title 35, United States Code, including § 271. This Court has exclusive jurisdiction under Title 28, United States Code, particularly § 1338(a).

6.      Defendant DENSO has committed the tort of patent infringement in the Eastern District. Defendant DENSO has sold and shipped into the Eastern District products that infringe on Plaintiff GE Licensing's Patent or has sold such products under circumstances in which it was reasonably foreseeable that the products would be shipped into the Eastern District. Accordingly, Defendant DENSO resides in the Eastern District as the term "reside" is defined in 28 U.S.C. § 1391(c), and, therefore, venue in the Eastern District is proper under 28 U.S.C. §§ 1391(b) and 1400(b).

7.      Defendant DENSO is subject to personal jurisdiction in Texas and this District.

8.      Defendant Remy has committed the tort of patent infringement in the Eastern District. Defendant Remy has sold and shipped into the Eastern District products that infringe on Plaintiff GE Licensing's Patent or has sold such products under circumstances in which it was reasonably foreseeable that the products would be shipped into the Eastern District. Accordingly, Defendant Remy resides in the Eastern District as the term "reside" is defined in 28 U.S.C. § 1391(c), and, therefore, venue in the Eastern District is proper under 28 U.S.C. §§ 1391(b) and 1400(b).

9.      Defendant Remy is subject to personal jurisdiction in Texas and this District.

10.      Defendant Valeo has committed the tort of patent infringement in the Eastern District. Defendant Valeo has sold and shipped into the Eastern District products that infringe on Plaintiff GE Licensing's Patent or has sold such products under circumstances in which it

was reasonably foreseeable that the products would be shipped into the Eastern District. Accordingly, Defendant Valeo resides in the Eastern District as the term "reside" is defined in 28 U.S.C. § 1391(c), and, therefore, venue in the Eastern District is proper under 28 U.S.C. §§ 1391(b) and (c), and 1400(b).

     11.    Defendant Valeo is subject to personal jurisdiction in Texas and this District.

**COUNT I**
(Patent Infringement – DENSO)

**Defendant DENSO's Activities**

     1-11.    Plaintiff hereby repeats and incorporates by reference ¶1-11 as ¶1-11 of this Count I.

     12.    Defendant DENSO operates as a manufacturer and wholesaler of automotive motor vehicle supplies and parts, including alternators containing voltage regulator units. Defendant DENSO sells such supplies and parts to entities engaged in the automobile industry in North America.

     13.    On information and belief, the above-mentioned activities by Defendant DENSO have amounted to infringement, directly, by inducement, and/or by contributing to the infringement, of the Patent.

     14.    Plaintiff GE Licensing is the owner of all right, title and interest in and to the Patent with the right to recover damages for all past infringement of the Patent.

     15.    On information and belief, DENSO is infringing the Patent willfully and with knowledge. On information and belief, DENSO will continue infringing the Patent unless enjoined by this Court.

     16.    As a result of DENSO's infringing conduct, GE Licensing has been damaged and will continue to suffer irreparable harm without the issuance of an injunction by this Court.

4

17.    DENSO's willful infringement of the Patent and other conduct make this an exceptional case under 35 U.S.C. § 285.

## COUNT II
(Patent Infringement – Remy)

### Defendant Remy's Activities

1-17.    Plaintiff hereby repeats and incorporates by reference ¶1-17 of Count I as ¶1-17 of this Count II.

18.    Defendant Remy operates as a manufacturer and re-manufacturer of original equipment and aftermarket electrical components for automobiles, light trucks, medium and heavy duty trucks and other heavy duty vehicles, including alternators containing voltage regulator units. Defendant Remy sells such components to original equipment manufacturers and dealers, automotive retail chains and warehouse distributors in North America, Europe, Latin America, and Asia-Pacific.

19.    On information and belief, the above-mentioned activities by Defendant Remy have amounted to infringement, directly, by inducement, and/or by contributing to the infringement, of the Patent.

20.    On information and belief, Remy is infringing the Patent willfully and with knowledge. On information and belief, Remy will continue infringing the Patent unless enjoined by this Court.

21.    As a result of Remy's infringing conduct, GE Licensing has been damaged and will continue to suffer irreparable harm without the issuance of an injunction by this Court.

22.    Remy's willful infringement of the Patent and other conduct make this an exceptional case under 35 U.S.C. § 285.

## COUNT III

(Patent Infringement – Valeo)

### Defendant Valeo's Activities

1-22.    Plaintiff hereby repeats and incorporates by reference ¶1-22 of Count II as ¶1-22 of this Count III.

23.    Defendant Valeo operates as a manufacturer of automotive motor vehicle parts, including alternators containing voltage regulator units. Valeo sells such parts to entities engaged in the automobile industry, consisting of various divisions of vehicle manufacturers in North America and Europe.

24.    On information and belief, the above-mentioned activities by Defendant Valeo have amounted to infringement, directly, by inducement, and/or by contributing to the infringement, of the Patent.

25.    On information and belief, Valeo is infringing the Patent willfully and with knowledge. On information and belief, Valeo will continue infringing the Patent unless enjoined by this Court.

26.    As a result of Valeo's infringing conduct, GE Licensing has been damaged and will continue to suffer irreparable harm without the issuance of an injunction by this Court.

27.    Valeo's willful infringement of the Patent and other conduct make this an exceptional case under 35 U.S.C. § 285.

### Requested Relief

WHEREFORE, Plaintiff GE Licensing prays that this Court enter judgment.

a.  Finding that Defendants DENSO, Remy, and Valeo have infringed, induced others to infringe and/or committed acts of contributing infringement of the Patent under 35 U.S.C. § 271.

6

b. Enjoining Defendants DENSO, Remy, and Valeo and their subsidiaries, agents, officers and employees, and all others acting in concert with them, from infringing, inducing infringement, and contributing to the infringement of the Patent.

c. Ordering Defendants DENSO, Remy, and Valeo to award GE Licensing an amount that adequately compensates GE Licensing for Defendants' infringement, including lost profits (and/or a reasonably royalty), treble damages, court costs, pre-judgment interest, post-judgment interest and attorney's fees under 35 U.S.C. §§ 284 and 285.

d. Granting GE Licensing such other and further relief as is just.

**Demand for Jury Trial**

Plaintiff GE Licensing hereby demands a jury trial on all claims and issues triable of

right by a jury.

Dated August 30, 2006                          Respectfully submitted,

                                               BY: _____
                                               (signed by permission by Otis Carroll)
                                               Bradford P. Lyerla. **Lead Attorney**
                                               Marshall, Gerstein & Borun LLP
                                               6300 Sears Tower
                                               233 South Wacker Drive
                                               Chicago, IL 60606-6357
                                               Tel: (312) 474-6300
                                               Fax: (312) 474-0448
                                               E-mail: blyerla@marshallip.com

OF COUNSEL:

Anthony G. Sitko
Marshall, Gerstein & Borun LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6357
Tel: (312) 474-6300
Fax: (312) 474-0448
E-Mail: asitko@marshallip.com

Jeffrey H. Dean
Marshall, Gerstein & Borun LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6357
Tel: (312) 474-6300
Fax: (312) 474-0448
E-Mail: jdean@marshallip.com

Anthony S. Hind
Marshall, Gerstein & Borun LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6357
Tel: (312) 474-6300
Fax: (312) 474-0448
E-Mail: ahind@marshallip.com

Otis W. Carroll
Texas Bar No. 03895700
IRELAND, CARROLL & KELLEY, P.C.
6101 South Broadway, Suite 500
Tyler, Texas 75703
Tel: (903) 561-1600
Fax: (903) 581-1070
E-Mail: Fedserv@icklaw.com

                                 Attorneys for Plaintiff CIF Licensing, LLC
                                 d/b/a GE Licensing

# United States Patent [19]

## Edwards et al.

[11]  Patent Number: 4,733,159

[45]  Date of Patent: Mar. 22, 1988

[54]  CHARGE PUMP VOLTAGE REGULATOR

[75]  Inventors:  Arthur J. Edwards, Hoffman Estates, Ill.; Mihaly Lamoth, Coppet, Switzerland

[73]  Assignee:  Motorola, Inc., Schaumburg, Ill.

[21]  Appl. No.: 924,100

[22]  Filed:  Oct. 28, 1986

[51]  Int. Cl.⁴ ........................................ G05F 1/56
[52]  U.S. Cl. ............................... 323/282; 322/28
[58]  Field of Search ........... 323/282, 284; 318/139; 322/28

[56]  References Cited

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,343,060 | 9/1967 | Ingraham | 323/282 X |
| 3,447,065 | 5/1969 | Kuhn | 322/28 X |
| 4,210,856 | 7/1980 | Taylor | 320/17 |
| 4,346,337 | 8/1982 | Watrous | 322/25 |
| 4,386,310 | 5/1983 | Sievers | 322/28 |
| 4,388,586 | 6/1983 | Lamoth | 323/283 |
| 4,388,587 | 6/1983 | Lamoth et al. | 323/283 |
| 4,580,090 | 4/1986 | Bailey et al. | 323/282 X |
| 4,636,711 | 1/1987 | Freymuth | 318/139 X |

### OTHER PUBLICATIONS

Motorola Data Sheets XPC1500 for the 16 Ampere Logic-to-Power Switch.
Motorola Data Sheet MPC1500, Logic-to-Power Switch Block Diagram.

*Primary Examiner*—Patrick R. Salce

*Assistant Examiner*—Marc S. Hoff
*Attorney, Agent, or Firm*—Phillip H. Melamed

[57]  ABSTRACT

A voltage regulator (11) provides a pulse width modulated voltage regulator output (40) to a drive circuit (37) to provide field coil excitation for a voltage generator (15–17) providing a charging signal for a battery (14). The voltage regulator output determines on/off states of an FET power switching device (28) coupled in series with a field coil (17) across a battery voltage potential $V_{BAT}$ corresponding to battery voltage. The drive circuit includes a charge pump (26, 35, 36) with a low capacitance capacitor (26) coupled and decoupled across a source of voltage potential at a rate determined by a high frequency signal (41), provided by the regulator, having a frequency substantially in excess of the frequency of the voltage regulator output. The drive circuit includes a pair of switches (21, 35) which alternately couple one terminal of the capacitor to either battery voltage or ground potential in accordance with the voltage regulator output. The above configuration provides a control voltage (44) at the gate of the FET substantially in excess of battery voltage and this insures maximum field current when the FET is on. This is achieved with a minimum capacitance for the capacitor, thus reducing circuit size and cost. Battery current drain of the drive circuit is minimized by disconnecting the one terminal of the capacitor from battery voltage when the FET is off.

18 Claims, 2 Drawing Figures



EXHIBIT

A

U.S. Patent      Mar. 22, 1988      Sheet 1 of 2      4,733,159



*FIG. 1*



FIG.2

4,733,159

1

## CHARGE PUMP VOLTAGE REGULATOR

### BACKGROUND OF THE INVENTION

The present invention generally relates to the field of voltage regulators, and in particular to voltage regulator systems utilized to control the charging of a battery, such as the battery in a vehicle.

In prior voltage regulator systems for vehicles it is known to provide a voltage regulator which senses battery voltage and provides a pulse width modulated output signal that varies in duty cycle in accordance with the difference between sensed battery voltage and a reference signal. This output signal is used to control a power switching device connected in series with a field coil across the battery voltage potential. The field coil controls excitation of stator windings of a voltage generating system which, after rectification of the output of the stator windings, provides a charging signal for the battery. Such voltage regulator systems, as described above, are conventional and well understood.

In some of the above-noted voltage regulator systems, it is necessary to provide a relatively large voltage, larger than battery voltage, at a control terminal of the power switching device so as to insure that maximum field current is provided when the switching device is on. In some cases an FET (field effect transistor) is utilized as the power switching device, with the drain electrode connected to battery voltage and the source terminal is connected through the field coil to ground potential. In such a configuration, to provide a gate voltage in excess of battery voltage when it is desired to have the FET on, a prior voltage regulator system has utilized a voltage doubler circuit. In the prior voltage doubler circuit, a voltage of approximately twice battery voltage is selectively provided at the gate terminal to insure that approximately the entire battery voltage potential is applied across the field coil when the FET is on.

The voltage doubler circuit of the prior voltage regulator relies on utilizing the pulse width modulated output signal of the voltage regulator to selectively couple and decouple a large magnitude capacitor across the battery voltage potential via a switch device. The end result is that essentially a voltage doubler is provided by the capacitor and the selective switching of the capacitor across the battery voltage potential. However, in such a configuration, a very large capacitance for the capacitor is utilized to insure that at high duty cycle percentages of the voltage regulator output signal, the voltage across the capacitor does not substantially decrease during the long on-duty cycle and thereby decrease the magnitude of the voltage at the gate electrode of the FET. When the prior voltage regulator produced an output signal which essentially resulted in the FET being on all of the time since field coil current was required all of the time, additional complex logic circuitry was required to provide some alternate coupling and decoupling of the capacitor across the battery voltage, and this increased the circuit cost. Without this additional logic circuitry, the twice battery voltage to be maintained at one terminal of the large capacitance capacitor would decrease due to leakage effects and the loading of the turned-on FET device. This is undesirable as it would result in reducing field coil current when the voltage regulator has indicated that maximum field coil current should be provided. Also, the required large magnitude capacitor is expensive, and it cannot be

2

implemented as part of an integrated circuit so as to reduce circuit cost.

### SUMMARY OF THE INVENTION

An object of the present invention is to provide an improved voltage regulator which overcomes the aforementioned deficiencies.

A more particular object of the present invention is to provide a voltage regulator which does not require a large magnitude capacitor but which still provides a switching control voltage substantially in excess of battery voltage at the gate of an FET device connected in series with the field coil that controls the output of a voltage generator which implements battery charging.

In one embodiment of the present invention, an improved voltage regulator is provided. The voltage regulator comprises: regulator means for receiving a sensed voltage signal and for providing, in response to the effective comparison of said sensed voltage signal with a reference signal, a regulator output signal, comprising pulses, having a predetermined frequency and a predetermined signal characteristic determined in accordance with said comparison; drive circuit means coupled to said regulator means and comprising a power switching device having a control terminal effectively coupled to said regulator output signal and having at least two output terminals, said output terminals coupled in series with a control element of a voltage control means, which determines said sensed voltage signal, across a maximum power source voltage potential, said drive circuit means controlling said sensed voltage, via said control means, in accordance with said characteristic of said regulator output signal to maintain said sensed voltage signal at a predetermined voltage level determined by said reference signal, said drive circuit means including a peak voltage increasing means for receiving said regulator output signal and effectively providing in response thereto a corresponding increased magnitude voltage signal generally varying as said regulator output signal but varying up to a peak voltage potential in excess of said maximum power source voltage potential, wherein the improvement comprises said peak voltage increasing means comprising a capacitor selectively series coupled and decoupled across a predetermined power source voltage potential in accordance with pulses of a high frequency signal having a pulse frequency substantially in excess of the frequency of said regulator output signal, said peak voltage increasing means, therefore, comprising a high frequency charge pump which provides said increased voltage signal, said increased voltage signal having the same general waveform as said regulator output signal but increased in voltage magnitude to achieve a peak voltage potential in excess of said maximum power source voltage potential, the charge pump providing said increased voltage signal as an output which is coupled to said control terminal of said power switching device.

Essentially, the above-recited configuration results in utilization of a relatively small magnitude capacitor while still providing a switching voltage at the control terminal of the power switching device that is substantially in excess of maximum power source voltage potential, which preferably corresponds to battery voltage in the vehicle charging system. Preferably, the power switching device comprises an N channel field effect transistor (FET) in which the gate electrode is the control terminal the drain electrode is connected to

4,733,159

**3**

positive battery voltage and the source electrode is connected through a field coil to ground potential. Preferably, the voltage regulator means output signal comprises a pulse width modulated switching signal which selectively couples one terminal of the capacitor, at which said increased voltage signal is provided, to ground during one polarity of the duty cycle of the regulator output signal and during another polarity of the regulator output signal couples this terminal to battery voltage.

Preferably the high frequency switching signal is at least two orders of magnitude higher than the frequency of the regulator output signal, and this results in requiring only a very small capacitance for the selectively series coupled capacitor thus reducing component cost and size. This also permits synthesizing the capacitor as part of an integrated circuit which includes other regulator components. In addition, the present invention contemplates utilizing the pulse width modulated output signal of the regulator and a switch device to alternately couple and decouple the capacitive terminal at which the increased voltage is produced to battery voltage, and this minimizes battery current drain during duty cycle portions of the regulator output signal during which no field current is desired. Also, this insures no substantial battery current drain when the voltage regulator is off and a low voltage regulator output signal is provided.

## BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the invention, reference should be made to the drawings, in which:

FIG. 1 is a schematic diagram of a voltage regulator system constructed in accordance with the present invention; and

FIG. 2 comprises a series of graphs A through F illustrating waveforms of signals provided at the terminals A through F in FIG. 1.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to FIG. 1, a voltage regulator system 10 is illustrated in which a substantially conventional pulse width modulated voltage regulator 11 has a voltage sensing input terminal 12 also designated to a positive battery voltage terminal 13 also designated as $V_{BAT}$. The terminal 13 corresponds to the positive electrode of a vehicle battery 14 which has its negative electrode connected to ground potential. Charging of the battery 14 is accomplished by means of a plurality of stator output windings 15 which provide an output that is rectified by a rectifier circuit 16. The output of the stator windings 15 is controlled, as is conventionally understood, by the current excitation applied to the field coil 17 having a flyback transient suppression diode 18 connected thereacross.

Essentially, the voltage across the battery is sensed by the voltage regulator 11 via the signal at the terminal 12. The voltage regulator compares this voltage to an internal or external reference voltage signal provided at a terminal 19, and in response to this comparison produces a pulse width modulated regulator output signal at an output terminal 20. The duty cycle of this pulse width modulated output signal at the terminal 20 can vary from approximately 0% to 100% and is essentially determined in accordance with the difference between the sensed battery voltage and the reference signal at the terminal 19. This is accomplished in a conventional manner as is understood to those in the voltage regula-

**4**

tor art field, and can be implemented by a number of different circuit configurations for the voltage regulator 11. The constant frequency regulator disclosed in U.S. Pat. No. 4,386,310 to Sievers, assigned to the same assignee as the present invention, can be used for the above described voltage regulator 11. Also see U.S. Pat. Nos. 4,388,586 and 4,388,587. Essentially, the voltage regulator system 10, as is understood, responds to the pulse width modulated switching output signal at the terminal 20 so as to provide field coil current such that the battery voltage at the terminal 13 is maintained at a predetermined voltage with respect to the voltage magnitude of the reference signal at the terminal 19. This operation is conventional.

Essentially, the present invention involves providing a drive circuit means so as to couple the pulse width modulated regulator output signal at the terminal 20 to the field coil 17 so as to control field coil current excitation. This is accomplished in an advantageous manner by a relatively simple and economical drive circuit utilizing inexpensive components. The construction and operation of the drive circuit means is as follows.

The battery voltage terminal 13 is connected through a resistor 13A to the emitter of a PNP first switch device transistor 21 which has its collector coupled through a diode 22 to a terminal 23 also designated as terminal D. The emitter of transistor 21 is coupled to ground through an effective 20 volt Zener diode 13B and coupled through a resistor 24 to a terminal 25 also designated as terminal C. A relatively small magnitude capacitor 26 is connected between the terminals C and D wherein the capacitor 26 has a typical capacitance magnitude of 50 picofarads.

The terminal D is connected through a diode 27 to a gate electrode G of an N channel FET transistor 28 wherein the gate electrode is also designated by the terminal E. A drain electrode D of the FET is directly connected to the battery voltage terminal 13, and a source electrode S of the FET corresponds to a terminal F. A Zener diode 29 is connected between the terminals E and F to insure that no excessive voltage can be applied between the gate and source electrodes which would cause destruction of the FET. In FIG. 1, the effective internal input capacitance of the FET is illustrated as an inherent capacitor 30 connected between the gate and source electrodes and having a typical magnitude of 1000 picofarads. The FET 28 is utilized as a power switching device that controls current in the field coil 17.

The source electrode of the FET is connected through a current sensing resistor 31 to a terminal 32 at which one end of the field coil 17 is connected and a cathode of the flyback diode 18 is connected. Another end of the field coil 17 and the anode of the diode 18 are connected to ground potential. The amount of field coil current being drawn can be measured by noting the voltage drop across the resistor 31, if desired. With this configuration the output electrodes (drain and source) of the FET are connected in series with field coil 17 between a maximum power source potential corresponding to the battery voltage.

The pulse width modulated regulator output signal at the terminal 20 is connected to a terminal 33 also designated as terminal A. This terminal is connected through a level shifter or isolation device 34 to the base electrode of the first switch device transistor 21. The terminal 33 is also connected directly to the base electrode of an NPN transistor 35 which comprises a third switch

4,733,159

5

device transistor having its emitter connected to ground and its collector connected to the terminal E. An effective 40 volt Zener diode 35A is connected between the collector and base electrodes of the transistor 35. A second switch device transistor 36 comprising an NPN transistor has its collector connected to the terminal C, its emitter connected to ground potential and its base electrode connected to a terminal B which is contemplated as being an additional output terminal of the voltage regulator 11 at which a very high frequency switching signal is provided. It is contemplated that the high frequency switching signal at the terminal B is a constant frequency signal having a frequency of 200 to 300 kilohertz, as contrasted with the frequency of the pulse width modulated regulator output signal at the terminal 20 which has an output frequency of 50 to 70 hertz.

The operation of the voltage regulator system 10 in FIG. 1 will now be discussed with reference to the signal waveforms shown in the graphs A through F in FIG. 2. It should be noted that the signal waveforms illustrated in FIG. 2 in graphs A through F correspond to the voltage waveforms of electrical signals present at the terminals A through F, respectively, in FIG. 1. In the graphs in FIG. 2, the vertical axes are representative of signal magnitude, and the horizontal axes are representative of time. It should also be noted that the time scale utilized to illustrate the very high frequency signal at the terminal B, and its affect on other signals, is not drawn to scale with regard to the much slower varying signal of the pulse width modulated regulator output signal at the terminal 20 corresponding to the signal at terminal A. However, this has been done to enhance the clarity of the Figures as is readily understood.

As shown in FIG. 2, the voltage regulator 11 provides a pulse width modulated signal 40 at the terminal A wherein the duty cycle of this signal is variable and is determined in accordance with the difference between the sensed battery voltage at the terminal 12 and the reference signal voltage at the terminal 19. During a high, or positive, polarity 41A of the duty cycle portion of the signal 40, no field current will be drawn, but during the low, or negative, polarity 41B of the duty cycle of the signal 40, field current will be provided so as to charge the battery 14. The signal 40 illustrates that at a reference time $t_0$, there is a high to low transition indicating the commencement of a low state for the signal 40 during which field current will flow. The frequency of the signal 40 is typically between 50 to 70 hertz, and the duty cycle can vary between extreme percentages such as 0 to 100% depending upon how much field current the voltage regulator 11 determines is necessary.

In generating the pulse width modulated signal 40 at the terminal 20, it is contemplated that the voltage regulator may internally use a very high frequency oscillator. Alternatively, a separate high frequency reference oscillator may be provided within the voltage regulator 11 even though this signal may not be utilized to generate the pulse width modulated regulator output signal 20. In either event, the voltage regulator 11 provides at the terminal B a very high frequency signal comprising a series of pulses wherein the frequency is 200 to 300 kilohertz. This is generally shown in graph B in FIG. 2, even though the time scale for graph B does not correspond to the same time scale utilized for graph A.

6

Essentially, in response to the high and low outputs provided at the terminal 20 by the voltage regulator 11, the first and third switch transistor devices 21 and 35, will be alternately opened and closed. More specifically, in response to a high signal level at the terminal A, transistor 35 will be turned on, therefore grounding the gate electrode of the FET and limiting the voltage at the terminal D to only one diode drop above ground potential. At the same time, this high signal level at the terminal A, via the level shifter 34, will result in effectively turning off the first switch device 21 and thereby decouple the battery voltage terminal 13 from the capacitor terminal D via the transistor 21 and diode 22.

During the time that a high or positive logic level is present at the terminal A, and even when a low logic level is present at the terminal A, a high frequency signal 41 is continuously provided at the terminal B as illustrated in graph B in FIG. 2. The signal 41 is not necessarily continuously during the duty cycle polarity 41A of signal 40. This high frequency signal continually results in turning the transistor 36 on and off and, therefore, alternately connecting the terminal C to ground potential and then opening this connection. When a positive signal level is provided at a terminal A, the opening and closing of the transistor switch 36 results in providing a corresponding ramp signal 42 at terminal C as illustrated in graph C in FIG. 2. During the time that the transistor 36 is on, terminal C is connected to ground potential, but when transistor 36 is off, the potential at terminal C rises due to a charging current provided from the battery voltage terminal 13 through the resistor 24. Typically, the peak of this ramp signal during a positive logic state at the terminal A will be approximately 2.5 volts less than the battery voltage at the terminal 13, which is typically 14 volts. Thus, approximately 11.5 volts is the magnitude of the voltage peaks of the signal 42 for a positive logic state at the terminal A which corresponds to no field current being conducted. During this same time, a relatively small magnitude square wave signal of the same frequency as the high frequency signal 41 is at the terminal D wherein the signal at the terminal D is generally designated by the reference numeral 43 in graph D. The peak magnitude of the signal 43 when a positive logic state is at the terminal A is approximately $+1$ volt since at that time the transistor 35 is on and the peaks of signal at the terminal D are limited by the clipping action provided by the diode 27. Typically, a slight negative voltage is provided at the terminal D when a positive logic state is present at terminal A and the transistor 36 is turned off.

Since a positive logic state at the terminal A turns the transistor 35 on, this means that at this time the gate electrode of the FET is at ground potential, and, therefore, the FET is turned off. While the FET is turned off, field current will not flow in the field coil 17 by virtue of power (current) supplied by the battery 14. A signal 44 in graph E in FIG. 2 illustrates the voltage waveform for the signal at the gate electrode of the FET, and a signal 45 in graph F in FIG. 2 illustrates the voltage waveform at the source electrode of the FET. The signals at the terminals F and 32 are identical, except for a minor voltage shift in case field current is flowing due to the drop across the resistor 31. Thus a graph of the signal at terminal 32 is not provided.

Essentially, prior to the time $t_0$ shown in FIG. 2, there is no field coil current because the FET 28 is turned off. At the time $t_0$, the transistor 35 which was previously on, is now turned off, thus removing the clamping ac-

4,733,159

7

tion provided at the gate electrode of the FET by virtue of the transistor 35 and diode 27. At the same time, since a low or negative logic state is now provided at the terminal A, the transistor 21 is turned on via level shifter 34 resulting in applying approximately battery voltage at the terminal D by virtue of the transistor 21 and diode 22. This is illustrated in the graphs in FIG. 2 by the abrupt rising transient present at the time $t_0$ in the signals 43, 44 and 45. Immediately after $t_0$ the signal 43 has a magnitude of $V_{BAT}$—1 diode drop, signal 44 has a magnitude of $V_{BAT}$—2 diode drops, and signal 45 has a magnitude of approximately 7 volts representing the difference between the signal 44 at the terminal E and the gate-to-source turn-on threshold developed across the FET 28.

After the time $t_0$, the transistor 36 continues to be switched on and off at a very rapid rate in accordance with the pulses of the high frequency signal 41. This results in only a slight change in the peak magnitudes of the signal 42 at the terminal C, and this slight increase in magnitude is due to the fact that the clamping action of the diode 27 to ground potential through the transistor 35 has now been removed. However, the significance of continuing the high frequency switching after the time $t_0$ is more evident in the signals 43 through 45. For signal 43, it is noted that what essentially happens is that the ramp signal provided at the terminal C is now effectively transferred to the terminal D and superimposed upon a DC level of approximately the battery voltage $V_{BAT}$ at the terminal 13 minus the series drop across the transistor 21 and diode 22. This essentially results in the signal 43 reaching peak magnitudes of approximately twice the battery voltage since the AC variation of the signal 42 is now effectively superimposed on a DC level of approximately battery voltage.

In response to the signal 43, the diode 27, and the effective input capacitance 30 of the FET effectively provide a peak rectification circuit such that the signal 44 essentially follows the envelope of the signal peaks of the signal 43 less the voltage drop across diode 27. This is illustrated in graph E in FIG. 2. The signal 45 at the source electrode essentially tracks the gate voltage and, therefore, also increases, but the maximum value of the signal 45 is achieved at battery voltage since this signal cannot exceed the drain voltage wherein the drain electrode is directly connected to the relatively constant voltage $V_{BAT}$ at the battery voltage terminal 13. However, as seen in graph F in FIG. 2, the signal 45 does increase from a voltage somewhat below battery voltage to approximately battery voltage during the time that field current is flowing. This means that maximum possible field current is provided during the time that a low logic level is provided for the signal 40 since the source voltage of the FET will now reach approximately battery voltage due to the effective saturation of the FET device 28. This is possible in the present invention since the gate voltage is maintained in excess of the battery voltage $V_{BAT}$ present at the drain electrode and this situation is required in order to maintain the FET in an on condition with the source at $V_{BAT}$. At a subsequent time $t_o$, the signal 40 undergoes a logic state inversion resulting in the turning off of field current, and this is maintained until a subsequent time $t_1$ at which time the turn-on cycle is reinstituted.

Essentially, the present invention is concerned with providing a voltage as high as possible at the terminal F such that maximum field coil current can be drawn when the voltage regulator 11 indicates that field cur-

8

rent should be provided. This is accomplished by the present circuit providing approximately battery voltage $V_{BAT}$ at the source electrode of the FET. In order to accomplish this, a much higher than $V_{BAT}$ voltage must be provided at the gate of the N channel FET to insure that the FET turns on and remains on since there is a minimum gate-to-source threshold which must be exceeded in order for the FET to be on. The present invention is concerned with how this larger than battery voltage control signal at the gate of the FET can be produced efficiently and with minimum expense. It should be noted that the reason that the field coil 17 is not provided in the drain circuit of the FET, is that many voltage regulator systems do not wish to subject the field coil to constant positive voltage potential even when no field current is to be drawn. Thus, in the present circuit, the field coil is in the source circuit of the N channel FET, and the FET essentially acts as a source follower. Also, an N channel FET is used since P channel FETs are substantially more expensive.

The present invention essentially provides the approximately twice battery voltage signal at the gate of the FET when it is desired to commence field current. This occurs by use of the high frequency switching provided by the signal 41 at the terminal B and the use of a relatively small magnitude capacitor 26. This is contrasted with prior voltage regulator systems, which while recognizing that a high gate voltage is desirable, implemented this by utilizing relatively slow switching speeds with a very large magnitude capacitor to form a battery voltage doubling system. Those prior systems were not cost effective in implementing field current for 100% of the time, because they required utilization of extensive additional logic circuitry required to provide some periodic interruptions (in case a 100% duty cycle was required) for charging the large capacitor. In addition, the prior systems required an extremely large magnitude capacitor 26 to insure that there was not a substantial decrease in the voltage being maintained at the terminal D after commencement of field current flow. The present invention avoids these problems by implementing very rapid switching via the transistor 36 and, therefore can utilize a very small capacitor (typically 50 picofarads), for the capacitor 26. This enhances circuit performance and reduces circuit cost. In the present circuit, rather than relying on the massive capacitance of the capacitor 26, now the inherent gate-to-source capacitance of the FET 28 can be relied on to maintain an appropriate voltage at the terminal E during field current flow, and thus no additional large capacitor is required. The small size of the capacitor 26 makes it possible to synthesize, on a single integrated circuit chip, substantially all of the components of a driver circuit 37, shown dashed in FIG. 1, and the regulator 11, except the FET 28 and the resistor 31.

In addition to the above advantages, the present invention minimizes battery current drain during a condition of no field current being required. This is because the switch 21 will effectively decouple the capacitor terminal D from battery voltage when no field current is required. If the transistor 21 were replaced by a direct connection between the anode of the diode 22 and the terminal 13, then there would have to be some provision to prevent excessive battery current drain because of the shorting action provided by the transistor 35 and additional leakage current associated with the FET, when this device is off and no field current is drawn. These problems are avoided by utilization of the transistor 21 which is

4,733,159

9

switched alternately with respect to, but at the same frequency as, the transistor 35. Thus transistor 21 prevents series coupling the capacitor 26 between $V_{BAT}$ at terminal 13 and ground during duty cycle portions 41A, and permits such coupling during 41B, and this reduces battery current drain. Also, this insures no substantial battery current drain when the voltage regulator is off, and, therefore, a low voltage regulator output signal at terminal 20 is provided. The effective Zener diode 13B protects the transistors 21 and 36 from excessive battery voltage transients caused by battery load variations, and the effective Zener 35A protects the transistor 35 against transients at the terminal E.

While specific embodiments of the present invention have been shown and described, further modifications and improvements will occur to those skilled in the art. All such modifications which retain the basic underlying principles disclosed and claimed herein are within the scope of this invention.

We claim:

1. A voltage regulator comprising:
   regulator means for receiving a sensed voltage signal and for providing, in response to the effective comparison of said sensed voltage signal with a reference signal, a regulator output signal, comprising pulses, having a predetermined frequency and a predetermined signal characteristic determined in accordance with said comparison;
   drive circuit means coupled to said regulator means and comprising a power switching device having a control terminal effectively coupled to said regulator output signal and having at least two output terminals, said output terminals coupled in series with a control element of a voltage control means which determines said sensed voltage signal, across a maximum power source voltage potential, said drive circuit means controlling said sensed voltage, via said control means, in accordance with said signal characteristic of said regulator output signal to maintain said sensed voltage signal at a predetermined voltage level determined by said reference signal, said drive circuit means including a peak voltage increasing means for receiving said regulator output signal and effectively providing in response thereto a corresponding increased magnitude voltage signal generally varying as said regulator output signal but varying up to a peak voltage potential in excess of said maximum power source voltage potential;
   wherein the improvement comprises said peak voltage increasing means comprising a capacitor selectively series coupled and decoupled across a predetermined power source voltage potential in accordance with pulses of a high frequency signal having a pulse frequency substantially in excess of the frequency of said regulator output signal, said peak voltage increasing means, therefore, comprising a high frequency charge pump which provides said increased voltage signal, said increased voltage signal having the same general waveform as said regulator output signal but increased in voltage magnitude to achieve a peak voltage potential in excess of said maximum power source voltage potential, the charge pump providing said increased voltage signal as an output which is coupled to said control terminal of said power switching device.

10

2. A voltage regulator according to claim 1 wherein said predetermined characteristic of said regulator output signal, which characteristic is determined in accordance with said comparison, comprises duty cycle.

3. A voltage regulator according to claim 2 wherein said drive circuit means includes means for selectively preventing said series coupling of said capacitor across said predetermined power source voltage potential during duty cycle portions of said regulator output signal of a predetermined polarity and permitting said series coupling during duty cycle portions of said regulator output signal of an opposite predetermined polarity.

4. A voltage regulator according to claim 3 wherein said predetermined power source voltage potential that said capacitor is selectively series coupled and decoupled across substantially comprises said maximum power source voltage potential that said power switching device and control element of said voltage control means are coupled across.

5. A voltage regulator according to claim 4 wherein the frequency of said high frequency signal pulses is at least one order of magnitude higher than the frequency of said regulator output signal.

6. A voltage regulator according to claim 5 wherein said preventing means of said drive circuit means includes a first switch device which selectively couples a first terminal of said capacitor to a first predetermined voltage in accordance with duty cycle portions of said regulator output signal of a predetermined polarity and decouples said first terminal during duty cycle portions of said regulator output signal of an opposite predetermined polarity, and wherein said peak voltage increasing means of said drive circuit means includes a second switch device which selectively series couples and decouples a second terminal of said capacitor to a second predetermined voltage, different from said first predetermined voltage, in accordance with said pulses of said high frequency signal.

7. A voltage regulator according to claim 6 wherein said drive circuit means includes a third switch device which selectively couples and decouples said one capacitor terminal to said second voltage potential in accordance with said regulator output signal.

8. A voltage regulator according to claim 1 wherein said drive circuit means includes a first switch device which selectively couples a first terminal of said capacitor to a first predetermined voltage in accordance with duty cycle portions of said regulator output signal of a predetermined polarity and decouples said first terminal during duty cycle portions of said regulator output signal of an opposite predetermined polarity, and wherein said peak voltage increasing means of said drive circuit means includes a second switch device which selectively series couples and decouples a second terminal of said capacitor to a second predetermined voltage, different from said first predetermined voltage, in accordance with said pulses of said high frequency signal.

9. A voltage regulator according to claim 8 wherein said drive circuit means includes a third switch device which selectively couples and decouples said one capacitor terminal to said second voltage potential in accordance with said regulator output signal.

10. A voltage regulator according to claim 9 wherein said first capacitor terminal is coupled to said power switching device control terminal through a peak rectifying diode

4,733,159

**11**

11. A voltage regulator according to claim 10 wherein said first predetermined voltage is coupled to said first capacitor terminal through a diode.

12. A voltage regulator according to claim 11 wherein said power switching device comprises an FET having gate, drain and source electrodes corresponding to said control and output terminals, respectively.

13. A voltage regulator according to claim 12 wherein said drain electrode is coupled to a source of constant voltage potential and wherein the effective internal capacitance of said FET between said gate and source electrodes is substantially larger than the capacitance of said capacitor.

14. A voltage regulator according to claim 13 wherein said voltage control means comprises a voltage generator means and wherein said control element of said voltage control means comprises a field coil.

**12**

15. A voltage regulator according to claim 1 wherein said voltage control means comprises a voltage generator means and wherein said control element of said voltage control means comprises a field coil.

16. A voltage regulator according to claim 15 wherein said voltage generator means includes stator windings, in addition to said field coil, and a rectifier circuit means for receiving the output of said stator windings and providing a charging signal for a battery so as to maintain a predetermined battery voltage thereacross.

17. A voltage regulator according to claim 16 wherein said predetermined voltage across said battery corresponds to said predetermined maximum power source voltage potential.

18. A voltage regulator according to claim 1 wherein the frequency of said high frequency pulses is at least one order of magnitude higher than the frequency of said regulator output signal.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.  :  4,733,159

DATED  :  March 22, 1988

INVENTOR(S) :  Arthur J. Edwards and Mihaly Lamoth

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In claim 1, Col. 9, line 35, after "voltage control means", please insert —,—.

Signed and Sealed this

Twenty-seventh Day of September, 1988

Attest:

DONALD J. QUIGG

*Attesting Officer*                    *Commissioner of Patents and Trademarks*

# Exhibit D

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| CIF Licensing, LLC, d/b/a<br>GE Licensing,<br><br>       Plaintiff,<br><br>     v.<br><br>DENSO CORPORATION, Remy International<br>Inc., Valeo, Inc., and Valeo Sistemas Electricos<br>S.A. DE C.V.<br><br>       Defendants. | § § § § § § § § § § § § § § | Case No. 2:06cv345  DF<br><br>JURY TRIAL DEMANDED |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff CIF Licensing, LLC, d/b/a GE Licensing ("GE Licensing"), brings this action

against Defendants DENSO CORPORATION ("DENSO"), Remy International, Inc. ("Remy"),

Valeo, Inc. ("Valeo Inc"), and Valeo Sistemas Electricos S.A. de C.V. ("Valeo CV"), alleging as

follows:

### The Parties

1.  Plaintiff GE Licensing is a limited liability company organized and existing under

the laws of the State of Delaware, with its principal place of business in Princeton, New Jersey

08540. GE Licensing is the owner of all right, title, and interest in and to United States patent

No. 4,733,159 (the "Patent") by assignment, with the right to recover damages for all past

infringement of the Patent. The Patent was duly and legally issued on March 22, 1988 by the

United States Patent and Trademark Office. The invention of the Patent contains a voltage

regulator system for automobile alternators, including a unique high frequency charge pump. A

copy of the Patent is attached hereto as Exhibit A.

2.    Upon information and belief, Defendant DENSO is a Japanese corporation with

its principal place of business and home office at 1-1 Showa-cho, Kariya Aichi 448-8661, Japan.

Although DENSO does business in Texas by, among other things, committing acts that

constitute the tort of infringement of the Patent (*see*, TEX. CIV. PRAC. & REM. CODE § 17.042),

upon information and belief, DENSO does not maintain a regular place of business in Texas, has

not registered to do business in Texas, and does not maintain a designated agent for service of

process in Texas. Therefore, DENSO may be served with process by serving the Texas Secretary

of State, who is deemed to be DENSO's agent for service of process. TEX. CIV. PRAC. & REM.

CODE § 17.044.

3.    Upon information and belief, Defendant Remy is a corporation organized and

existing under the laws of the state of Delaware, with its principal place of business and home

office at 2902 Enterprise Drive, Anderson, Indiana 46013.. Although Remy does business in

Texas by, among other things, committing acts that constitute the tort of infringement of the

Patent (*see*, TEX. CIV. PRAC. & REM. CODE § 17.042), upon information and belief, Remy does

not maintain a regular place of business in Texas, has not registered to do business in Texas, and

does not maintain a designated agent for service of process in Texas. Therefore, Remy may be

served with process by serving the Texas Secretary of State, who is deemed to be Remy's agent

for service of process. TEX. CIV. PRAC. & REM. CODE § 17.044.

4.    Upon information and belief, Defendant Valeo Inc is a corporation organized and

existing under the laws of the state of New York, with its principal place of business and home

office at 3000 University Drive, Auburn Hills, Michigan 48326. Upon information and belief,

Valeo Inc maintains branch offices in El Paso, TX, Fort Worth, TX, and Pharr, TX. Valeo Inc

also does business in Texas by, among other things, committing acts that constitute the tort of

2

infringement of the Patent and recruiting Texas residents for employment (*see*, TEX. CIV. PRAC. & REM. CODE § 17.042).Valeo Inc has not registered to do business in Texas, and does not maintain a designated agent for service of process in Texas. Therefore, Valeo Inc may be served with process by serving the person in charge of its business in Texas. TEX. CIV. PRAC. & REM. CODE § 17.043.

     5.    Upon information and belief, Defendant Valeo CV is a Mexican corporation with its principal place of business and home office at Avenida Circuito Mexico No. 160, Z.I. Parque Tres Naciones, 78395 San Luis Potosi, Mexico. Although Valeo CV does business in Texas by, among other things, committing acts that constitute the tort of infringement of the Patent (see, TEX. CIV. PRAC. & REM. CODE § 17.042), upon information and belief, Valeo CV does not maintain a regular place of business in Texas, has not registered to do business in Texas, and does not maintain a designated agent for service of process in Texas. Therefore, Valeo CV may be served with process by serving the Texas Secretary of State, who is deemed to be Valeo CV's agent for service of process. TEX. CIV. PRAC. & REM. CODE § 17.044.

## Jurisdiction and Venue

     6.    This action for infringement arises under the patent laws of the United States, Title 35, United States Code, including § 271. This Court has exclusive jurisdiction under Title 28, United States Code, particularly § 1338(a).

     7.    Defendant DENSO has committed the tort of patent infringement in the Eastern District. Defendant DENSO has sold and shipped into the Eastern District products that infringe on Plaintiff GE Licensing's Patent and/or has sold such products under circumstances in which it was reasonably foreseeable that the products would be shipped into the Eastern District. Accordingly, Defendant DENSO resides in the Eastern District as the term "reside" is defined in

3

28 U.S.C. § 1391(c), and, therefore, venue in the Eastern District is proper under 28 U.S.C. §§ 1391(b) and 1400(b).

     8.     Defendant DENSO is subject to personal jurisdiction in Texas and this District.

     9.     Defendant Remy has committed the tort of patent infringement in the Eastern District. Defendant Remy has sold and shipped into the Eastern District products that infringe on Plaintiff GE Licensing's Patent and/or has sold such products under circumstances in which it was reasonably foreseeable that the products would be shipped into the Eastern District. Accordingly, Defendant Remy resides in the Eastern District as the term "reside" is defined in 28 U.S.C. § 1391(c), and, therefore, venue in the Eastern District is proper under 28 U.S.C. §§ 1391(b) and 1400(b).

     10.     Defendant Remy is subject to personal jurisdiction in Texas and this District.

     11.     Defendant Valeo Inc has committed the tort of patent infringement in the Eastern District. Defendant Valeo Inc has sold and shipped into the Eastern District products that infringe on Plaintiff GE Licensing's Patent and/or has sold such products under circumstances in which it was reasonably foreseeable that the products would be shipped into the Eastern District. Accordingly, Defendant Valeo Inc resides in the Eastern District as the term "reside" is defined in 28 U.S.C. § 1391(c), and, therefore, venue in the Eastern District is proper under 28 U.S.C. §§ 1391(b) and (c), and 1400(b).

     12.     Defendant Valeo Inc is subject to personal jurisdiction in Texas and this District.

     13.     Defendant Valeo CV has committed the tort of patent infringement in the Eastern District. Defendant Valeo CV has sold and shipped into the Eastern District products that infringe on Plaintiff GE Licensing's Patent and/or has sold such products under circumstances in which it was reasonably foreseeable that the products would be shipped into the Eastern District.

4

Accordingly, Defendant Valeo CV resides in the Eastern District as the term "reside" is defined in 28 U.S.C. § 1391(c), and, therefore, venue in the Eastern District is proper under 28 U.S.C. §§ 1391(b) and (c), and 1400(b).

14.    Defendant Valeo CV is subject to personal jurisdiction in Texas and this District.

## COUNT I
(Patent Infringement – DENSO)

### Defendant DENSO's Activities

1-14.    Plaintiff hereby repeats and incorporates by reference ¶¶1-14 as ¶¶1-14 of this Count I.

15.    Defendant DENSO operates as a manufacturer and wholesaler of automotive motor vehicle supplies and parts, including alternators containing voltage regulator units. Defendant DENSO sells such supplies and parts to entities engaged in the automobile industry in North America.

16.    On information and belief, the above-mentioned activities by Defendant DENSO have amounted to infringement, directly, by inducement, and/or by contributing to the infringement, of the Patent.

17.    Plaintiff GE Licensing is the owner of all right, title and interest in and to the Patent with the right to recover damages for all past infringement of the Patent.

18.    On information and belief, DENSO is infringing the Patent willfully and with knowledge. On information and belief, DENSO will continue infringing the Patent unless enjoined by this Court.

19.    As a result of DENSO's infringing conduct, GE Licensing has been damaged and will continue to suffer irreparable harm without the issuance of an injunction by this Court.

5

20.    DENSO's willful infringement of the Patent and other conduct make this an exceptional case under 35 U.S.C. § 285.

**COUNT II**
(Patent Infringement – Remy)

**Defendant Remy's Activities**

1-20.   Plaintiff hereby repeats and incorporates by reference ¶1-20 of Count I as ¶1-20 of this Count II.

21.    Defendant Remy operates as a manufacturer and re-manufacturer of original equipment and aftermarket electrical components for automobiles, light trucks, medium and heavy duty trucks and other heavy duty vehicles, including alternators containing voltage regulator units. Defendant Remy sells such components to original equipment manufacturers and dealers, automotive retail chains and warehouse distributors in North America, Europe, Latin America, and Asia-Pacific.

22.    On information and belief, the above-mentioned activities by Defendant Remy have amounted to infringement, directly, by inducement, and/or by contributing to the infringement, of the Patent.

23.    On information and belief, Remy is infringing the Patent willfully and with knowledge. On information and belief, Remy will continue infringing the Patent unless enjoined by this Court.

24.    As a result of Remy's infringing conduct, GE Licensing has been damaged and will continue to suffer irreparable harm without the issuance of an injunction by this Court.

25.    Remy's willful infringement of the Patent and other conduct make this an exceptional case under 35 U.S.C. § 285.

6

## COUNT III
(Patent Infringement – Valeo Inc)

### Defendant Valeo Inc's Activities

1-25.   Plaintiff hereby repeats and incorporates by reference ¶1-25 of Count II as ¶1-25 of this Count III.

26.   Defendant Valeo Inc operates as a manufacturer of automotive motor vehicle parts, including alternators containing voltage regulator units. Valeo Inc sells such parts to entities engaged in the automobile industry, consisting of various divisions of vehicle manufacturers in North America and Europe.

27.   On information and belief, the above-mentioned activities by Defendant Valeo Inc have amounted to infringement, directly, by inducement, and/or by contributing to the infringement, of the Patent.

28.   On information and belief, Valeo Inc is infringing the Patent willfully and with knowledge. On information and belief, Valeo Inc will continue infringing the Patent unless enjoined by this Court.

29.   As a result of Valeo Inc's infringing conduct, GE Licensing has been damaged and will continue to suffer irreparable harm without the issuance of an injunction by this Court.

30.   Valeo Inc's willful infringement of the Patent and other conduct make this an exceptional case under 35 U.S.C. § 285.

## Count IV
(Patent Infringement Valeo CV)

### Defendant Valeo CV's Activities

31.   Plaintiff hereby repeats and incorporates by reference 1-31 of Count III as 1-31 of this Count IV.

7

32.    Defendant Valeo CV operates as a manufacturer of automotive motor vehicle parts, including alternators containing voltage regulator units. Valeo CV sells such parts to entities engaged in the automobile industry, consisting of various divisions of vehicle manufacturers in North America and Europe.

33.    On information and belief, the above-mentioned activities by Defendant Valeo CV have amounted to infringement, directly, by inducement, and/or by contributing to the infringement of the Patent.

34.    On information and belief, Valeo CV is infringing the Patent willfully and with knowledge. On information and belief, Valeo CV will continue infringing the Patent unless enjoined by this Court.

35.    As a result of Valeo CV's infringing conduct, GE Licensing has been damaged and will continue to suffer irreparable harm without the issuance of an injunction by this Court.

36.    Valeo CV's willful infringement of the Patent and other conduct make this an exceptional case under 35 U.S.C. § 285.

### Requested Relief

WHEREFORE, Plaintiff GE Licensing prays that this Court enter judgment.

a.    Finding that Defendants DENSO, Remy, Valeo Inc, and Valeo CV have infringed, induced others to infringe and/or committed acts of contributing infringement of the Patent under 35 U.S.C. § 271.

b.    Enjoining Defendants DENSO, Remy, Valeo Inc, and Valeo CV and their subsidiaries, agents, officers and employees, and all others acting in concert with them, from infringing, inducing infringement, and contributing to the infringement of the Patent.

c.    Ordering Defendants DENSO, Remy, Valeo, and Valeo CV to award GE Licensing an amount that adequately compensates GE Licensing for Defendants' infringement,

8

including lost profits (and/or a reasonably royalty), treble damages, court costs, pre-judgment

interest, post-judgment interest and attorney's fees under 35 U.S.C. §§ 284 and 285.

     d.     Granting GE Licensing such other and further relief as is just.

### Demand for Jury Trial

     Plaintiff GE Licensing hereby demands a jury trial on all claims and issues triable of right

by a jury.

     Dated October 17, 2006

                                  Respectfully submitted,

                                  /s/ Bradford P. Lyerla (by permission Otis Carroll)
                                  Bradford P. Lyerla, **Lead Attorney**
                                  Marshall, Gerstein & Borun LLP
                                  6300 Sears Tower
                                  233 South Wacker Drive
                                  Chicago, IL 60606-6357
                                  Tel: (312) 474-6300
                                  Fax: (312) 474-0448
                                  E-mail: blyerla@marshallip.com

OF COUNSEL:

Anthony G. Sitko
Marshall, Gerstein & Borun LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6357
Tel: (312) 474-6300
Fax: (312) 474-0448
E-Mail: asitko@marshallip.com

Jeffrey H. Dean
Marshall, Gerstein & Borun LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6357
Tel: (312) 474-6300
Fax: (312) 474-0448
E-Mail: jdean@marshallip.com

9

Anthony S. Hind
Marshall, Gerstein & Borun LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6357
Tel: (312) 474-6300
Fax: (312) 474-0448
E-Mail: ahind@marshallip.com

Otis W. Carroll
Texas Bar No. 03895700
IRELAND, CARROLL & KELLEY, P.C.
6101 South Broadway
Suite 500
Tyler, Texas  75703
Tel: (903) 561-1600
Fax: (903) 581-1070

ATTORNEYS FOR PLAINTIFF

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have

consented to electronic service are being served with a copy of this document via the Court's

CM/ECF system per Local Rule CV-5(a)(3).  Any other counsel of record will be served by

facsimile transmission and/or first class mail this 20th day of October, 2006.


/s/ Otis Carroll_____

10

# EXHIBIT A

# United States Patent [19]

## Edwards et al.

[11] Patent Number: 4,733,159

[45] Date of Patent: Mar. 22, 1988

[54] CHARGE PUMP VOLTAGE REGULATOR

[75] Inventors: Arthur J. Edwards, Hoffman Estates, Ill.; Mihaly Lamoth, Coppet, Switzerland

[73] Assignee: Motorola, Inc., Schaumburg, Ill.

[21] Appl. No.: 924,100

[22] Filed: Oct. 28, 1986

[51] Int. Cl.⁴ .................................... G05F 1/56
[52] U.S. Cl. ............................... 323/282; 322/28
[58] Field of Search ................. 323/282, 284; 318/139; 322/28

[56] References Cited

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,343,060 | 9/1967 | Ingraham | 323/282 X |
| 3,447,065 | 5/1969 | Kuhn | 322/28 X |
| 4,210,856 | 7/1980 | Taylor | 320/17 |
| 4,346,337 | 8/1982 | Watrous | 322/25 |
| 4,386,310 | 5/1983 | Sievers | 322/28 |
| 4,388,586 | 6/1983 | Lamoth | 323/283 |
| 4,388,587 | 6/1983 | Lamoth et al. | 323/283 |
| 4,580,090 | 4/1986 | Bailey et al. | 323/282 X |
| 4,636,711 | 1/1987 | Freymuth | 318/139 X |

### OTHER PUBLICATIONS

Motorola Data Sheets XPC1500 for the 16 Ampere Logic-to-Power Switch.
Motorola Data Sheet MPC1500, Logic-to-Power Switch Block Diagram.

*Primary Examiner*—Patrick R. Salce

*Assistant Examiner*—Marc S. Hoff
*Attorney, Agent, or Firm*—Phillip H. Melamed

[57] ABSTRACT

A voltage regulator (11) provides a pulse width modulated voltage regulator output (40) to a drive circuit (37) to provide field coil excitation for a voltage generator (15–17) providing a charging signal for a battery (14). The voltage regulator output determines on/off states of an FET power switching device (28) coupled in series with a field coil (17) across a maximum power source voltage potential $V_{BAT}$ corresponding to battery voltage. The drive circuit includes a charge pump (26, 35, 36) with a low capacitance capacitor (26) coupled and decoupled across a source of voltage potential at a rate determined by a high frequency signal (41), provided by the regulator, having a frequency substantially in excess of the frequency of the voltage regulator output. The drive circuit includes a pair of switches (21, 35) which alternately couple one terminal of the capacitor to either battery voltage or ground potential in accordance with the voltage regulator output. The above configuration provides a control voltage (44) at the gate of the FET substantially in excess of battery voltage and this insures maximum field current when the FET is on. This is achieved with a minimum capacitance for the capacitor, thus reducing circuit size and cost. Battery current drain of the drive circuit is minimized by disconnecting the one terminal of the capacitor from battery voltage when the FET is off.

18 Claims, 2 Drawing Figures



Dbt f l3;17.dw11456.EG!!!!!Epdvn f ou23.3!!!!!Gjfne!210308117!!!!!Qbhf !4!pg22

U.S. Patent    Mar. 22, 1988    Sheet 1 of 2    4,733,159



FIG. 1

Dbt f !3;17.dw.11456.EG!!!!Epdvn f ou23.3!!!!Gjrne!210310.8117!!!!!Qbhf !5!pg22



FIG.2

4,733,159

1

## CHARGE PUMP VOLTAGE REGULATOR

### BACKGROUND OF THE INVENTION

The present invention generally relates to the field of 5 voltage regulators, and in particular to voltage regulator systems utilized to control the charging of a battery, such as the battery in a vehicle.

In prior voltage regulator systems for vehicles it is known to provide a voltage regulator which senses 10 battery voltage and provides a pulse width modulated output signal that varies in duty cycle in accordance with the difference between sensed battery voltage and a reference signal. This output signal is used to control a power switching device connected in series with a 15 field coil across the battery voltage potential. The field coil controls excitation of stator windings of a voltage generating system which, after rectification of the output of the stator windings, provides a charging signal for the battery. Such voltage regulator systems, as de- 20 scribed above, are conventional and well understood.

In some of the above-noted voltage regulator systems, it is necessary to provide a relatively large voltage, larger than battery voltage, at a control terminal of the power switching device so as to insure that maxi- 25 mum field current is provided when the switching device is on. In some cases an FET (field effect transistor) is utilized as the power switching device, with the drain electrode connected to battery voltage and the source terminal is connected through the field coil to ground 30 potential. In such a configuration, to provide a gate voltage in excess of battery voltage when it is desired to have the FET on, a prior voltage regulator system has utilized a voltage doubler circuit. In the prior voltage doubler circuit, a voltage of approximately twice bat- 35 tery voltage is selectively provided at the gate terminal to insure that approximately the entire battery voltage potential is applied across the field coil when the FET is on.

The voltage doubler circuit of the prior voltage regu- 40 lator relies on utilizing the pulse width modulated output signal of the voltage regulator to selectively couple and decouple a large magnitude capacitor across the battery voltage potential via a switch device. The end result is that essentially a voltage doubler is provided by 45 the capacitor and the selective switching of the capacitor across the battery voltage potential. However, in such a configuration, a very large capacitance for the capacitor is utilized to insure that at high duty cycle percentages of the voltage regulator output signal, the 50 voltage across the capacitor does not substantially decrease during the long on-duty cycle and thereby decrease the magnitude of the voltage at the gate electrode of the FET. When the prior voltage regulator produced an output signal which essentially resulted in 55 the FET being on all of the time since field coil current was required all of the time, additional complex logic circuitry was required to provide some alternate coupling and decoupling of the capacitor across the battery voltage, and this increased the circuit cost. Without this 60 additional logic circuitry, the twice battery voltage to be maintained at one terminal of the large capacitance capacitor would decrease due to leakage effects and the loading of the turned-on FET device. This is undesirable as it would result in reducing field coil current 65 when the voltage regulator has indicated that maximum field coil current should be provided. Also, the required large magnitude capacitor is expensive, and it cannot be

2

implemented as part of an integrated circuit so as to reduce circuit cost.

### SUMMARY OF THE INVENTION

An object of the present invention is to provide an improved voltage regulator which overcomes the aforementioned deficiencies.

A more particular object of the present invention is to provide a voltage regulator which does not require a large magnitude capacitor but which still provides a switching control voltage substantially in excess of battery voltage at the gate of an FET device connected in series with the field coil that controls the output of a voltage generator which implements battery charging.

In one embodiment of the present invention, an improved voltage regulator is provided. The voltage regulator comprises: regulator means for receiving a sensed voltage signal and for providing, in response to the effective comparison of said sensed voltage signal with a reference signal, a regulator output signal, comprising pulses, having a predetermined frequency and a predetermined signal characteristic determined in accordance with said comparison; drive circuit means coupled to said regulator means and comprising a power switching device having a control terminal effectively coupled to said regulator output signal and having at least two output terminals, said output terminals coupled in series with a control element of a voltage control means, which determines said sensed voltage signal, across a maximum power source voltage potential, said drive circuit means controlling said sensed voltage, via said control means, in accordance with said characteristic of said regulator output signal to maintain said sensed voltage signal at a predetermined voltage level determined by said reference signal, said drive circuit means including a peak voltage increasing means for receiving said regulator output signal and effectively providing in response thereto a corresponding increased magnitude voltage signal generally varying as said regulator output signal but varying up to a peak voltage potential in excess of said maximum power source voltage potential, wherein the improvement comprises said peak voltage increasing means comprising a capacitor selectively series coupled and decoupled across a predetermined power source voltage potential in accordance with pulses of a high frequency signal having a pulse frequency substantially in excess of the frequency of said regulator output signal, said peak voltage increasing means, therefore, comprising a high frequency charge pump which provides said increased voltage signal, said increased voltage signal having the same general waveform as said regulator output signal but increased in voltage magnitude to achieve a peak voltage potential in excess of said maximum power source voltage potential, the charge pump providing said increased voltage signal as an output which is coupled to said control terminal of said power switching device.

Essentially, the above-recited configuration results in utilization of a relatively small magnitude capacitor while still providing a switching voltage at the control terminal of the power switching device that is substantially in excess of the maximum power source voltage potential, which preferably corresponds to battery voltage in the vehicle charging system. Preferably, the power switching device comprises an N channel field effect transistor (FET) in which the gate electrode is the control terminal the drain electrode is connected to

Dbt f !3;17. dw 11456. EG!!!!Epdvn f ou23.3!!!!!Gjrfhe!2103103117!!!!!Qbhf !7!pg22

4,733,159

3

positive battery voltage and the source electrode is connected through a field coil to ground potential. Preferably, the voltage regulator means output signal comprises a pulse width modulated switching signal which selectively couples one terminal of the capacitor, at which said increased voltage signal is provided, to ground during one polarity of the duty cycle of the regulator output signal and during another polarity of the regulator output signal couples this terminal to battery voltage.

Preferably the high frequency switching signal is at least two orders of magnitude higher than the frequency of the regulator output signal, and this results in requiring only a very small capacitance for the selectively series coupled capacitor thus reducing component cost and size. This also permits synthesizing the capacitor as part of an integrated circuit which includes other regulator components. In addition, the present invention contemplates utilizing the pulse width modulated output signal of the regulator and a switch device to alternately couple and decouple the capacitive terminal at which the increased voltage is produced to battery voltage, and this minimizes battery current drain during duty cycle portions of the regulator output signal during which no field current is desired. Also, this insures no substantial battery current drain when the voltage regulator is off and a low voltage regulator output signal is provided.

BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the invention, reference should be made to the drawings, in which:

FIG. 1 is a schematic diagram of a voltage regulator system constructed in accordance with the present invention; and

FIG. 2 comprises a series of graphs A through F illustrating waveforms of signals provided at the terminals A through F in FIG. 1.

DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to FIG. 1, a voltage regulator system 10 is illustrated in which a substantially conventional pulse width modulated voltage regulator 11 has a voltage sensing input terminal 12 connected to a positive battery voltage terminal 13 also designated as $V_{BAT}$. The terminal 13 corresponds to the positive electrode of a vehicle battery 14 which has its negative electrode connected to ground potential. Charging of the battery 14 is accomplished by means of a plurality of stator output windings 15 which provide an output that is rectified by a rectifier circuit 16. The output of the stator windings 15 is controlled, as is conventionally understood, by the current excitation applied to a field coil 17 having a flyback transient suppression diode 18 connected thereacross.

Essentially, the voltage across the battery is sensed by the voltage regulator 11 via the signal at the terminal 12. The voltage regulator compares this voltage to an internal or external reference voltage signal provided at a terminal 19, and in response to this comparison produces a pulse width modulated regulator output signal at an output terminal 20. The duty cycle of this pulse width modulated output signal at the terminal 20 can vary from approximately 0% to 100% and is essentially determined in accordance with the difference between the sensed battery voltage and the reference signal at the terminal 19. This is accomplished in a conventional manner as is understood to those in the voltage regula-

4

tor art field, and can be implemented by a number of different circuit configurations for the voltage regulator 11. The constant frequency regulator disclosed in U.S. Pat. No. 4,386,310 to Sievers, assigned to the same assignee as the present invention, can be used for the above described voltage regulator 11. Also see U.S. Pat. Nos. 4,388,586 and 4,388,587. Essentially, the voltage regulator system 10, as is understood, responds to the pulse width modulated switching output signal at the terminal 20 so as to provide field coil current such that the battery voltage at the terminal 13 is maintained at a predetermined voltage with respect to the voltage magnitude of the reference signal at the terminal 19. This operation is conventional.

Essentially, the present invention involves providing a drive circuit means so as to couple the pulse width modulated regulator output signal at the terminal 20 to the field coil 17 so as to control field coil current excitation. This is accomplished in an advantageous manner by a relatively simple and economical drive circuit utilizing inexpensive components. The construction and operation of the drive circuit means is as follows.

The battery voltage terminal 13 is connected through a resistor 13A to the emitter of a PNP first switch device transistor 21 which has its collector coupled through a diode 22 to a terminal 23 also designated as terminal D. The emitter of transistor 21 is coupled to ground through an effective 20 volt Zener diode 13B and coupled through a resistor 24 to a terminal 25 also designated as terminal C. A relatively small magnitude capacitor 26 is connected between the terminals C and D wherein the capacitor 26 has a typical capacitance magnitude of 50 picofarads.

The terminal D is connected through a diode 27 to a gate electrode G of an N channel FET transistor 28 wherein the gate electrode is also designated as the terminal E. A drain electrode D of the FET is directly connected to the battery voltage terminal 13, and a source electrode S of the FET corresponds to a terminal F. A Zener diode 29 is connected between the terminals E and F to insure that no excessive voltage can be applied between the gate and source electrodes which would cause destruction of the FET. In FIG. 1, the effective internal input capacitance of the FET is illustrated as an inherent capacitor 30 connected between the gate and source electrodes and having a typical magnitude of 1000 picofarads. The FET 28 is utilized as a power switching device that controls current in the field coil 17.

The source electrode of the FET is connected through a current sensing resistor 31 to a terminal 32 at which one end of the field coil 17 is connected and a cathode of the flyback diode 18 is connected. Another end of the field coil 17 and the anode of the diode 18 are connected to ground potential. The amount of field coil current being drawn can be measured by noting the voltage drop across the resistor 31, if desired. With this configuration the output electrodes (drain and source) of the FET are connected in series with field coil 17 between a maximum power source potential corresponding to the battery voltage.

The pulse width modulated regulator output signal at the terminal 20 is connected to a terminal 33 also designated as terminal A. This terminal is connected through a level shifter or isolation device 34 to the base electrode of the first switch device transistor 21. The terminal 33 is also connected directly to the base electrode of an NPN transistor 35 which comprises a third switch

Dbt f !3;17.dw 11456.EGI!!!!Epdvn f ou23.3!!!!Gj鵩e!21⃝3103117!!!!Qbhf !8!pg22

4,733,159

5

device transistor having its emitter connected to ground
and its collector connected to the terminal E. An effec-
tive 40 volt Zener diode 35A is connected between the
collector and base electrodes of the transistor 35. A
second switch device transistor 36 comprising an NPN
transistor has its collector connected to the terminal C,
its emitter connected to ground potential and its base
electrode connected to a terminal B which is contem-
plated as being an additional output terminal of the
voltage regulator 11 at which a very high frequency
switching signal is provided. It is contemplated that the
high frequency switching signal at the terminal B is a
constant frequency signal having a frequency of 200 to
300 kilohertz, as contrasted with the frequency of the
pulse width modulated regulator output signal at the
terminal 20 which has an output frequency of 50 to 70
hertz.

The operation of the voltage regulator system 10 in
FIG. 1 will now be discussed with reference to the
signal waveforms shown in the graphs A through F in
FIG. 2. It should be noted that the signal waveforms
illustrated in FIG. 2 in graphs A through F correspond
to the voltage waveforms of electrical signals provided
at the terminals A through F, respectively, in FIG. 1. In
the graphs in FIG. 2, the vertical axes are representative
of signal magnitude, and the horizontal axes are repre-
sentative of time. It should also be noted that the time
scale utilized to illustrate the very high frequency signal
at the terminal B, and its affect on other signals, is not
drawn to scale with regard to the much slower varying
signal of the pulse width modulated regulator output
signal at the terminal 20 corresponding to the signal at
terminal A. However, this has been done to enhance the
clarity of the Figures as is readily understood.

As shown in FIG. 2, the voltage regulator 11 pro-
vides a pulse width modulated signal 40 at the terminal
A wherein the duty cycle of this signal is variable and is
determined in accordance with the difference between
the sensed battery voltage at the terminal 12 and the
reference signal voltage at the terminal 19. During a
high, or positive, polarity 41A of the duty cycle portion
of the signal 40, no field current will be drawn, but
during the low, or negative, polarity 41B of the duty
cycle of the signal 40, field current will be provided so
as to charge the battery 14. The signal 40 illustrates that
at a reference time t₀, there is a high to low transition
indicating the commencement of a low state for the
signal 40 during which field current will flow. The
frequency of the signal 40 is typically between 50 to 70
hertz, and the duty cycle can vary between extreme
percentages such as 0 to 100% depending upon how
much field current the voltage regulator 11 determines
is necessary.

In generating the pulse width modulated signal 40 at
the terminal 20, it is contemplated that the voltage regu-
lator may internally use a very high frequency reference
oscillator. Alternatively, a separate high frequency ref-
erence oscillator may be provided within the voltage
regulator 11 even though this signal may not be utilized
to generate the pulse width modulated regulator output
20. In either event, the voltage regulator 11 pro-
vides at the terminal B a very high frequency signal
comprising a series of pulses wherein the frequency is
200 to 300 kilohertz. This is generally shown in graph B
in FIG. 2, even though the time scale for graph B does
not correspond to the same time scale utilized for graph
A.

6

Essentially, in response to the high and low outputs
provided at the terminal 20 by the voltage regulator 11,
the first and third switch transistor devices 21 and 35,
will be alternately opened and closed. More specifi-
cally, in response to a high signal level at the terminal
A, transistor 35 will be turned on, therefore grounding
the gate electrode of the FET and limiting the voltage
at the terminal D to only one diode drop above ground
potential. At the same time, this high signal level at the
terminal A, via the level shifter 34, will result in effec-
tively turning off the first switch device 21 and thereby
decouple the battery voltage terminal 13 from the ca-
pacitor terminal D via the transistor 21 and diode 22.

During the time that a high or positive logic level is
present at the terminal A, and even when a low logic
level is present at the terminal A, a high frequency
signal 41 is continuously provided at the terminal B as
illustrated in graph B in FIG. 2. The signal 41 is not
necessarily continuously provided during the duty
cycle polarity 41A of signal 40. This high frequency
signal continually results in turning the transistor 36 on
and off and, therefore, alternately connecting the termi-
nal C to ground potential and then opening this connec-
tion. When a positive signal level is provided at a termi-
nal A, the opening and closing of the transistor switch
36 results in providing a corresponding ramp signal 42
at terminal C as illustrated in graph C in FIG. 2. During
the time that the transistor 36 is on, terminal C is con-
nected to ground potential, but when transistor 36 is off,
the potential at terminal C rises due to a charging cur-
rent provided from the battery voltage terminal 13
through the resistor 24. Typically, the peak of this ramp
signal during a positive logic state at the terminal A will
be approximately 2.5 volts less than the battery voltage
at the terminal 13, which is typically 14 volts. Thus,
approximately 11.5 volts is the magnitude of the voltage
peaks of the signal 42 for a positive logic state at the
terminal A which corresponds to no field current being
conducted. During this same time, a relatively small
magnitude square wave varying at the same frequency
as the high frequency signal 41 is at the terminal D
wherein the signal at the terminal D is generally desig-
nated by the reference numeral 43 in graph D. The peak
magnitude of the signal 43 when a positive logic state is
at the terminal A is approximately +1 volt since at that
time the transistor 35 is on and the peaks of signal at the
terminal D are limited by the clipping action provided
by the diode 27. Typically, a slight negative voltage is
provided at the terminal D when a positive logic state is
present at terminal A and the transistor 36 is turned off.

Since a positive logic state at the terminal A turns the
transistor 35 on, this means that at this time the gate
electrode of the FET is at ground potential, and, there-
fore, the FET is turned off. While the FET is turned off,
field current will not flow in the field coil 17 by virtue
of power (current) supplied by the battery 14. A signal
44 in graph B in FIG. 2 illustrates the voltage waveform
for the signal at the gate electrode of the FET, and a
signal 45 in graph F in FIG. 2 illustrates the voltage
waveform at the source electrode of the FET. The
signals at the terminals F and 32 are identical, except for
a minor voltage shift in case field current is flowing due
to the drop across the resistor 31. Thus a graph of the
signal at terminal 32 is not provided.

Essentially, prior to the time t₀ shown in FIG. 2, there
is no field coil current because the FET 28 is turned off.
At the time t₀, the transistor 35 which was previously
on, is now turned off, thus removing the clamping ac-

4,733,159

7

tion provided at the gate electrode of the FET by virtue of the transistor 35 and diode 27. At the same time, since a low or negative logic state is now provided at the terminal A, the transistor 21 is turned on via level shifter 34 resulting in applying approximately battery voltage at the terminal D by virtue of the transistor 21 and diode 22. This is illustrated in the graphs in FIG. 2 by the abrupt rising transient present at the time $t_0$ in the signals 43, 44 and 45. Immediately after $t_0$ the signal 43 has a magnitude of $V_{BAT}-1$ diode drop, signal 44 has a magnitude of $V_{BAT}-2$ diode drops, and signal 45 has a magnitude of approximately 7 volts representing the difference between the signal 44 at the terminal E and the gate-to-source turn-on threshold developed across the FET 28.

After the time $t_0$, the transistor 36 continues to be switched on and off at a very rapid rate in accordance with the pulses of the high frequency signal 41. This results in only a slight change in the peak magnitudes of the signal 42 at the terminal C, and this slight increase in magnitude is due to the fact that the clamping action of the diode 27 to ground continued through the transistor 35 has now been removed. However, the significance of continuing the high frequency switching after the time $t_0$ is more evident in the signals 43 through 45. For signal 43, it is noted that what essentially happens is that the ramp signal provided at the terminal C is now effectively transferred to the terminal D and superimposed upon a DC level of approximately the battery voltage $V_{BAT}$ at the terminal 13 minus the series drop across the transistor 21 and diode 22. This essentially results in the signal 43 reaching peak magnitudes of approximately twice the battery voltage since the AC variation of the signal 42 is now effectively superimposed on a DC level of approximately battery voltage.

In response to the signal 43, the diode 27, and the effective input capacitance 30 of the FET effectively provide a peak rectification circuit such that the signal 44 essentially follows the envelope of the signal peaks of the signal 43 less the voltage drop across diode 27. This is illustrated in graph E in FIG. 2. The signal 45 at the source electrode essentially tracks the gate voltage and, therefore, also increases, but the maximum value of the signal 45 is achieved at battery voltage since this signal cannot exceed the drain voltage wherein the drain electrode is directly connected to the relatively constant voltage $V_{BAT}$ at the battery voltage terminal 13. However, as seen in graph F in FIG. 2, the signal 45 does increase from a voltage somewhat below battery voltage to approximately battery voltage during the time that field current is flowing. This means that maximum possible field current is provided during the time that a low logic level is provided for the signal 40 since the source voltage of the FET will now reach approximately battery voltage due to the effective saturation of the FET device 28. This is possible in the present invention since the gate voltage is maintained in excess of the battery voltage $V_{BAT}$ present at the drain electrode and this situation is required in order to maintain the FET in an on condition with the source at $V_{BAT}$. At a subsequent time $t_5$, the signal 40 undergoes a logic state inversion resulting in the turning off of field current, and this is maintained until a subsequent time $t_1$ at which time the turn-on cycle is reinstituted.

Essentially, the present invention is concerned with providing a voltage as high as possible at the terminal F such that maximum field coil current can be drawn when the voltage regulator 11 indicates that field cur-

8

rent should be provided. This is accomplished by the present circuit providing approximately battery voltage $V_{BAT}$ at the source electrode of the FET. In order to accomplish this, a much higher than $V_{BAT}$ voltage must be provided at the gate of the N channel FET to insure that the FET turns on and remains on since there is a minimum gate-to-source threshold which must be exceeded in order for the FET to be on. The present invention is concerned with how this larger than battery voltage control signal at the gate of the FET can be produced efficiently and with minimum expense. It should be noted that the reason that the field coil 17 is not provided in the drain circuit of the FET, is that many voltage regulator systems do not wish to subject the field coil to constant positive voltage potential even when no field current is to be drawn. Thus, in the present circuit, the field coil is in the source circuit of the N channel FET, and the FET essentially acts as a source follower. Also, an N channel FET is used since P channel FETs are substantially more expensive.

The present invention essentially provides the approximately twice battery voltage signal at the gate of the FET when it is desired to commence field current. This occurs by use of the high frequency switching provided by the signal 41 at the terminal B and the use of a relatively small magnitude capacitor 26. This is contrasted with prior voltage regulator systems, which while recognizing that a high gate voltage is desirable, implemented this by utilizing relatively slow switching speeds with a very large magnitude capacitor to form a battery voltage doubling system. Those prior systems were not cost effective in implementing field current for 100% of the time, because they required utilization of extensive additional logic circuitry required to provide some periodic interruptions (in case a 100% duty cycle was required) for charging the large capacitor. In addition, the prior systems required an extremely large magnitude capacitor 26 to insure that there was not a substantial decrease in the voltage being maintained at the terminal D after commencement of field current flow. The present invention avoids these problems by implementing very rapid switching via the transistor 36 and, therefore, can utilize a very small capacitor (typically 50 picofarads), for the capacitor 26. This enhances circuit performance and reduces circuit cost. In the present circuit, rather than relying on the massive capacitance of the capacitor 26, now the inherent gate-to-source capacitance of the FET 28 can be relied on to maintain an appropriate voltage at the terminal E during field current flow, and thus no additional large capacitor is required. The small size of the capacitor 26 makes it possible to synthesize, on a single integrated circuit chip, substantially all of the components of a driver circuit 37, shown dashed in FIG. 1, and the regulator 11, except the FET 28 and the resistor 31.

In addition to the above advantages, the present invention minimizes battery current drain during a condition of no field current flow. This is because the switch 21 will effectively decouple the capacitor terminal D from battery voltage when no field current is required. If the transistor 21 were replaced by a direct connection between the anode of the diode 22 and the terminal 13, then there would have to be some provision to prevent excessive battery current drain because of the shorting action provided by the transistor 35 and additional leakage current associated with the FET, when this device is off and no field current is drawn. These problems are avoided by utilization of the transistor 21 which is

Dbt f !3;17.dw.11456.EGℹ!!!!Epdvn f ou23.3!!!!Gjﬁe!21⊘3⊘3117!!!!!Qbhf I: !pg22

4,733,159

9

switched alternately with respect to, but at the same frequency as, the transistor 35. Thus transistor 21 prevents series coupling the capacitor 26 between $V_{BAT}$ at terminal 13 and ground during duty cycle portions 41A, and permits such coupling during 41B, and this reduces battery current drain. Also, this insures no substantial battery current drain when the voltage regulator is off, and, therefore, a low voltage regulator output signal at terminal 20 is provided. The effective Zener diode 13B protects the transistors 21 and 36 from excessive battery voltage transients caused by battery load variations, and the effective Zener 35A protects the transistor 35 against transients at the terminal E.

While specific embodiments of the present invention have been shown and described, further modifications and improvements will occur to those skilled in the art. All such modifications which retain the basic underlying principles disclosed and claimed herein are within the scope of this invention.

We claim:

1. A voltage regulator comprising:

regulator means for receiving a sensed voltage signal and for providing, in response to the effective comparison of said sensed voltage signal with a reference signal, a regulator output signal, comprising pulses, having a predetermined frequency and a predetermined signal characteristic determined in accordance with said comparison;

drive circuit means coupled to said regulator means and comprising a power switching device having a control terminal effectively coupled to said regulator output signal and having at least two output terminals, said output terminals coupled in series with a control element of a voltage control means which determines said sensed voltage signal, across a maximum power source voltage potential, said drive circuit means controlling said sensed voltage, via said control means, in accordance with said characteristic of said regulator output signal to maintain said sensed voltage signal at a predetermined voltage level determined by said reference signal, said drive circuit means including a peak voltage increasing means for receiving said regulator output signal and effectively providing in response thereto a corresponding increased magnitude voltage signal generally varying as said regulator output signal but varying up to a peak voltage potential in excess of said maximum power source voltage potential,

wherein the improvement comprises said peak voltage increasing means comprising a capacitor selectively series coupled and decoupled across a predetermined power source voltage potential in accordance with pulses of a high frequency signal having a pulse frequency substantially in excess of the frequency of said regulator output signal, said peak voltage increasing means, therefore, comprising a high frequency charge pump which provides said increased voltage signal, said increased voltage signal having the same general waveform as said regulator output signal but increased in voltage magnitude to achieve a peak voltage potential in excess of said maximum power source voltage potential, the charge pump providing said increased voltage signal as an output which is coupled to said control terminal of said power switching device.

10

2. A voltage regulator according to claim 1 wherein said predetermined characteristic of said regulator output signal, which characteristic is determined in accordance with said comparison, comprises duty cycle.

3. A voltage regulator according to claim 2 wherein said drive circuit means includes means for selectively preventing said series coupling of said capacitor across said predetermined power source voltage potential during duty cycle portions of said regulator output signal of a predetermined polarity and permitting said series coupling during duty cycle portions of said regulator output signal of an opposite predetermined polarity.

4. A voltage regulator according to claim 3 wherein said predetermined power source voltage potential that said capacitor is selectively coupled and decoupled across substantially comprises said maximum power source voltage potential that said power switching device and control element of said voltage control means are coupled across.

5. A voltage regulator according to claim 4 wherein the frequency of said high frequency signal pulses is at least one order of magnitude higher than the frequency of said regulator output signal.

6. A voltage regulator according to claim 5 wherein said preventing means of said drive circuit means includes a first switch device which selectively couples a first terminal of said capacitor to a first predetermined voltage in accordance with duty cycle portions of said regulator output signal of a predetermined polarity and decouples said first terminal during duty cycle portions of said regulator output signal of an opposite predetermined polarity, and wherein said peak voltage increasing means of said drive circuit means includes a second switch device which selectively series couples and decouples a second terminal of said capacitor to a second predetermined voltage, different from said first predetermined voltage, in accordance with said pulses of said high frequency signal.

7. A voltage regulator according to claim 6 wherein said drive circuit means includes a third switch device which selectively couples and decouples said one capacitor terminal to said second voltage potential in accordance with said regulator output signal.

8. A voltage regulator according to claim 1 wherein said drive circuit means includes a first switch device which selectively couples a first terminal of said capacitor to a first predetermined voltage in accordance with duty cycle portions of said regulator output signal of a predetermined polarity and decouples said first terminal during duty cycle portions of said regulator output signal of an opposite predetermined polarity, and wherein said peak voltage increasing means of said drive circuit means includes a second switch device which selectively series couples and decouples a second terminal of said capacitor to a second predetermined voltage, different from said first predetermined voltage, in accordance with said pulses of said high frequency signal.

9. A voltage regulator according to claim 8 wherein said drive circuit means includes a third switch device which selectively couples and decouples said one capacitor terminal to said second voltage potential in accordance with said regulator output signal.

10. A voltage regulator according to claim 9 wherein said first capacitor terminal is coupled to said power switching device control terminal through a peak rectifying diode.

4,733,159

**11**

11. A voltage regulator according to claim 10 wherein said first predetermined voltage is coupled to said first capacitor terminal through a diode.

12. A voltage regulator according to claim 11 wherein said power switching device comprises an FET having gate, drain and source electrodes corresponding to said control and output terminals, respectively.

13. A voltage regulator according to claim 12 wherein said drain electrode is coupled to a source of constant voltage potential and wherein the effective internal capacitance of said FET between said gate and source electrodes is substantially larger than the capacitance of said capacitor.

14. A voltage regulator according to claim 13 wherein said voltage control means comprises a voltage generator means and wherein said control element of said voltage control means comprises a field coil.

**12**

15. A voltage regulator according to claim 1 wherein said voltage control means comprises a voltage generator means and wherein said control element of said voltage control means comprises a field coil.

16. A voltage regulator according to claim 15 wherein said voltage generator means includes stator windings, in addition to said field coil, and a rectifier circuit means for receiving the output of said stator windings and providing a charging signal for a battery so as to maintain a predetermined battery voltage thereacross.

17. A voltage regulator according to claim 16 wherein said predetermined voltage across said battery corresponds to said predetermined maximum power source voltage potential.

18. A voltage regulator according to claim 1 wherein the frequency of said high frequency pulses is at least one order of magnitude higher than the frequency of said regulator output signal.

* * * * *

Dbt f !3;17.dw11456.EG!!!!Epdvn f ou23.3!!!!Gjme!210810117!!!!Qbhf !22!pg22

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.   :   4,733,159

DATED        :   March 22, 1988

INVENTOR(S) :   Arthur J. Edwards and Mihaly Lamoth

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In claim 1, Col. 9, line 35, after "voltage control means", please insert --,--.

Signed and Sealed this

Twenty-seventh Day of September, 1988

*Attest:*

DONALD J. QUIGG

*Attesting Officer*          *Commissioner of Patents and Trademarks*

# UNREPORTED CASES

LEXSEE

**CADDY PRODUCTS, INC., Plaintiff, v. GREYSTONE INTERNATIONAL, INC., Defendant and Third-Party Plaintiff, v. VISTEON GLOBAL TECHNOLOGIES, INC., Third-Party Defendant.**

**Civil No. 05-301 (JRT/FLN)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA**

**2006 U.S. Dist. LEXIS 58441**

**August 17, 2006, Decided**

**PRIOR HISTORY:** Caddy Prods., Inc. v. Greystone Int'l., Inc., 2005 U.S. Dist. LEXIS 34467 (D. Minn., Nov. 29, 2005)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent holder sued defendant purchaser of a business, alleging that the business's movie theater armrest infringed the holder's patent, and the purchaser asserted claims against third-party defendant seller of the business based on indemnity and fraud. The seller moved to dismiss the indemnity claim and to dismiss or stay the fraud claim pending arbitration.

**OVERVIEW:** The purchaser contended that the seller represented in the purchase agreement that there were no claims against the armrests, despite knowing that the patent holder considered the armrests to be infringing. The purchaser asserted that the agreement required the seller to indemnify the purchaser for its misrepresentations, and that the misrepresentations constituted fraud. The court held that the seller was not required to indemnify the purchaser and that the purchaser's fraud claim was subject to the arbitration clause in the agreement. Indemnity was not required since one alleged misrepresentation was not included within the indemnity provision and, with regard to the other alleged misrepresentation, the indemnity requirement expired under the terms of the agreement before the purchaser asserted its claim. Further, arbitration of the fraud claim was required since the agreement contained a valid arbitration clause and the purchaser's claim clearly involved a dispute arising out of the agreement.

**OUTCOME:** The seller's motion to dismiss was granted in part with regard to the indemnity claim, but the motion was denied in part with regard to the fraud claim, and the action was stayed pending arbitration of the fraud claim.

**CORE TERMS:** armrest, indemnity, indemnification, arbitration, fraud claim, pending arbitration, motion to dismiss, warranties, unambiguous, Federal Arbitration Act, parties agree, arbitrable, enforcing, sole remedy, good title, third-party, lawsuit, patent, public record, inefficient, arbitrate, submitted to arbitration, arbitration provision, specific performance, patent infringement, limitations period, committed fraud, losses arising, claim arising, negotiation

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN1] In a motion to dismiss, a court construes the complaint in the light most favorable to the plaintiff and presumes all facts alleged in the complaint to be true. The court may dismiss a claim only where the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief.

*Contracts Law > Contract Interpretation > General Overview*
[HN2] Like most jurisdictions, Michigan law provides that, in construing the terms of an agreement, a court is obligated to give effect to the intent of the parties as

Page 1

expressed by the plain language of their written agreement. Where the contract language is clear and unambiguous, its meaning is a question of law for the court to decide.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > General Overview*
[HN3] As evidenced by the Federal Arbitration Act, there is a strong federal policy in favor of enforcing arbitration agreements. If claims are arbitrable under the Federal Arbitration Act, the claims must be referred to arbitration, and the judicial proceedings must be stayed pending that arbitration. 9 U.S.C.S. §§ 2, 3. In determining whether a claim is arbitrable, a court must first decide whether a valid agreement to arbitrate exists between the parties, and then decide whether the specific dispute falls within the scope of that agreement. In engaging in the inquiry, the court applies ordinary state law contract principles to decide whether parties have agreed to arbitrate a particular matter.

**COUNSEL:** [*1] Dyanna L. Street and Richard G. Jensen, FABYANSKE, WESTRA, HART & THOMSON, P.A., Minneapolis, MN, for plaintiff, Caddy Products, Inc.

Allen W. Hinderaker, Anthony R. Zeuli, and Rebecca A. Bortolotti, MERCHANT & GOULD PC, Minneapolis, MN, for defendant and third-party plaintiff, Greystone International, Inc. n1

> n1 Greystone International, Inc. was formerly represented by Kathleen Loucks, Gislason & Hunter LLP, Hopkins, Minnsota.

Martin R. Lueck, Thomas C. Mahlum, and A. L. Brown, ROBINS KAPLAN MILLER & CIRESI LLP, Minneapolis, MN, for third party-defendant, Visteon Global Technologies, Inc.

For Greystone International Inc, Counter Claimant: Allen W Hinderaker, Anthony R Zeuli, Rebecca A Bortolotti, Merchant & Gould PC, Mpls, MN.

**JUDGES:** John R. Tunheim, United States District Judge.

**OPINION BY:** John R. Tunheim

**OPINION:**

### MEMORANDUM OPINION AND ORDER

### BACKGROUND

The underlying dispute in this case is a patent infringement action filed by Caddy Products, Inc. ("Caddy") against defendant Greystone International, Inc. ("Greystone"), in which Caddy alleges that Greystone's movie theater armrest infringes Caddy's patent rights. Greystone purchased the allegedly infringing armrest [*2] from Visteon Global Technologies ("Visteon") in a Purchase and Sale Agreement ("Purchase Agreement") on June 10, 2002. Pursuant to that agreement, Greystone acquired Visteon's business related to the design, manufacture and sale of seating for public venues, including the armrest at issue in this lawsuit. The Purchase Agreement contained representations that Visteon had good title to the armrests, and that no claims had been made or threatened related to the armrests. The Purchase Agreement also contained an indemnification provision.

After Caddy sued Greystone, Greystone sought indemnification from Visteon, but Visteon refused. Greystone then served a third-party complaint against Visteon. n2 In Greystone's complaint against Visteon, Greystone alleges that in 2000, two years prior to the Purchase Agreement, Caddy informed Visteon that it considered Visteon's armrests to infringe Caddy's patent rights. Caddy did not, however, initiate a lawsuit against Visteon. Later, during the course of the negotiation of the armrest sale to Greystone, Visteon did not disclose Caddy's opinion to Greystone, despite representations in the Purchase Agreement that no claims had been made or threatened [*3] against the armrests. The first time that Greystone learned of Caddy's opinion regarding the armrests was when Caddy brought this patent infringement lawsuit against Greystone.

> n2 Greystone served both a third-party complaint and an amended third-party complaint (collectively, the "complaint") against Visteon. *See* Docket Nos. 50, 67.

## ANALYSIS

### I. Standard Of Review

Visteon moves to dismiss Grey stone's complaint, or in the alternative, moves to stay the case pending arbitration. [HN1] In a motion to dismiss, the Court construes the complaint in the light most favorable to the plaintiff and presumes all facts alleged in the complaint to be true. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984); *Schmedding v. Tnemec Co.*, 187 F.3d 862, 864 (8th Cir. 1999). The Court may dismiss a claim only where the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957); *Casazza v. Kiser*, 313 F.3d 414, 418 (8th Cir. 2002). [*4] A court ruling on a motion to dismiss may consider "materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings," such as a contract to which all parties agree. *Haley v. AIG Life Ins. Co.*, 2002 U.S. Dist. LEXIS 1114, 2002 WL 417419, at *2 (D.N.D. Jan. 24, 2002); *see Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

Here, Visteon brings its motion to dismiss based on the terms of the Purchase Agreement, a contract to which the parties agree, and which is part of the public record. *See* Docket No. 58 (copy of Purchase Agreement). Therefore, the Court relies on the Purchase Agreement in ruling on Visteon's motion to dismiss.

### II. Purchase Agreement

Greystone asserts two causes of action against Visteon. First, Greystone seeks specific performance of the Purchase Agreement, requiring Visteon to indemnify Greystone for costs incurred in connection with the underlying lawsuit. Second, Greystone alleges that Visteon committed fraud with respect to the Purchase Agreement. Visteon moves to dismiss Greystone's claim for indemnity, and moves for an order staying Greystone's [*5] fraud claim pending arbitration of that claim.

The parties agree that, under the terms of the Purchase Agreement, Michigan law controls. [HN2] Like most jurisdictions, Michigan law provides that, in construing the terms of an agreement, the court is obligated to give effect to the intent of the parties as expressed by the plain language of their written agreement. *Devillers v. Auto Club Ins. Ass'n*, 473 Mich. 562, 702 N.W.2d 539, 550 (Mich. 2005). Where the contract language is clear and unambiguous, its meaning is a question of law for the court to decide. *Port Huron Educ. Ass'n MEA/NEA v. Port Huron Area Sch. Dist.*, 452 Mich. 309, 550 N.W.2d 228, 237 (Mich. 1996).

### A. Indemnification

Greystone seeks indemnification from Visteon for costs associated with this litigation based on breach of the representations contained in Section 8.3 and Section 8.4 of the Purchase Agreement. In Sections 8.3 and 8.4, Visteon represented that it had good title to the armrests, and that no claims had been made or threatened against them.

The Purchase Agreement contains an indemnification provision in Section 15.2. The Purchase Agreement provides that the indemnification provision is the "sole remedy" [*6] with respect to any claims relating to the subject matter of the Purchase Agreement, such as claims for breach of representations contained in the Purchase Agreement, except for claims based upon fraud and claims for which money damages are not an adequate remedy. Purchase Agreement, § 15.4. Claims based upon fraud are not, therefore, subject to the "sole remedy" of indemnification, and the Court addresses Greystone's claims of fraud below.

Although the indemnification provision the sole remedy for claims of breach of representations, by its terms, the indemnification provision is only available for losses arising out of the breach of representations contained in Sections 8.1 through 8.3 of the Purchase Agreement:

> [T]he following Section 15.2 [indemnity provision] shall have no application whatsoever to the representations and warranties contained in this Agreement other than with respect to the representations and warranties contained in Sections 8.1-8.3.

Purchase Agreement, § 15.1. In addition, the Purchase Agreement contains a limitations period, providing that all claims relating to those representations and warranties terminates two years after the Closing [*7] Date of the Purchase Agreement:

The representations and warranties contained in Sections 8.1-8.3 and Sections 9.1 and 9.2, and all claims with respect to such representations and warranties hereunder, shall terminate upon the expiration of two (2) years following the Closing Date.

Purchase Agreement, § 15.1.

Greystone seeks indemnity based on breach of Visteon's representations in Section 8.3 and 8.4 of the Purchase Agreement. In ruling on Visteon's motion to dismiss, the Court must determine whether the language of the Purchase Agreement is clear and unambiguous. *See Port Huron*, 550 N.W.2d at 237.

The Court finds that the language of the Purchase Agreement is clear and unambiguous, and holds that, based on the terms of the Purchase Agreement, Greystone's claim for indemnity fails as a matter of law. With respect to Greystone's claim for indemnity based on breach of the representations contained in Section 8.4, the Court finds that indemnity is not available because the Purchase Agreement expressly states that indemnity is only available for losses arising out of the breach of representations contained in Sections 8.1 through 8.3.

AS to Greystone's [*8] claim for indemnity based on Section 8.3, the Court finds that indemnity is not available, because Greystone's claim is outside the two-year limitations provision in Section 15.1. Under that section, Greystone's ability to assert a claim for indemnity based on Section 8.3 expired two years after the Closing Date of the Purchase Agreement. The Closing Date of the Purchase Agreement was June 12, 2002, and the two-year limitations period therefore ended on June 12, 2004. Greystone did not assert this claim until October 13, 2005. Accordingly, Greystone's claim for indemnity based on Section 8.3 is not timely under the terms of the Purchase Agreement, and must be dismissed.

### B. Fraud

Greystone also alleges that Visteon committed fraud with respect to the Purchase Agreement. Greystone alleges that Visteon fraudulently represented in the Purchase Agreement that it had good title, "free and clear of all Encumbrances" to the armrests, and that there were

no "threatened" claims against the armrests, when in truth, Visteon knew that Caddy had alleged that the armrests infringed its patent rights. Purchase Agreement, §§ 8.3, 8.4. Visteon moves to dismiss Greystone's fraud claim, or in [*9] the alternative, to stay the fraud claim pending arbitration, based on an arbitration provision in the Purchase Agreement.

[HN3] As evidenced by the Federal Arbitration Act, there is a strong federal policy in favor of enforcing arbitration agreements. *Moses H. Cone Memorial Hosp. v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983). If claims are arbitrable under the Federal Arbitration Act, the claims must be referred to arbitration, and the judicial proceedings must be stayed pending that arbitration. *See id.; 9 U.S.C. §§ 2, 3*. In determining whether a claim is arbitrable, the court must first decide whether a valid agreement to arbitrate exists between the parties, and then decide whether the specific dispute falls within the scope of that agreement. *Daisy Mfg. Co. v. NCR Corp.*, 29 F.3d 389, 392 (8th Cir. 1994). In engaging in the inquiry, the Court applies "ordinary state law contract principles to decide whether parties have agreed to arbitrate a particular matter." *Simitar Entm't, Inc. v. Silva Entm't, Inc.*, 44 F. Supp. 2d 986, 992 (D. Minn. 1999).

Here, Section 17.10 of the Purchase Agreement states that [*10] "any dispute" arising out of the Purchase Agreement shall be submitted to arbitration, except for actions for specific enforcement:

> Each of the parties agrees that any dispute, controversy or claim arising out of or in connection with this Agreement or any Related Agreement or any alleged breach hereof or thereof that is not resolved by negotiation as provided in Section 17.11 (a) shall, upon ten (10) days' prior written notice from one party to the other of its intent to arbitrate, be submitted to and settled exclusively by final and binding arbitration in Southfield, Michigan, before a panel of three arbitrators, in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA"). . . . Notwithstanding anything to the contrary in this Section 17.11(b), no party shall be precluded from seeking or obtaining from a court of competent

jurisdiction (i) injunctive relief or (ii) equitable or other judicial relief to specifically enforce the provisions of this Agreement and the Related Documents or to preserve the status quo ante pending resolutions of disputes hereunder or thereunder.

Purchase Agreement, § 17.10(b). The Court finds that [*11] Section 17.10 is clear and unambiguous, and that Grey stone's fraud claim must be submitted to arbitration. First, the parties do not dispute that the Purchase Agreement contains an agreement to arbitrate, and that the agreement is valid. Second, Grey stone's fraud claim is plainly encompassed by the language "any dispute, controversy, or claim arising out of or in connection with" the Purchase Agreement. In addition, unlike Greystone's claim for indemnity, Greystone's fraud claim does not fall into the exceptions to the arbitration requirement. n3 Finally, enforcing Section 17.10 is consistent with the strong policy in favor of enforcing arbitration agreements. n4

> n3 *Cf.* Purchase Agreement, § 17.10(b)(i)-(ii). As set forth above, Greystone's claim for indemnity is an action for specific performance of the Purchase Agreement, and therefore is not subject to the mandatory arbitration provision in Section 17.10.

> n4 Greystone offers only two arguments opposing enforcement of the arbitration provision. First, Greystone contends that arbitration should not be compelled, because it would be "inefficient" to litigate claims both in arbitration and in court. This argument has been rejected. *See Dean Witter Reynolds, Inc., v. Byrd, 470 U.S. 213, 217, 105 S. Ct. 1238, 84 L. Ed. 2d 158 (1985)* (holding that the Federal Arbitration Act requires arbitration of arbitrable claims, even though that may result in the "inefficient"

maintenance of separate proceedings in different forums). Second, Greystone cites to *All Saint's Brands, Inc. v. Brewery Group Denmark, A/S, 57 F. Supp. 2d 825, 829 (D. Minn. 1999)*, a case in which the court denied a motion to stay the case pending arbitration. *All Saint's Brands,* however, is not analogous to the instant case. That case involved unique circumstances not present here, including the court's finding that staying the case pending arbitration would have been prejudicial to parties to the litigation who were not parties to the arbitration agreement.

[*12]

## ORDER

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that Visteon's Motion to Dismiss Third-Party Complaint [Docket No. 55] and Visteon's Motion to Dismiss Greystone's Fraud Claim or, in the Alternative, to Stay [Docket No 76] are **GRANTED in part and DENIED in part** as follows:

1. Greystone's claim for indemnification by Visteon is **DISMISSED with prejudice;**

2. Greystone is **ORDERED** to submit its fraud claim to arbitration in accordance with the Purchase Agreement; and

3. All further proceedings with respect to Greystone's fraud claim are **STAYED PENDING ARBITRATION.**

DATED: August 17, 2006
at Minneapolis, Minnesota.

s/ John R. Tunheim

United States District Judge

LEXSEE

**CALUMET LUMBER, INC., an Indiana corporation, Plaintiff, v. MID-AMERICA INDUSTRIAL, INC. an Illinois corporation; RISING SUN BAPTIST CHURCH a/k/a RISING SUN MISSIONARY BAPTIST CHURCH, an Illinois not-for-profit corporation; COMERICA BANK OF ILLINOIS, an Illinois bank, f/k/a AFFILIATED BANK/WESTERN NATIONAL; ROYAL CRANE SERVICE, INC., an Illinois corporation; CUSTOM BRICK CO., INC., an Illinois corporation; PICK-A-TOOL, an Illinois company; UNKNOWN OWNERS and NON-RECORD CLAIMANTS, Defendants. MID-AMERICA INDUSTRIAL, INC., an Illinois corporation, Counter Plaintiff, v. RISING BAPTIST CHURCH a/k/a RISING SUN MISSIONARY BAPTIST CHURCH, an Illinois not-for-profit corporation, et al., Counter Defendants.**

No. 95 C 4875

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

**1996 U.S. Dist. LEXIS 5158**

**April 16, 1996, Decided
April 18, 1996, DOCKETED**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In an action brought by plaintiff subcontractor against defendants, owner and general contractor, to foreclose a mechanic's lien pursuant to 770 Ill. Comp. Stat. 60/0.01 et seq., the owner filed a motion to enlarge the time for discovery and to continue the trial date or sever the trial.

**OVERVIEW:** The subcontractor supplied materials for a church reconstruction project and filed a three-count complaint against multiple defendants for breach of contract and account stated and to foreclose a mechanic's lien when the general contractor allegedly failed to pay the subcontractor the full amount due. The case had a complicated procedural history that included the filing of various counterclaims and cross-claims. After several parties failed to comply with the court's deadlines for discovery and the filing of pleadings, the court dismissed the action for failure to prosecute. The court later vacated that dismissal and set a firm trial date. The owner then filed a motion for an extended discovery time and to continue the trial date or sever the trial. Noting that the owner had not diligently pursued discovery and that it

had not filed its answer until five months after the complaint was filed, the court granted the motion to extend the discovery time and continued the trial date. The court reasoned that none of the parties had cited anything more than general prejudice in objecting to such extensions and held that severance of the trial would have been cumbersome for all parties.

**OUTCOME:** The court granted the owner's motion to enlarge the time for discovery and to continue the trial date in the subcontractor's action to foreclose a mechanic's lien.

**CORE TERMS:** cross-claim, discovery, trial date, counterclaim, mechanics', sever, pretrial, prepare, enlarge, default judgment, purportedly, deposition, subcontractors, motion to dismiss, cross-defendant, reconstruction, advisement, diligence, instanter, separate trial, church, cross-plaintiff, foreclosure, prejudiced, foreclose, responsive pleading, want of prosecution, general contractor, failed to comply, failure to file

**LexisNexis(R) Headnotes**

*Civil Procedure > Pretrial Matters > Separate Trials*
*Civil Procedure > Judgments > Entry of Judgments >*
*Enforcement & Execution > General Overview*
*Real Property Law > Nonmortgage Liens > Mechanics'*
*Liens*

[HN1] While all foreclosure actions must be brought in one suit under the Illinois Mechanics Lien Act, a court has discretion to sever the claims for separate adjudication. 770 Ill. Comp. Stat. 60/14.

## COUNSEL: [*1]

For CALUMET LUMBER, INC., an Indiana corporation, plaintiff: Michael Sweig Mendelson, Anjali C. Das, McConnell & Mendelson, Chicago, IL. Mitchell Bryan, Levenfeld, Eiseneberg, Janger, Glassberg, Samotny & Halper, Chicago, IL.

For MID-AMERICA INDUSTRIAL, INC., an Illinois corporation, defendant: Robert A. Filpi, Paul F. Stack, Stack, Filipi & Kakacek, Chicago, IL. For RISING SUN BAPTIST CHURCH aka Rising Sun Missionary Baptist Church, defendant: Martin Louis Schwartz, Martin L. Schwartz & Associates, Chicago, IL. For CUSTOM BRICK CO., INC., an Illinois corporation, defendant: Colleen M. Loftus-Hopkinson, Loftus & Loftus, Park Ridge, IL. Russell J. Luchtenburg, Russell J. Luchtenburg, Ltd., Park Ridge, IL.

For MID-AMERICA INDUSTRIAL, INC., cross-defendant: Robert A. Filpi, Paul F. Stack, Stack, Filipi & Kakacek, Chicago, IL. For RISING SUN BAPTIST CHURCH aka Rising Sun Missionary Baptist Church, cross-defendant: Martin Louis Schwartz, Martin L. Schwartz & Associates, Chicago, IL. For CUSTOM BRICK CO., INC., cross-defendant: Colleen M. Loftus-Hopkinson, Loftus & Loftus, Park Ridge, IL. Russell J. Luchtenburg, Russell J. Luchtenburg, Park Ridge, IL.

For MID-AMERICA INDUSTRIAL, INC., cross-claimant: Robert A. Filpi, Paul F. Stack, Stack, Filipi & Kakacek, Chicago, IL.

For MID-AMERICA INDUSTRIAL, INC., counter-claimant: Robert A. Filpi, Paul F. Stack, Stack, Filipi & Kakacek, Chicago, IL. For RISING SUN BAPTIST CHURCH aka Rising Sun Missionary Baptist Church, counter-claimant: Martin Louis Schwartz, Martin L. Schwartz & Associates, Chicago, IL.

For CALUMET LUMBER, INC., counter-defendant: Michael Sweig Mendelson, Anjali C. Das, McConnell & Mendelson, Chicago, IL. Mitchell Bryan, Levenfeld, Eisenberg, Janger, Glassberg, Samotny & Halper, Chicago, IL. For MID-AMERICA INDUSTRIAL, INC., counter-defendant: Robert A. Filpi, Paul F. Stack, Stack, Filipi & Kakacek, Chicago, IL.

**JUDGES:** Suzanne B. Conlon, United States District Judge

**OPINION BY:** Suzanne B. Conlon

## OPINION:

### MEMORANDUM OPINION AND ORDER

Calumet Lumber, Inc. ("Calumet") brings a three-count complaint against multiple defendants to foreclose a mechanics' lien pursuant to 770 ILCS 60/0.01 et seq. and for other relief. Calumet sues Mid-America Industrial, Inc. ("Mid-America") for breach of contract and account stated, and Mid-America, Rising Sun Baptist Church a/k/a Rising Sun Missionary Baptist Church ("Rising Sun"), Custom Brick Co., Inc. ("Custom Brick"), Comerica Bank of Illinois f/k/a Affiliated Bank/Western National, Royal Crane Service, Inc., and Pick-A-Tool (collectively "defendants") for foreclosure of a mechanics' lien. Counterclaims and cross-claims have been filed by Custom Brick, Mid-America and Rising Sun. Bench trial is set for April 29, 1996. Before the court is Rising Sun's motion to enlarge discovery and sever the trial.

### BACKGROUND

#### A. Factual Background

Rising Sun is a not-for-profit corporation and legal owner of the property and all buildings and improvements located at 822-26 North Central Avenue in Chicago, Illinois ("the property"). In May 1994, Rising Sun [*2] hired Mid-America as the general contractor to oversee reconstruction of a fire-damaged church and adjoining recreational facility and other improvements on the property. Between August 1994 and February 1995, Calumet and Custom Brick entered into subcontracts with Mid-America to furnish and deliver materials, supplies and equipment for the reconstruction project. Calumet furnished a total of $ 76,283.95 in materials, supplies and

equipment. Through October 1994, Mid-America paid Calumet a total of $ 25,685.80 of the subcontract price, leaving $ 50,598.15 still due and owing. Mid-America owes $ 8,504.60 to Custom Brick. Mid-America refuses to pay these outstanding balances. Calumet seeks a first and prior lien, paramount to all other liens, upon the property and its improvements, and for the property to be sold if Mid-America continues to default on its payment.

**B. Procedural Background**

The procedural history of this case is convoluted. It is rife with various parties' failure to file responsive pleadings, an alleged failure to serve a counterclaim, failures to appear for a status conference, the dismissal of the case for want of prosecution, and the court's subsequent [*3] vacation of the case's dismissal with a one month extension of discovery and the setting of a firm trial date.

On August 23, 1995, Calumet filed its complaint. On October 3, 1995, this court ordered that the parties comply with the mandatory disclosure provisions of Rule 26(a)(1) by December 2, 1995. Dispositive motions were due by January 3, 1996.

On October 17, Custom Brick filed its answer to the complaint and filed a counterclaim against Mid-America. On October 24, 1995, Mid-America filed its answer to the complaint, a counterclaim to foreclose Calumet's mechanic's lien, and a cross-claim against Rising Sun in which Mid-America seeks judgment against Rising Sun for $ 117,787.13; Mid-America admittedly owes $ 50,598.15 to Calumet and $ 8,504.60 to Custom Brick.

Rising Sun filed an appearance on October 11, 1995. Rising Sun's attorney attended and participated in the November 3, 1995 Rule 26(a) discovery conference. Rising Sun did not file a motion to dismiss the complaint and Mid-America's cross-claim until December 22, 1995. On December 27, 1995, Rising Sun filed its cross-claim against Mid-America. n1

n1  Mid-America never filed a responsive pleading to the cross-claim. Mid-America claims it was never served with the cross-claim and notes the purported certificate of service is not signed. Rising Sun's motion for entry of a default judgment on its cross-claim against

Mid-America has been taken under advisement and will be addressed separately.

[*4]

On January 9, 1996, the court denied Rising Sun's motion to dismiss Mid-America's cross-claim and directed Rising Sun to answer the cross-claim by January 22, 1996. Rising Sun neither filed its answer to Mid-America's cross-claim on January 22 nor filed a motion for an extension of time to answer. On January 25, the court denied Rising Sun's motion to dismiss the complaint, granted Calumet leave to file an amended complaint *instanter,* and directed Rising Sun to answer the amended complaint by February 8, 1996. Rising Sun timely filed its answer to the amended complaint.

Subsequently, this court entered the following order:

No motions for summary judgment having been filed in accordance with this court's order of 10/03/95, the parties are directed to present their joint final pretrial order and agreed jury instructions on 02/29/96 at 9:00 a.m. Plaintiff shall furnish all parties with its portions of the pretrial order by 02/21/96. This case is placed on the March trial calendar.

Order, No. 95 C 4875 (N.D. Ill. Jan. 30, 1996). The parties failed to appear and present their joint final pretrial order on February 29, 1996. Accordingly, this court dismissed the case [*5] for want of prosecution. See Order, No. 95 C 4875 (N.D. Ill. Feb. 29, 1996). On the parties' motions, this court vacated the February 29 order "on the condition that all discovery is completed by 04/15/96." See Order, No. 95 C 4875 (N.D. Ill. Mar. 14, 1996). A firm bench trial date was set for April 29, 1996. Id. Thus, the court extended discovery for an additional month.

On March 22, 1996, Mid-America filed its answer to Calumet's amended complaint. On April 8, 1996, Mid-America moved for entry of a default judgment against cross-defendant Rising Sun on Mid-America's cross-claim for failure to file a responsive pleading, due by court order on January 22, 1996. n2 Subsequently, Rising Sun filed its proposed answer to Mid-America's cross-claim and a motion to enlarge discover until August

15, 1996, and to continue the trial date or sever for separate trials. Mid-America and Custom Brick timely filed their objections.

> n2 Mid-America's motion for entry of a default judgment against Rising Sun and Rising Sun's motion to file an answer to Mid-America's cross-claim have been taken under advisement and will be addressed separately.

[*6]

### DISCUSSION

Rising Sun premises its motion to enlarge discovery and to postpone trial or to sever trial on purportedly numerous complex issues of fact concerning construction defects in the reconstruction of the property requiring expert examination and testimony. Rising Sun further contends there are numerous issues regarding claimed extra work and delay in performing the construction work. Rising Sun asserts the 30-day time period this court granted upon reinstating the case on March 14 is inadequate to complete discovery and prepare for trial. Rising Sun notes that its previously disclosed expert witness, Mr. Joseph Babat, requires an additional 80 days to inspect all aspects of the design and construction, form an opinion, prepare a proper report and submits to deposition. Rising Sun maintains Babat has indicated that invasive and non-invasive testing will be required on the newly constructed church.

Finally, Rising Sun asserts the causes of action between it and general contractor Mid-America are more intricate and diverse than the issues involving the subcontractors Calumet and Custom Brick. Thus, Rising Sun contends, while the discovery deadline may be achievable [*7] as to the materialmen's complaints, it is "unrealistic" as to the issues between Rising Sun and Mid-America. Furthermore, [HN1] while all foreclosure actions must be brought in one suit under the Illinois Mechanics Lien Act, this court has discretion to sever the claims for separate adjudication. 770 ILCS 60/14. Rising Sun argues that neither Calumet nor Custom Brick will be prejudiced by a separate trial because both should be able to enforce a judgment against Mid-America -- Rising Sun has purportedly paid $ 371,656 to Mid-America, providing Mid-America with sufficient funds to pay its subcontractors.

Mid-America objects to Rising Sun's motion. Mid-America asserts that Rising Sun did not file a pleading in this case until mid-December 1995, four months after the complaint and two months after Mid-America's cross-claim against Rising Sun were filed. Mid-America notes that Rising Sun failed to comply with this court's order to answer Mid-America's cross-claim by January 22, did not move to extend the answer date, and only filed leave to file its answer two and one-half months after it was due and three weeks prior to trial. Mid-America asserts that piecemeal litigation will impose a burden [*8] on this court and on Mid-America -- a necessary party to all claims. Mid-America would be forced to prepare for two separate trials. Mid-America contends that severing the trial will delay the final disposition because the primary purpose of the complaint and cross-claims is to determine the amount due to each lien creditor and order the sale of the property to satisfy the claims. 770 ILCS 60/18-19.

Custom Brick argues it will be severely prejudiced by a delay in the final adjudication of this matter. Custom Brick asserts that a continuation of the trial date is inappropriate because of Rising Sun's lack of due diligence in litigating this case. Custom Brick contends final resolution of its lien claim cannot be had until the issues between Rising Sun and Mid-America are resolved because there can only be one sale of the property. Custom Brick maintains Rising Sun's motion is untimely and seriously prejudicial.

Rising Sun's argument that it needs an additional four months to conduct discovery is unpersuasive. Rising Sun has not diligently litigated this case. Rising Sun did not respond until December 1995 to the August 1995 complaint. Rising Sun did not answer the complaint until [*9] January 1996. Rising Sun failed to comply with this court's order to answer Mid-America's cross-claim by January 22, 1996. Nor does Rising Sun demonstrate it conducted discovery with due diligence that would entitle it to four months of additional discovery. In fact, Rising Sun fails to show that it has conducted any discovery since this case was filed in August 1995. Rising Sun claims it may need to take seven depositions, but has purportedly attempted to take only one; that deposition was allegedly to occur near the end of this court's one month discovery extension. n3 Rising Sun allegedly identified Babat as an expert "pursuant to this Court's order," but fails to disclose when he was retained. Presuming Rising Sun is referring to this court's October

3, 1995 order directing compliance with Fed. R. Civ. P. 26(a)(1) by December 2, 1995, Rising Sun fails to explain why Babat could not and did not conduct his inspection, form his opinion and prepare his expert report by April 1996, or at least substantially complete the tasks required pursuant to Fed. R. Civ. P. 26(a)(2).

> n3 Rising Sun's attorney attests that a Mid-America witness, Paul Seeger, refused to "voluntarily appear for his deposition scheduled on April 3, 1996." Affidavit of Peter Swan ("Swan Aff.") P 12. Swan maintains that Rising Sun will seek an order to compel; Rising Sun has failed to do so promptly.

[*10]

This lack of due diligence is particularly troubling because Rising Sun has been aware of Calumet's claim since April 1995. See Am. Compl. P 35; Am. Compl. Ex. C; Rising Sun Answer P 35. Rising Sun purportedly refused to pay Mid-America under their contract because of alleged construction defects and delays in performance. Rising Sun presumably had some basis for its actions occurring one year ago. Thus, Rising Sun's need for an additional four months for discovery rings hollow.

Moreover, a severance of trial would be cumbersome for the court and the parties. Not only would the court and Mid-America have to prepare for two separate trials, but all parties would need to wait until after the second trial to enforce any judgment against Rising Sun. n4 Because the parties have asserted mechanics' liens on the property, a sale of the property may be required to satisfy the claims. See 770 ILCS 60/19. Rising Sun's unsupported assertion that it has paid Mid-America sufficient funds to cover the subcontractors' claims is misplaced in this mechanics' lien action.

> n4 The need for a second trial could be moot depending on the court's resolution of the pending motions for default judgment concerning cross-claims between Mid-America and Rising Sun.

[*11]

Finally, none of the parties claim more than general prejudice to an extension of discovery and delay in the trial date. Accordingly, although Rising Sun has not diligently pursued discovery, this court reluctantly grants one final extension of discovery and shall reschedule the trial date. The dates entered in accordance with this opinion are **final.**

**CONCLUSION**

Defendant/cross-defendant/cross-plaintiff Rising Sun Baptist Church's motion to file an answer instanter, enlarge discovery cut off and continue trial date or sever for separate trial is granted in part. The motion to file an answer instanter is taken under advisement. All parties shall fully comply with Fed. R. Civ. P. 26(a)(2) by April 29, 1996. All discovery is to be completed by May 29, 1996.

The parties are to present their joint final pretrial order on June 10, 1996 at 9:00 a.m. Plaintiff, counter-plaintiffs and cross-plaintiffs shall provide defendants, counter-defendants and cross-defendants with drafts of their portions of the pretrial order concerning the complaint, counterclaims and cross-claims by June 3, 1996, respectively. This case is set for trial on June 17, 1996 at 9:00 a.m.

ENTER: [*12]

Suzanne B. Conlon

United States District Judge

April 16, 1996

LEXSEE

**ENEX RESOURCES CORPORATION AND ENEX PROGRAM I PARTNERS,
L.P., Appellants v. TEXAS CRUDE, INC., Appellee**

**No. 05-94-00641-CV**

**COURT OF APPEALS OF TEXAS, FIFTH DISTRICT, DALLAS**

**1994 Tex. App. LEXIS 4112**

**December 30, 1994, Opinion Filed**

**NOTICE:** [*1]    PURSUANT TO THE TEXAS
RULES OF APPELLATE PROCEDURE,
UNPUBLISHED OPINIONS SHALL NOT BE CITED
AS AUTHORITY BY COUNSEL OR BY A COURT.

**SUBSEQUENT HISTORY:**

Petition for Review Denied May 20, 1999.

**PRIOR HISTORY:** On Appeal from the 101st Judicial
District Court. Dallas County, Texas. Trial Court Cause
No. 89-15431.

**DISPOSITION:** REVERSED and RENDERED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Both appellee oil and gas
operator and appellant working interest owners appealed
the decision of the 101st Judicial District Court, Dallas
County (Texas), that netted out the damage awards to
both parties under the jury's verdict and rendered
judgment for appellee in a contract dispute with
appellants.

**OVERVIEW:** Appellee oil and gas operator sought
indemnity from appellant working interest owners.
Appellants counterclaimed for funds it claimed were
wrongfully withheld by appellee. A jury found both
appellants and appellee liable for damages. The trial court
netted out the damage awards under the jury verdict and
rendered judgment for appellee. Appellants sought
review on multiple grounds, including that appellee was
not entitled to indemnity as a matter of law and that the
jury question on indemnity contained an impermissible

comment on the evidence. Appellee contended in its
cross-point that the trial court erred in sustaining
appellants' objections to the testimony of appellee's
experts. Giving effect to the intentions of the parties as
expressed in their contract, the court held that appellee
was not entitled to indemnity. Accordingly, the court
reversed the judgment of the trial court and rendered
judgment for appellants.

**OUTCOME:** The court reversed the judgment of the
trial court and rendered judgment that appellee oil and
gas operator take nothing on its claim for indemnity. The
court also rendered judgment that appellant working
interest owners recover from appellee the sum awarded as
an offset.

**CORE TERMS:** letter agreement, settlement, withheld,
net income, indemnity, working interest, lawsuit, entitled
to indemnity, modification, fees incurred, matter of law,
royalty, oil, one year, preponderance, contingency fund,
render judgment, counterclaim, cross-point, reimburse,
obligate, complains, withhold, oral agreement, entire
record, great weight, accounting, unambiguous,
conceivably, cease

**LexisNexis(R) Headnotes**

*Contracts Law > Contract Conditions & Provisions >
Indemnity*
*Contracts Law > Contract Interpretation > General
Overview*
[HN1] A contract for indemnity is read as any other
contract. Under principles of contract law, courts must
ascertain and give effect to the intentions of the parties as

expressed in the instrument. When the contract is unambiguous, courts must determine the rights and liabilities of the parties by giving legal effect to the contract as written. Courts may not expand the parties' rights or responsibilities beyond the limits agreed upon by them in the contract.

*Contracts Law > Contract Modifications > General Overview*
[HN2] When parties to a contract make a valid modification of their contract and exchange consideration, the terms of the latest contract control.

*Civil Procedure > Appeals > Standards of Review > Substantial Evidence > General Overview*
[HN3] If an appellant is attacking the legal sufficiency of an adverse finding on an issue on which he had the burden of proof, he must demonstrate on appeal that the evidence conclusively established all vital facts in support of the issue. In reviewing such a "matter of law" challenge, the appellate court first examines the record for evidence that supports the finding, while ignoring all evidence to the contrary. If there is no evidence to support the finding, it will then examine the entire record to determine if the contrary proposition is established as a matter of law.

*Contracts Law > Contract Modifications > Oral Modifications*
*Contracts Law > Statutes of Frauds > Requirements > Performance*
[HN4] Oral modification of a contract does not violate the statute of frauds, Tex. Bus. & Com. Code Ann. § 26.01, if neither the portion of the written contract affected by the subsequent modification, nor the matter encompassed by the modification itself is required to be in writing.

*Contracts Law > Statutes of Frauds > General Overview*
[HN5] Under Tex. Bus. & Com. Code Ann. § 26.01, an operating agreement need not be in writing if it can be performed within one year.

*Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review*
[HN6] In reviewing a challenge that the jury's failure to give an award is against the great weight and preponderance of the evidence, the appellate court considers and weighs the entire record, and sets aside the verdict only if it is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust.

*Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review*
[HN7] Appellate courts are not free to substitute their judgment for that of the jury simply because they may disagree with the jury's verdict. When considering great weight points complaining of a jury's failure to find a fact, courts of appeals should be mindful that a jury was not convinced by a preponderance of the evidence.

*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
[HN8] It is the jury's province to reconcile the conflicting or contradictory evidence of the witnesses, or to give a greater degree of credit to one or more of the witnesses.

**JUDGES:** Before Chief Justice McGarry and Justices Thomas and Whitham. n1 Opinion by Chief Justice McGarry

> n1 The Honorable Warren Whitham, Justice, Court of Appeals, Fifth District of Texas at Dallas, Retired, sitting by assignment.

**OPINION BY:** CHARLES W. McGARRY

**OPINION:** OPINION

Opinion by Chief Justice McGarry

Texas Crude, Inc. ("Texas Crude"), an oil and gas operator, sought indemnity from working interest owners Enex Resources Corporation and Enex Program I Partners, L.P. (collectively referred to as "Enex"). Enex counterclaimed for funds it alleged were wrongfully withheld by Texas Crude. A jury found both Enex and Texas Crude liable for damages. Based on the jury verdict, the trial court netted out the damage awards and rendered judgment for Texas Crude. In eleven points of error, Enex argues that Texas Crude is not entitled to indemnity as a matter of law. Enex also complains the jury question [*2] on indemnity contained an

impermissible comment on the evidence. Regarding its counterclaim, Enex complains that the jury's award should have included additional sums withheld by Texas Crude for in-house personnel fees. Texas Crude contends in a single cross-point that the trial court erred in sustaining Enex's objections to the testimony of certain Texas Crude experts. We agree with Enex that Texas Crude is not entitled to indemnity. Accordingly, we reverse the judgment of the trial court and render judgment for Enex.

## BACKGROUND

Texas Crude is the operator of certain oil and gas properties in Cherokee County, Texas. Enex acquired an ownership interest in the same properties from the Schlensker Drilling Corporation. Schlensker reserved a share of the net proceeds from future production and required Enex to pay Schlensker a "net income payment." Schlensker later assigned the net income payment to BancTexas, which then assigned it to Community Credit Union.

In 1985, Texas Crude filed suit against a gas purchaser, Delhi Gas Pipeline ("Delhi"), alleging breach of contract. Texas Crude sought recovery against Delhi on behalf of all working interest owners. Enex signed a [*3] Letter of Instruction and Authorization that ratified the actions taken by Texas Crude in pursuing the claims against Delhi. The case went to trial, and Texas Crude obtained a judgment against Delhi. While the case was on appeal, Texas Crude and Delhi settled the litigation for approximately $ 33.4 million.

Prior to the settlement between Texas Crude and Delhi, Enex attempted to obtain a release of the net income payment from BancTexas. Because Enex was unable to settle BancTexas' claim to the net income payment, Texas Crude and Delhi required Enex to enter into an agreement ("the letter agreement") in which Enex authorized Texas Crude to withhold $ 1,576,977 (the unpaid balance of the net income payment) out of Enex's share of the settlement. The letter agreement permitted Enex to later substitute an irrevocable letter of credit for the withheld funds. The letter of credit was to reimburse Texas Crude if it paid a judgment attributable to the net income payment. Enex also agreed to retain counsel to defend Texas Crude in event of a claim and to pay all legal expenses, fees and costs of such counsel.

In 1989, the then owner of the net income payment,

Community Credit Union, filed [*4] suit against Enex, Texas Crude, and Delhi. Community Credit Union claimed Enex had breached its contractual obligation to make the net income payment, and that the other defendants had tortiously caused or contributed to Enex's breach. In January 1990, Texas Crude notified Enex it was being sued by Community Credit Union and asked Enex to defend the lawsuit on behalf of Texas Crude. Enex's counsel filed an answer on behalf of Texas Crude. Two months later, Texas Crude claimed the attorney retained by Enex had a conflict of interest, and instructed him to stop all work on behalf of Texas Crude and to relinquish the defense to new counsel.

In November 1991, Texas Crude settled with Community Credit Union for $ 150,000. No judgment was entered against Texas Crude. Following its settlement with Community Credit Union, Texas Crude pursued a cross-action against Enex to indemnify it for the $ 150,000 paid in settlement, plus $ 450,122.78 in attorney's fees incurred after Texas Crude hired its own counsel.

Enex asserted a counterclaim against Texas Crude for money withheld by Texas Crude from Enex's share of the Delhi settlement. Texas Crude had set aside 3.75 percent of the settlement [*5] as a contingency fund for royalty owner claims. After those claims were resolved, Enex's share of the amount remaining in the contingency fund was $ 163,019.15. Texas Crude also withheld $ 145,751 from Enex for the cost of Texas Crude's legal staff and other office employees. These funds were withheld in addition to the $ 1,576,977 withheld pursuant to the letter agreement.

The jury found that Enex owed Texas Crude $ 600,122.78, representing $ 150,000 settlement plus the attorneys' fees incurred by Texas Crude in defending the Community Credit Union lawsuit. The jury also found Texas Crude had improperly withheld $ 163,019.50 (the remainder of the contingency fund) from Enex. After netting out the two amounts, the trial court entered judgment in favor of Texas Crude. n2

> n2 Texas Crude agreed to a remittitur of $ 22,900.44, for attorney's fees incurred after the settlement with Community Credit Union.

## INDEMNITY

Enex's first two points of error contend that, as a matter of law, Texas Crude is not [*6] entitled to indemnity under either the letter agreement or the operating agreements. We agree.

[HN1] A contract for indemnity is read as any other contract. _Safeco Ins. Co. of Am. v. Gaubert, 829 S.W.2d 274, 281_ (Tex. App.--Dallas 1992, writ denied). Under principles of contract law, courts must ascertain and give effect to the intentions of the parties as expressed in the instrument. _Ideal Lease Serv. v. Amoco Prod. Co., 662 S.W.2d 951, 953 (Tex. 1983)._ When the contract is unambiguous, we must determine the rights and liabilities of the parties by giving legal effect to the contract as written. _Id._ We may not expand the parties' rights or responsibilities beyond the limits agreed upon by them in the contract. _Id._

Texas Crude argues that it may seek indemnity from Enex under either the letter agreement or its operating agreements with the working interest owners. We disagree. Assuming that both the operating agreements and the letter agreement address Texas Crude's indemnity rights, the letter agreement more specifically addresses indemnity for claims by, through or under BancTexas. The letter agreement, being later in time and more specific, constitutes a modification of [*7] the original agreement. Thus, the letter agreement controls. _Lake LBJ Mun. Util. Dist. v. Coulson, 839 S.W.2d 880_ (Tex. App.--Austin 1992, no writ) ( [HN2] When parties to a contract make a valid modification of their contract and exchange consideration, the terms of the latest contract control.)

_Letter Agreement_

Texas Crude relies upon the following language in the letter agreement to support its claim for reimbursement of the $ 150,000 paid in settlement to Community Credit Union:

The letter of credit shall name Texas Crude, Delhi, and TXO Production Corp. as beneficiaries, and shall be available to reimburse Texas Crude, Delhi, and/or TXO Production if they pay, satisfy or respond to a judgment in favor of BancTexas Dallas, or anyone claiming by,

through or under them, for any claim attributable to the Net Income Payment describe above.

Texas Crude paid $ 150,000 to settle Community Credit Union's claims. It did not pay, satisfy or respond to a judgment. Community Credit Union's claims were dismissed with prejudice by an order that did not award damages. Under the unambiguous terms of the letter agreement, Texas Crude is not entitled to indemnity for a voluntary settlement. [*8] Texas Crude also argues that the letter agreement, even if insufficient to permit recovery of the $ 150,000 settlement, still entitles Texas Crude to indemnification for the attorney's fees incurred in defending the Community Credit Union lawsuit. The last paragraph of the letter agreement obligates Enex to "provide a defense to Texas Crude, Delhi and/or TXO Production in the event they are named by BancTexas Dallas (or anyone claiming by, through, or under them) as defendants in a lawsuit alleging a claim for money owed pursuant to the Net Income Payment described above."

The letter agreement obligates Enex to retain counsel to defend Texas Crude and pay the fees and costs incurred by such counsel. It does not obligate Enex to pay all legal expenses, fees and costs of counsel retained by Texas Crude. _See Ingram Exploration Co. v. Wild Well Control, Inc., 838 S.W.2d 317, 319_ (Tex. App.--El Paso 1992, no writ). Enex honored its obligation to Texas Crude. When Texas Crude notified Enex it was being sued by Community Credit Union, Enex's counsel filed an answer on behalf of Texas Crude. Texas Crude then instructed counsel to take no further action on the part of Texas Crude, and [*9] retained different counsel. Enex has no obligation to reimburse Texas Crude for attorney's fees incurred by counsel retained by Texas Crude.

_Joint Operating Agreements_

In the alternative, if both the letter agreement and the joint operating agreements provide a basis for indemnification, the joint operating agreement would not be applicable to this indemnity claim. Texas Crude relies upon the following language from the operating agreements concerning royalty burdens:

Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Unit Area, exclusive of production which may be used in development and producing operations and in preparing

and treating oil for marketing purposes and production unavoidably lost. Each party shall pay or deliver, or cause to be paid or delivered, all royalties, overriding royalties, or other payments due on its share of such production, and shall hold the other parties free from any liability therefor.

This language appears in a section of the operating agreements entitled "Right to Take Production in Kind." That section applies where a working interest owner takes its share of [*10] production in-kind and owes a royalty or production payment on the production taken. The defense of the lawsuit by Community Credit Union against Texas Crude did not involve such a situation. Texas Crude sold Enex's gas and then paid Enex its share. Because Enex was not taking production in-kind, Texas Crude is not entitled to indemnity for the settlement with Community Credit Union or for attorney's fees associated with that lawsuit under the joint operating agreements.

Texas Crude is not entitled to indemnity for the settlement or attorney's fees under either the letter agreement or the joint operating agreements. Points of error one and two are sustained. It is therefore unnecessary to address Enex's points of error three through eight.

**DELHI ATTORNEY FEES**

In its counterclaim against Texas Crude, Enex sought recovery of its share of the $ 950,506.15 Texas Crude withheld from the settlement for litigation expenses incurred by Texas Crude during the Delhi lawsuit. Enex's ninth and eleventh points of error contend that it was entitled to additional damages for its share of these expenses as a matter of law.

[HN3] If an appellant is attacking the legal sufficiency of an adverse [*11] finding on an issue on which he had the burden of proof, he must demonstrate on appeal that the evidence conclusively established all vital facts in support of the issue. *Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989).* In reviewing such a "matter of law" challenge, we first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Id.* If there is no evidence to support the finding, we will then examine the entire record to determine if the contrary proposition is established as a matter of law. *Id.* Enex contends that the $ 950,056.15 (of which Enex's share is $ 145, 751) was

withheld in violation of the "Accounting Procedure Joint Operation" section of the Joint Operating Agreements. Enex maintains it did not consent to the $ 950,056.15 in litigation expenses as required by the accounting procedures section. Texas Crude maintains that the operating agreement required the agreement of only a majority of the owners.

Enex claims the approval amounted to an oral modification of the contract barred by the Statute of Frauds. *See* TEX. BUS. & COM. CODE ANN. § 26.01. Thus, Enex contends, the plain language of the [*12] operating agreements should be enforced, and judgment rendered for Enex for the $ 145,751 withheld by Texas Crude for in-house personnel fees.

[HN4] Oral modification of a contract does not violate the Statute of Frauds if neither the portion of the written contract affected by the subsequent modification, nor the matter encompassed by the modification itself is required to be in writing. *See Lone Star Steel Co. v. Scott, 759 S.W.2d 144, 153* (Tex. App.--Texarkana 1988, writ denied). Operating agreements can conceivably be performed within one year in accordance with the agreements. When oil production ceases, the operating agreements cease. [HN5] Under section 26.01, an operating agreement need not be in writing if it can be performed within one year. *Hardin Assoc., Inc. v. Brummett, 613 S.W.2d 4, 7* (Tex. Civ. App.--Texarkana 1980, no writ); *Hondo Oil & Gas Co. v. Texas Crude Operator, Inc., 970 F.2d 1433, 1438 (5th Cir. 1992).* Because the operating agreements could conceivably be performed within one year, a modification to the accounting section need not be in writing.

The jury had before it copies of all the operating agreements relevant to this dispute. The testimony of Helen [*13] Crowder, vice-president of finance for Texas Crude, indicates Texas Crude obtained the consent of a majority of the non-operators to withhold the money for litigation expenses. The record also contains her testimony regarding how the costs were determined. This constitutes some evidence that Texas Crude properly withheld the money for litigation expenses. Thus, our inquiry need go no further. Points of error nine and eleven are overruled.

In point of error ten, Enex attacks the jury's failure to award the $ 145,751 to Enex as being against the great weight and preponderance of the evidence. [HN6] In reviewing this challenge, we consider and weigh the

entire record, and set aside the verdict only if it is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Cropper v. Caterpillar Tractor Co., 754 S.W.2d 646, 651 (Tex. 1988); Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986)* (per curiam).

[HN7] Appellate courts are not free to substitute their judgment for that of the jury simply because they may disagree with the jury's verdict. *Herbert v. Herbert, 754 S.W.2d 141, 144 (Tex. 1988).* When considering great weight points [*14] complaining of a jury's failure to find a fact, courts of appeals should be mindful that a jury was not convinced by a preponderance of the evidence. *Id.*

Enex argues there is no evidence of an oral agreement among the working interest owners to allow Texas Crude to charge for litigation expense. They contend Crowder's testimony is insufficient to prove an oral agreement because she failed to specify the individual working interest owners who agreed to the expenses. The record supports the jury finding. Crowder testified that she obtained the consent of a majority of the working interest owners to withhold the money. [HN8] It is the jury's province to reconcile the conflicting or contradictory evidence of the witnesses, or to give a greater degree of credit to one or more of the witnesses. Herbert, 754 S.W.2d at 144 (citing *Jones v. Williams, 41*

Tex. 390 (1874). The record does not contain evidence to the contrary. Point of error ten is overruled.

**TEXAS CRUDE'S CROSS-POINT**

In a single cross-point, Texas Crude complains that the trial court erroneously excluded the testimony of three expert witnesses for failure to properly identify them and the subject of their testimony [*15] in response to interrogatories. However, none of the excluded testimony is material to our disposition of this appeal. The cross-point is therefore overruled. *See City of Corpus Christi v. Corpus Christi Police Officers Ass'n, 557 S.W.2d 182, 186* (Tex. Civ. App.--Corpus Christi 1977, writ ref'd n.r.e.) (points of error overruled as immaterial to disposition of appeal).

Accordingly, we reverse the judgment of the trial court awarding Texas Crude damages and render judgment that Texas Crude take nothing on its claim for indemnity. We render judgment that Enex have and recover from Texas Crude the sum previously awarded by the trial court as an offset.

CHARLES W. McGARRY

CHIEF JUSTICE

LEXSEE

**GENERAL ELECTRIC CAPITAL BUSINESS ASSET FUNDING CORP., Plaintiff,
v. S.A.S.E. MILITARY LTD., VANDERBURG INVESTMENTS, INC., and JOHN
Q. VANDERBURG, Defendants.**

**SA-03-CA-189-RF**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
TEXAS, SAN ANTONIO DIVISION**

**2004 U.S. Dist. LEXIS 26083**

**December 22, 2004, Decided**

**SUBSEQUENT HISTORY:** Costs and fees proceeding at, Request granted GE Capital Bus. Asset Funding Corp. v. S.A.S.E. Military Ltd., 2005 U.S. Dist. LEXIS 6215 (W.D. Tex., Apr. 12, 2005)

**DISPOSITION:** Court did not allow defendants to submit proposed parol evidence.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff lender sued defendant borrowers for breach of contract. The borrowers asserted affirmative defenses and a counterclaim for breach of the amended settlement agreement (ASA). The lender filed a motion in limine, raising as an issue the meaning of the term "net rents" as set forth in the ASA.

**OVERVIEW:** When the borrowers failed to make payments on four promissory notes regarding commercial properties, the lender began collecting the rents in each of buildings. The parties entered into the ASA. The borrowers argued that the lender failed to place rents collected from the building tenants into an escrow account to pay for necessary expenses. The court determined that the borrowers' proposed construction of the term "net rents" was unreasonable because the court could not accept as reasonable an interpretation of the term that meant simply "gross rents." Therefore, the ASA was clear and unambiguous with respect to the issue of what the term "net rents" meant. Under the ASA, the term "net rents" meant gross rents minus payments of principal and interest, which the lender was to deposit into the

expense escrow fund. Because there was no ambiguity, the court did not allow the borrowers to submit the proposed parol evidence.

**OUTCOME:** The court granted the lender's motion in limine and excluded the borrowers' proposed parol or extrinsic evidence relating to the meaning of "net rents."

**CORE TERMS:** net rents, rent, ambiguous, ambiguity, tenants, settlement agreement, deduct, parol evidence, unambiguous, limine, collected, used to pay, reduction, parol, minus, proposed construction, extrinsic evidence, written contract, plain meaning, legal meaning, collateral, collecting, definite, withheld, default, deposit, worded, repair, articulated, income attributable

**LexisNexis(R) Headnotes**

*Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview*
*Contracts Law > Defenses > Ambiguity & Mistake > General Overview*
*Contracts Law > Formation > Ambiguity & Mistake > General Overview*
[HN1] Determining whether a contract is ambiguous is a question of law. A term is ambiguous if it is susceptible to more than one meaning when viewed objectively by a reasonable person looking at the entire agreement in light of the customs, practices, and terminology as generally understood in the relevant trade or business.

*Contracts Law > Contract Interpretation > Parol*

Page 1

*Evidence > General Overview*
*Contracts Law > Defenses > Ambiguity & Mistake > General Overview*
*Evidence > Relevance > Parol Evidence*
[HN2] Texas law on contract construction and the admission of parol evidence is well settled: The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous. Parol evidence is not admissible for the purpose of creating an ambiguity. If, however, the language of a policy or contract is subject to two or more reasonable interpretations, it is ambiguous. Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation, and admit extraneous evidence to determine the true meaning of the instrument.

*Contracts Law > Contract Interpretation > Parol Evidence > General Overview*
*Contracts Law > Defenses > Ambiguity & Mistake > General Overview*
*Contracts Law > Formation > Ambiguity & Mistake > General Overview*
[HN3] Under Texas law, parol evidence is defined as "evidence given orally." It is well established that this type of evidence is not admissible to show the intent of the parties regarding a written instrument unless the court determines that the instrument is unclear or ambiguous. Agreements may be ambiguous on their face, or they may be ambiguous in light of the surrounding circumstances. Generally, however, the determination of ambiguity should be made solely on the basis of the language itself. Only if this analysis reveals ambiguity should extrinsic evidence be admitted.

*Contracts Law > Contract Interpretation > General Overview*
[HN4] A well-established principle of Texas contract law is that a contract must be construed "as a whole."

*Contracts Law > Contract Interpretation > General Overview*
[HN5] Under Texas law, a rule of contract construction requires a court to give terms their plain, grammatical meaning.

**COUNSEL:** [*1] For GENERAL ELECTRIC CAPITAL BUSINESS ASSET FUNDING CORP., plaintiff: Ricardo G. Cedillo, Davis, Cedillo & Mendoza, San Antonio, TX.

For JOHN Q. VANDERBURG aka J. Q. Vanderburg, consolidated plaintiff: James L. Branton, Branton & Hall, P.C., San Antonio, TX; George E. Chandler, Chandler Law Offices, Lufkin, TX; Darrin Walker, Law Office of Darrin Walker, Kingwood, TX.

For S.A.S.E. MILITARY, LTD., defendant: James L. Branton, Branton & Hall, P.C., San Antonio, TX; George E. Chandler, Chandler Law Offices, Lufkin, TX; Harry L. Munsinger, Branton & Hall, P.C., San Antonio, TX; Darrin Walker, Law Office of Darrin Walker, Kingwood, TX.

For VANDERBURG INVESTMENTS, INC., defendant: James L. Branton, Branton & Hall, P.C., San Antonio, TX; George E. Chandler, Chandler Law Offices, Lufkin, TX; Harry L. Munsinger, Branton & Hall, P.C., San Antonio, TX; Darrin Walker, Law Office of Darrin Walker, Kingwood, TX.

For S.A.S.E. MILITARY, LTD., counter-plaintiff: James L. Branton, Branton & Hall, P.C., San Antonio, TX; George E. Chandler, Chandler Law Offices, Lufkin, TX; Harry L. Munsinger, Branton & Hall, P.C., San Antonio, TX.

For VANDERBURG INVESTMENTS, INC., counter-plaintiff: [*2] James L. Branton, Branton & Hall, P.C., San Antonio, TX; George E. Chandler, Chandler Law Offices, Lufkin, TX; Harry L. Munsinger, Branton & Hall, P.C., San Antonio, TX.

For GENERAL ELECTRIC CAPITAL BUSINESS ASSET FUNDING CORP., counter-defendant: Ricardo G. Cedillo, Davis, Cedillo & Mendoza, San Antonio, TX.

For GENERAL ELECTRIC CAPITAL BUSINESS ASSET FUNDING CORP., counter-defendant: Ricardo G. Cedillo, Davis, Cedillo & Mendoza, San Antonio, TX.

**JUDGES:** ROYAL FURGESON, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** ROYAL FURGESON

**OPINION:**

### MEMORANDUM AND ORDER ON CONTRACT CONSTRUCTION

BEFORE THE COURT is Motion in Limine of Plaintiff General Electric Capital Business Asset Funding Group ("G.E.") (Docket No. 170), filed prior to trial on October 22, 2004. Also before the Court are various trial briefs submitted during the trial in this matter, including Defendants'/Counterplaintiffs (Vanderburg's) Trial Brief Regarding Evidence Surrounding The Amended Settlement Agreement (Docket No. 197) [hereinafter Defendants' First Trial Brief], Plaintiff's Brief on the Clear and Unambiguous Meaning of the Term "Net Rents" (Docket No. 220), and Defendants' Trial Brief Regarding Evidence About [*3] the Settlement Agreement (Docket No. 236) [hereinafter Defendants' Second Trial Brief]. Since this Order is issued after the close of the case and is intended to be a confirmation of the ruling made from the bench during trial, the Court also has before it the trial evidence.

Through the pleadings, arguments, and evidence advanced at trial, the Court has been asked to decide whether the Amended Settlement Agreement [hereinafter ASA] is clear and unambiguous with respect to the issue of what the term "net rents" means. Based upon a careful review of the settlement agreement and the parties' contentions and the trial evidence, the Court finds that Defendants' proposed construction of the term "net rents" is unreasonable. Because it finds that the arguments advanced by Plaintiff are the only reasonable construction of the term "net rents" in the context of the ASA as a whole, the Court finds that the contract is clear and unambiguous with respect to this term. Since the Court finds that the agreement is unambiguous, it has excluded Defendants' proposed parol or extrinsic evidence relating to the meaning of "net rents" as understood by Defendants or their counsel during the negotiation [*4] or operation of the ASA.

### BACKGROUND

The case, which has been tried to a jury before this Court, involves a contract dispute. Defendants S.A.S.E. and John Vanderburg individually borrowed around $ 11.5 million from Plaintiff G.E. Capital for the acquisition and development of four commercial properties. The indebtedness is evidenced by four promissory notes, each secured by Commercial Deeds of Trust.

In October 2000, Defendants failed to make payments on the four promissory notes and Plaintiff G.E. Capital sent default notices and began collecting the rents in each of the buildings. Vanderburg cured the deficiencies on the Killeen and Port Arthur I and II properties and on November 1, 2000, and the parties entered into Loan Modification Agreements on these properties. In late 2001, the parties entered into a settlement agreement related to all four loans, subject to approval by the bankruptcy court. After the first settlement agreement was not approved, the parties entered into an amended settlement agreement in April 2002. n1 Subsequently, G.E. Capital posted three of the properties for foreclosure and purchased them itself at the sales, which occurred in mid-2003.

> n1 This is the Amended Settlement Agreement, or ASA, attached hereto as Ex. A. Though the ASA was signed in April 2002, the parties made it retroactive to December 19, 2001. *See* Ex. A, at 13.

[*5]

G.E. Capital filed suit for breach of contract and fraud, though the fraud claims have been severed from this action. In its fourth amended complaint, G.E. Capital claims breach of contract for alleged loan defaults, failure to maintain the properties, failure to use best efforts to collect unpaid rent from tenants, failure to pay rent, and failure to renew leases as required by the parties' settlement agreement.

Defendants S.A.S.E. and Vanderburg have asserted affirmative defenses and a counterclaim for breach of the ASA. The essence of their argument is that G.E. Capital failed to place rents collected from the building tenants into an escrow account to pay for necessary expenses, including building repair and maintenance. Defendants argue that Plaintiff's failure to release collected funds for repairs needed at the buildings prevented Defendants from being able to sell the properties.

Pre-trial hearings were held on October 28 and November 1, 2004. At the hearings, the Court heard Plaintiff's Motion in Limine, which raised as an issue the

meaning of the term "net rents" as set forth in the ASA. n2 Plaintiff requested that the Court exclude any parol evidence of the parties' intentions [*6] related to the term "net rents" in the agreement and any suggestion that the agreement was ambiguous. The Court granted the motion. Now, the Court will address these and other arguments of the Plaintiff, along with the arguments of Defendants, in order to set forth the reasons behind its ruling.

n2 Docket No. 170, paras. 48, 67-70.

## DISCUSSION

### I. *Admission of Parol Evidence*

[HN1] Determining whether a contract is ambiguous is a question of law. n3 A term is ambiguous if it is susceptible to more than one meaning when viewed objectively by a reasonable person looking at the entire agreement in light of the customs, practices, and terminology as general understood in the relevant trade or business. n4 [HN2] Texas law on contract construction and the admission of parol evidence is well settled:

The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. If a written contract is so worded that it can be given a definite [*7] or certain legal meaning, then it is not ambiguous. Parol evidence is not admissible for the purpose of creating an ambiguity.

If, however, the language of a policy or contract is subject to two or more reasonable interpretations, it is ambiguous. Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation, and admit extraneous evidence to determine the true meaning of the instrument. n5

n3 *Bloom v. Hearst Entertainment, Inc.*, 33 F.3d 518, 521-22 (5th Cir. 1994).

n4 *Id.* at 522.

n5 *Dell Computer Corp. v. Rodriguez*, 390 F.3d 377, 2004 WL 2504373 (5th Cir.(Tex.) 2004)(citing *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520, 39 Tex. Sup. Ct. J. 7 (Tex. 1995) and *H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co.*, 150 F.3d 526, 529 (5th Cir. 1998)).

[*8]

[HN3] Parol evidence is defined as "evidence given orally." n6 It is well established that this type of evidence is not admissible to show the intent of the parties regarding a written instrument unless the Court determines that the instrument is unclear or ambiguous. n7 Agreements may be ambiguous on their face, or they may be ambiguous in light of the surrounding circumstances. n8 Generally, however, the determination of ambiguity should be made solely on the basis of the language itself. n9 Only if this analysis reveals ambiguity should extrinsic evidence be admitted.

n6 BLACK'S LAW DICTIONARY 579 (7th ed. 1999).

n7 *See Dell Computer*, 390 F.3d 377, 2004 WL 2504373, at *8; *Instone Travel Tech. Marine & Offshore v. Int'l Shipping Partners, Inc.*, 334 F.3d 423, 432 (5th Cir. 2003); *CBI Indus., Inc.*, 907 S.W.2d at 520.

n8 This distinction is articulated as the difference between "patent" and "latent" ambiguity respectively. *See Dell Computer*, 390 F.3d 377, 2004 WL 2504373, at *8; *CBI Indus., Inc.*, 907 S.W.2d at 520; *H.E. Butt Grocery Co.*, 150 F.3d at 529.

[*9]

n9 *Bloom v. Hearst Entertainment*, 33 F.3d at 522.

## II. *Arguments of Parties with Respect to Ambiguity*

During pre-trial hearings in this matter, Plaintiff submitted an extensive set of motions in limine, several of which are relevant to this determination. First, Plaintiff requested that the Court exclude any assertion that the term "net rents" as set forth in the Amended Settlement Agreement equals gross rents minus taxes and insurance. n10 Plaintiff also asked the Court to exclude any parol or extrinsic evidence of the parties' intent with respect to the Amended Settlement Agreement, arguing that without a finding of ambiguity, the Court and especially the jury could not consider such evidence. n11 Orally, counsel for Plaintiff also asserted that the Court could not consider whether language in a contract was ambiguous in the absence of a plea by one side or another that the language was ambiguous.

> n10 Plf.'s Motion in Limine, para. 48. However, this motion was orally abandoned during the parties' discussions with the Court. Tr. Nov. 1, 2004, at p. 183.

[*10]

> n11 Plf.'s Motion in Limine, para. 67. As counsel for Plaintiff indicated during oral argument on this motion, paragraphs 67 through 70 are related and generally make up a single request that the Court exclude parol evidence related to the parties' agreements. As a result, the Court need not treat them separately or distinguish them further.

At the hearing, counsel for Defendants responded that the Court could consider arguments about a contract's ambiguity whether or not one of the parties had pled ambiguity from the outset. Defendants argued that the pleadings did demonstrate that the parties were advancing divergent interpretations of their duties under the ASA and that there were several undefined terms which the parties construed differently. Specifically, Defendants argued that the agreement set forth that G.E.

Capital was to collect rents from the tenants and place "net rents" into an "Expense Escrow" account, which was to be used to pay certain, permitted expenses. However, Defendants argued that the agreement failed to specify what precise construction to give to the term "net rents" [*11] and that the parties were advancing different interpretations of what the term meant in the context of the settlement agreement. If the arguments of both sides were reasonable, Defendants argued, then the agreement is ambiguous as a matter of law. Because of this alleged ambiguity, Defendants argued that the Court should admit evidence from both sides as to their differing interpretations of the term "net rents."

In their Trial Brief Regarding Evidence Surrounding the Amended Settlement Agreement (Docket No. 197), Defendants seek to demonstrate that their construction of the ASA was reasonable, in support of their argument that the agreement was ambiguous. First, Defendants explain that the Amended Settlement Agreement provided that G.E. Capital was to place an initial sum of $ 233,000 and "any other income attributable to the [collateral buildings], including net rents," into the Expense Escrow fund. n12 The fund was to be used to pay for certain repair and maintenance expenses related to the collateral buildings. G.E. Capital argues that the phrase "including net rents" was evidence that the parties had agreed that G.E. would collect the rents from the tenants and immediately [*12] deduct principal and interest as due. The result would then be considered "net" rents, according to G.E. Capital.

> n12 Def.'s First Tr. Br. (Docket No. 197), at 2. *See also* Amended Settlement Agreement, para. 6.

Defendants argue that the Sections 5 and 6 of the ASA are far from clear about what the term "net rent payments" was intended to encompass, pointing to the Magistrate Judge's denial of Plaintiff's summary judgment motion on Vanderburg's cause of action for breach of that agreement. n13 Defendants also argue that, through Plaintiff's motion in limine, Plaintiff seeks to achieve the result that it was unable to achieve through dispositive motion: a ruling that the agreement allowed G.E. Capital to deduct payments of principal and interest immediately from the gross rent payments.

n13 Memorandum & Recommendation of Magistrate Judge Primomo (Docket No. 146), entered on October 4, 2004, at pp. 11-12 ("The Amended Settlement Agreement does not define "net rent payments" and therefore, the statement is unclear regarding what expenses G.E. Capital was allowed to remove from the rents collected before placing the monies in the Expense Escrow account.")

[*13]

Defendants also assert the argument that several other contractual provisions in the ASA support the reasonableness of their construction of the contract terms and the meaning of "net rents." They first point to Section 10, which provides that if the settlement agreement terminated by its own terms because Vanderburg failed to pay the Release Amounts by December 31, 2002, "Vanderburg and S.A.S.E. may resume payment of the notes. . . ." n14 Defendants argue that by using the resume payment' language with regard to the principal and interest payments due under the original notes, the ASA anticipated a moratorium on payments of principal and interest during the pendency of the ASA.

n14 *See* Def.'s First Tr. Br., at 4-5; Ex. A, p. 10.

Defendants also take issue with Plaintiff's argument that the release amounts provided in the ASA support G.E. Capital's interpretation. The relevant language, on pages 3 and 4 of the ASA, sets forth various "Release Amounts" that Vanderburg could pay for each of the buildings [*14] releasing him from all liens, claims, and security interests related to the properties. n15 The ASA provides that the Release Amounts were to be reduced by "any principal reductions received by GECBAF from October 25, 2001 through the date of payment." n16 Defendants argue that this language was added to account for principal payments between October 25 and December 19, 2001, when the ASA became effective, rather than for payments of principal and interest that G.E. Capital was deducting from rents collecting during the operation of the ASA. They urge that the difference between the San Antonio property and the other three properties in this regard -- no principal reduction'

language appears with respect to the San Antonio property release amount n17 -- proves that the parties did not intend that G.E. Capital would withhold payments of principal and interest from rents it directly collected.

n15 Ex. A, at 2-3.

n16 These reductions for payments of principal are only present on the Killeen and Port Arthur I and II properties; the San Antonio property did not contain this reduction for payments of principal. *Id.*

[*15]

n17 Ex. A. at 2.

Defendants argue further that this understanding is confirmed by Section 7 of the ASA, which provided that if tenants had withheld rental payments and then later paid the back rent, "any abated rent which is paid after cure of the alleged breaches shall be added to Expense Escrow and may be used to pay a Permitted Expense." n18 Extending the logic of their position to rents withheld by tenants, Defendants argue that if the parties had contemplated that G.E. Capital would deduct payments of principal and interest from rents received, then Section 7 should provide for a similar deduction from withheld back rents that were later paid by tenants.

n18 *Id.* at 8-9.

Finally, looking to the overall ASA, Defendants question why the parties would have entered into an agreement in which G.E. would simply continue to collect rents and pay itself principal and interest, since it had been doing just that under the [*16] Loan Modification Agreements that were in effect prior to the ASA. Defendants argue that Vanderburg took S.A.S.E. out of bankruptcy and subjected it to the terms of the ASA in reliance upon G.E.'s representations that it was going to collect rents and place all of this income into the Expense Escrow fund. If G.E. Capital were merely going to continue paying itself principal and interest, Defendants maintain, signing the ASA would have been without benefit to them.

Defendants claim that these sections show that their construction of the ASA and "net rents" is reasonable; they also concede that G.E.'s interpretation is reasonable. Therefore, they argue that ambiguity exists as a matter of law and Vanderburg is entitled to put on parol evidence of the parties' intent.

Plaintiff G.E. Capital responds with four main arguments. n19 First, G.E. argues that the parties, both of whom were sophisticated and represented by counsel, qualified the term "rents" with the term "net" in order to denote something less than gross rents.' G.E. argues that to adopt the Defendants' construction would be to read the term "net" out of the ASA completely or to assume that it is meaningless, in violation [*17] of [HN4] the well-established principle of Texas contract law that a contract must be construed "as a whole." n20

> n19 *See* Plf.'s Br. on Meaning of "Net Rents."

> n20 *See Weingarten Realty Investors v. Albertson's, Inc.,* 66 F. Supp.2d 825, 839 (S.D. Tex. 1999).

Plaintiff next argues that Sections 2 and 10 of the ASA confirm that G.E. was to deduct principal and interest from gross rents and support a finding that the agreement was not ambiguous, citing *Weingarten* n21 for the proposition that if a contract is worded so that it can be given a definite legal meaning, then it is not ambiguous. G.E. argues that the Release Amounts in Section 2 -- and the principal deductions described above -- make no sense under Defendants' construction that there was to be a moratorium on principal and interest payments during the operation of the ASA.

> n21 *Id.* at 840.

[*18]

In its second argument, G.E. points out that the third sentence in Section 10 of the ASA gave it the right to terminate the agreement if there was a default in "the scheduled payments due with respect to the Killeen, Port Arthur I and Port Arthur II properties *during the term of [the ASA].*" n22 They argue that Section 10 makes clear that these scheduled payments' were to be payments of

principal and interest deducted from the rents G.E. collected from the building tenants.

> n22 Plf.'s Br. on Meaning of "Net Rents," at 2.

G.E. also argues that this Court's earlier, oral ruling that the agreement was not ambiguous is consistent with the decision of the Fifth Circuit Court of Appeals, recently announced, in *Dell Computer Corp. v. Rodriguez,* n23 in which the appeals court found that the trial court erred in finding a contract unambiguous. G.E. argued that, unlike in that case, the Defendants have not provided this Court with an interpretation of "net rents" that is reasonable. n24 In fact, G.E. asserts [*19] that Defendants' proposed construction asks the Court to construe the term "net rents" to mean simply "rents" or "gross rents," rendering meaningless the qualifier "net." G.E. argues that this construction is not reasonable, since it requires the Court to ignore key language in the agreement.

> n23 390 F.3d 377, 2004 WL 2504373 (5th Cir.(Tex.), 2004).

> n24 *Compare Dell Computer,* 390 F.3d 377, 2004 WL 2504373 at *5-6.

Finally, G.E. argues that Defendants' construction, in addition to being unreasonable, violates [HN5] the rule of contract construction that requires a court to give terms their plain, grammatical meaning. n25 The plain meaning, G.E. argues, is that "net rents" equal gross rents minus principal and interest. To give net rents' any other meaning would be to adopt an unnatural construction, in violation of basic contract construction principles recognized in Texas and elsewhere. n26

> n25 *See Dorsett v. Cross,* 106 S.W.3d 213, 219-20 (Tex. App. -- Houston [1st Dist.] 2003 *pet. denied).*

[*20]

> n26 *CBI Indus., Inc.,* 907 S.W.2d at 520; *H.E. Butt Grocery,* 150 F.3d at 529.

Defendants assert a few more arguments in support of their construction of the ASA and their contention that it is ambiguous as to what the term "net rents" means. They emphasize that the phrase "including net rents" is exemplary and did not limit G.E. to placing only net rents into the Expense Escrow account. n27 Instead, they argue that the ASA provided that G.E. was to place net rents and "*any other income attributable to the GECBAF collateral* [leases]" into the escrow fund; thus, net rents was merely one category of monies to be placed into the fund. n28

n27 Def.'s Second Tr. Br., at 4-5.

N28 *Id.* (citing Ex. A, at 6.

Defendants also point out that the term "net rents" appears for the first time in Section 3 of the ASA, not in Section 6, over which this discussion has taken place. In Section 3, [*21] the term referred to the situation in which Defendants had to refinance the properties. That section provided that, "in the event of a refinancing of a Property . . . all *net rental* proceeds after the payment of the replacement mortgage . . . shall be held by [G.E.] in the Expense Escrow." n29 At the end of this sentence in the ASA was a footnote, stating that "If a subsequent lender prohibits the deposit of the *net rents* into the Expense Escrow, Vanderburg or SASE shall establish a separate escrow account for the deposit of such rentals. . . ." n30 Thus, Defendants argue, the term "net rents" was used to refer to money collected by Defendants after a refinancing and not to money collected by G.E. after deductions of principal and interest. When the term appears again in the ASA two pages later, Defendants urge the Court to construe it in like manner.

n29 Ex. A, at 4 (emphasis added).

n30 *Id.* n. 1.

### III. *Analysis*

Upon careful consideration of the thoughtful arguments raised by [*22] counsel in trial and the briefs

before it, the Court determines that its initial, oral determination that the contract language is clear and unambiguous is appropriate.

First, the Court agrees with Plaintiff that the term "net rents" must mean something. The Court cannot accept as reasonable an interpretation of the term that means than simply "gross rents." This would violate the rule articulated in *Dorsett* that courts should give terms their plain meaning when possible. n31 The Court believes that Defendants' proposed construction cannot be reasonable for this reason. Without two reasonable, conflicting interpretations, there can be no ambiguity. n32

n31 *See* 106 S.W.3d at 219-20.

n32 *See Weingarten*, 66 F. Supp.2d at 839.

Defendants' construction of the term "net rents" also makes little sense in light of the common practice of entities in such situations to deduct payments of principal and interest. Their construction would make the ASA a questionable arrangement [*23] from G.E.'s perspective and call into question their purpose in entering into the agreement in the first place. Interpreting the ASA as a whole, the Court cannot conclude that "net rents" means anything other than gross rents minus principal and interest.

Further, the Court heard evidence from defense witness Eric Taube, who formerly represented Defendants in the underlying transactions and who was also involved in the negotiation of the ASA. Mr. Taube testified about the meaning of "net rents" as follows. He stated that under the ASA, G.E. was to continue collecting monthly rents from the building tenants. It would then deduct "ordinary and necessary operating expenses" -- such as utility, maintenance, and related costs of operation -- from the gross rents to arrive at "net rents," which would be placed into the Expense Escrow fund. n33 The fund would then be used to pay "Permitted Expenses," as defined by the ASA. The flaw in this reasoning is that "Permitted Expenses," as defined in the agreement also includes "reasonable, necessary expenses to operate such properties." n34 Thus, in simple terms, Taube testified that G.E. was to collect the rents, subtract from them the ordinary [*24] operating costs of the

buildings, and then use them to pay, among other things, ordinary operating expenses of the buildings. This construction of the agreement and the term "net rents" is patently unreasonable and can be no basis for a finding that the contract was ambiguous.

n33 *See* Letter from Scott Rose to Eric Taube, Ex. B.

n34 Ex. A. at 6.

As a result, Defendants fail to offer a reasonable interpretation of the agreement and the term "net rents" that conflicts with the interpretation of G.E. and the plain meaning of the terms involved. Based on its careful analysis, the Court finds that under the ASA, the term "net rents" means gross rents minus payments of principal and interest, which G.E. was to deposit into the Expense Escrow fund.

**CONCLUSION**

Since it finds that the parties' written contract is so worded that it can be given a definite or certain legal meaning, the Court finds no ambiguity in the ASA. Accordingly, the Court will not allow Defendants to submit the proposed parol evidence.  [*25]

Signed this 22nd day of December, 2004.

ROYAL FURGESON

UNITED STATES DISTRICT JUDGE

LEXSEE

**J R DEVELOPMENT COMPANY, Plaintiff-Appellant, v SAM HAMAME,
Defendant-Appellee.**

**No. 246598**

**COURT OF APPEALS OF MICHIGAN**

**2004 Mich. App. LEXIS 1289**

**May 20, 2004, Decided**

**NOTICE:** [*1] THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**PRIOR HISTORY:** Oakland Circuit Court. LC No. 2001-035190-CK.

**DISPOSITION:** Affirmed.

**CORE TERMS:** deposit, earnest money, buyer, seller, breach of contract, directed verdict, refund, accord and satisfaction, election of remedies, liquidated damages, dispute arose, unambiguous, accepting, purchase agreement, purchaser, arbitration, real property, de novo, factually, escrow, mutual consent, closing date, bank account, default, broker, termination, depositing, diligence, returning, seven-day

**JUDGES:** Before: Markey, PJ, and Wilder and Meter, JJ.

**OPINION:** PER CURIAM.

Plaintiff sued defendant alleging breach of a contract to sell real property after defendant sold the property to another buyer. Defendant claimed plaintiff waived any right to seek additional damages by accepting a refund of its earnest money deposit. After the close of plaintiff's proofs at a jury trial, the trial court agreed with defendant and granted his motion for directed verdict. Plaintiff appeals by right. This appeal was submitted for decision without oral argument pursuant to MCR 7.214(E). We affirm.

We review de novo a trial court's decision on a motion for a directed verdict. *Sniecinski v Blue Cross & Blue Shield of Michigan,* 469 Mich. 124, 131; 666 N.W.2d 186 (2003) Likewise, the interpretation of a contract is also a question of law this Court reviews de novo on appeal, including whether the language of a contract is ambiguous and requires resolution [*2] by the trier of fact. *Klapp v United Ins Group Agency, Inc,* 468 Mich. 459, 463; 663 N.W.2d 447 (2003). An unambiguous contract must be enforced according to its terms. *Wilkie v Auto-Owners Ins Co,* 469 Mich. 41, 51-52; 664 N.W.2d 776 (2003).

On July 23, 2001, defendant and plaintiff, through its principal, John Hamood, entered a contract in which plaintiff agreed to buy for $ 440,000 and defendant agreed to sell 5.6 acres of undeveloped real estate situated in Canton Township, Oakland County. Real estate agent Sam Beydoun, not defendant's listing agent, brought the property to plaintiff's attention. On the day the contract was entered, plaintiff tendered an earnest money deposit of $ 20,000 to Beydoun. The parties do not dispute that the contract provided a due diligence period commencing on July 23, 2001, and ending thirty days thereafter. At trial, the parties disputed that a closing date was ever established: defendant contended the closing was scheduled for August 25, 2001, but plaintiff contended no firm closing date had been set. The parties agree that they met on August 23, 2001, and that plaintiff requested a seven-day [*3] extension of the due diligence period. Hamood testified that defendant granted the seven-day extension; defendant testified that he denied the requested extension and required that closing occur on August 25, 2001. In a letter to plaintiff on August 23, 2001, defendant's attorney confirmed: "My client does not desire to grant said request." n1 The letter also declared the purchase agreement was null and void and instructed

Baydoun, who received a copy of the letter, to return to plaintiff its earnest money deposit. Baydoun testified he subsequently delivered a $ 20,000 check to plaintiff. Hamood acknowledged at trial that he deposited the $ 20,000 check into a bank account.

n1 Plaintiff has failed to provide this Court with any of the exhibits admitted at trial. See MCR 7.210(A) (1), (C). The source of the quotation is plaintiff's brief on appeal, page 4, discussing the letter admitted at trial as exhibit 11.

At the close of plaintiff's proofs at trial, defendant moved for a directed verdict. Defendant argued [*4] that plaintiff had failed to prove any damages from the alleged breach of contract. Further, defendant argued that by accepting and depositing the check returning the earnest money, plaintiff had elected the return of the deposit as its sole remedy for the alleged breach of contract pursuant to paragraph seven of the parties' contract. That provision apparently n2 provides, in pertinent part:

7. DEFAULT BY PURCHASER OR SELLER: . . . In the event of legally inexcusable failure to perform by the Seller, the Purchaser may, at his/her option, elect to enforce the terms hereof or demand and seek a refund of his entire deposit in full termination of this agreement. Broker shall hold deposit until dispute is resolved by: written mutual consent, arbitration, or court of law.

n2 The pertinent part of paragraph seven was found in plaintiff's brief on appeal, page 6, and defendant's brief on appeal, page 12. See n 1.

The trial court agreed that plaintiff had failed to establish any damages from the alleged [*5] breach of contract. Then the trial court ruled as follows:

But paragraph seven is pretty dispositive, and frankly should have been

raised as [a] motion for summary disposition.

Mr. Hamood knew on the afternoon of the 23rd that Mr. Hamame was not willing to complete the transaction, and was advising Mr. Baydoun to refund the deposit. Mr. Baydoun was Mr. Hamood's agent. He could have at that time called him and said I don't want the deposit back. I want to go forward. And pursuant to paragraph seven, the broker shall hold the deposit until the dispute is resolved by written mutual consent, arbitration, or court of law. Instead when the check came a week later, he put it in the bank. He wants to argue with me he didn't cash it. It's the same thing. Putting it in your bank account or cashing it is the same thing. By accepting that check, he accepted that as termination of [the] agreement pursuant to paragraph seven.

So, I will grant the motion for directed verdict.

We agree with the trial court. A directed verdict is appropriate only when no factual question exists upon which reasonable minds could differ. _Cacevic v Simplimatic Engineering Co (On Remand),_ 248 Mich. App. 670, 679-680; [*6] 645 N.W.2d 287 (2001). Likewise, the pertinent contract provision here is clear and unambiguous because paragraph seven is not subject to more than one reasonable construction. _Mahnick v Bell Co,_ 256 Mich. App. 154, 159; 662 N.W.2d 830 (2003). The trial court correctly determined that paragraph seven provided for an election of remedies in the event of a breach of contract. Plaintiff could either receive its earnest money deposit back or could leave it with the escrow agent and resolve the disputed breach by negotiation, arbitration, or litigation. An unambiguous contract must be enforced according to its terms. _Quality Products & Concepts Co v Nagel Precision, Inc,_ 469 Mich. 362, 375; 666 N.W.2d 251 (2003).

Both plaintiff and defendant viewed paragraph seven as creating an election of remedies. Plaintiff's principal, John Hamood testified at trial as follows:

_Q._ What does that sentence [from paragraph seven] mean to you?

*A.* It means that if there's a default by the seller, the purchaser has an option to demand his money back.

*Q.* What is the other option?

*A.* Or enforce [*7] the terms of the contract. Full refund of his deposit.

In essence, plaintiff does not contest that paragraph seven provides for an election of remedies in the event of a breach of contract by defendant, but argues that by depositing the $ 20,000 check it did not select the deposit refund remedy. The cases on which plaintiff relies to support its argument are all factually distinguished because none involve a term in a written contract providing that the aggrieved party must either accept the return of an escrowed deposit or leave the deposit in escrow and pursue breach of contract remedies. Thus, *Fritz v Marantette,* 404 Mich. 329; 273 N.W.2d 425 (1978), *Gitre v Kessler Products Co. Inc,* 387 Mich. 619; 198 N.W.2d 405 (1972), and *Urben v Public Bank,* 365 Mich. 279; 112 N.W.2d 444 (1961) all addressed the question of whether the parties had reached an accord and satisfaction *after* a dispute arose. See *Faith Reformed Church v Thompson,* 248 Mich. App. 487, 497, n 2; 639 N.W.2d 831 (2001). In the instant case, the parties agreed *before* the dispute arose that [*8] the buyer must elect a remedy if the seller defaulted.

The case on which plaintiff relies that is closest factually to the case at bar is similarly distinguished. In *Obremski v Dworzanin,* 322 Mich. 285, 287; 33 N.W.2d 796 (1948), a real property purchase agreement contained a liquidated damages clause providing:

> In the event that the sellers or buyers will decline to close the deal, the refusing party have [sic] to pay the other party $ 1,500 as liquidated damages.

On the seller's failure to close, the buyer instituted suit to enforce the liquidated damages clause. In the midst of the litigation the seller returned the buyer's earnest money deposit, which also was in the amount of $ 1,500. *Id.* at 287-288. The Court rejected the seller's argument that returning the buyer's deposit was an accord and satisfaction. *Id.* at 288. The Court reasoned that there was nothing in writing to support the contention that settlement of the liquidated damage claim was intended and that "nothing occurred except the performance of that which was a clear duty on the part of the respective parties." *Id.* at 289. Thus, like the other cases on [*9] which plaintiff relies, *Obremski* addressed whether an accord and satisfaction was reached after a dispute arose. Further, in *Obremski* the buyer was entitled to the return of his earnest money deposit even while litigation was pending. *Id.* But here, the purchase agreement clearly and unambiguously required the buyer's earnest money deposit be held in escrow pending resolution of any litigation or alternative dispute resolution.

By choosing to retain and negotiate the tendered $ 20,000 as a return of its earnest money deposit with knowledge of the election of remedy provision the parties had agreed to before any dispute existed, plaintiff's actions speak louder than words. See, e.g., *DMI Design & Manufacturing, Inc v ADAC Plastics, Inc,* 165 Mich. App. 205, 210; 418 N.W.2d 386 (1987). Although *DMI* is an accord and satisfaction case, the same principle of election applies. Simply put, given paragraph seven of the parties' contract, plaintiff cannot prevail.

We affirm.

/s/ Jane E. Markey

/s/ Kurtis T. Wilder

/s/ Patrick M. Meter

LEXSEE

**KATHY L. LAMBERS and BARRY H. LAMBERS, Plaintiffs, v WHEELS, INC., a foreign corporation, Defendant/Third-Party Plaintiff-Appellant, v GRAND RAPIDS AUTO AUCTION, Third-Party Defendant-Appellee.**

No. 187787

COURT OF APPEALS OF MICHIGAN

1996 Mich. App. LEXIS 2230

December 6, 1996, Decided

**NOTICE:** [*1]  IN ACCORDANCE WITH THE MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**PRIOR HISTORY:** LC No. 93-19149-NI.

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant corporation appealed as of right from the judgment of the trial court (Michigan) that granted summary disposition in favor of third-party defendant auctioneer. The corporation had filed a third-party complaint against the auctioneer that was based on an indemnification provision contained in a contract.

**OVERVIEW:** The corporation filed a third-party complaint against the auctioneer, asserting contractual indemnification. On appeal, the court affirmed the trial court's judgment that granted summary disposition in the auctioneer's favor. The court held that the trial court properly found that the contract was unambiguous. As such it was not subject to construction and enforcement in accordance with the contract terms was appropriate. The clear language of the contract provided that the auctioneer only had a duty to indemnify the corporation if the auctioneer breached the contract. The corporation admitted that the auctioneer had not breached the contract. As the trial court observed, what was written in the contract may not have been what the corporation, as

the drafter, intended. However, what was written was capable of only one interpretation. The court held that a mistake in the wording was not an ambiguity. Because the contract's terms were clear and had a definite meaning the trial court did not err in granting the auctioneer summary disposition.

**OUTCOME:** The court affirmed the summary disposition that the trial court granted in favor of the auctioneer.

**CORE TERMS:** wheels, ambiguous, rules of construction, indemnity, contract language, unambiguous, resorted, circumstances surrounding, insurance coverage, indemnification, third-party, breached

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Appellate Review > General Overview*
*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN1] A trial court's grant of a motion for summary disposition is reviewed de novo. All the evidence and reasonable inferences therefrom must be construed in favor of the nonmoving party.

*Contracts Law > Contract Interpretation > General Overview*
*Contracts Law > Defenses > Ambiguity & Mistake > General Overview*

*Contracts Law > Negotiable Instruments > Enforcement > Duties & Liabilities of Parties > Forgery, Fraud & Mistake*
[HN2] An indemnity contract is construed in accordance with the rules for the construction of contracts generally. The cardinal rule in the construction of indemnity contracts is to enforce them so as to effectuate the intention of the parties. Intention is determined by considering not only the language of the contract but also the situation of the parties and the circumstances surrounding the contract. Indemnity contracts are construed most strictly against the party who drafts them and against the party who is the indemnitee. However, rules of construction are resorted to only when a contract is ambiguous. An unambiguous contract is not subject to construction and must be enforced according to its terms. A contract is not ambiguous if it admits of but one interpretation. A mistake in the wording of a contract is not an ambiguity. If the contract's terms are clear and have a definite meaning, the court may not rewrite the contract, in effect making a new contract.

**JUDGES:** Before: Markey, P.J., and Michael J. Kelly and M.J. Talbot. * JJ.

> \* Circuit judge, sitting on the Court of Appeals by assignment.

**OPINION:** PER CURIAM.

Defendant/third-party plaintiff Wheels, Inc. (hereinafter "Wheels") appeals as of right from the trial court's grant of summary disposition to third-party defendant Grand Rapids Auto Auction (hereinafter "GRAA") regarding Wheels' suit against GRAA based on an indemnification provision contained in a contract between these parties. The trial court found that the contract clearly provided that GRAA owed a duty to indemnify Wheels only in the event that GRAA breached the parties' contract. Because Wheels admitted that GRAA had not breached the contract, GRAA was not obligated to indemnify wheels and was, therefore, entitled to summary disposition.

On appeal, Wheels claims that the trial court erred in granting summary disposition to GRAA and that the issue of the parties' intent regarding the contract should have gone to trial for a jury [*2] determination. We disagree.

Wheels' argument for contractual indemnification from GRAA is based upon paragraph nine of the parties' contract, which provides as follows:

> Auctioneer [GRAA] shall indemnify, defend and hold harmless Wheels, its' [sic] affiliates, subsidiaries, officers, directors, employees, successors and assigns from and against any and all loss, damage, liability, claims, causes of action, and expenses of whatever kind and nature including any civil or criminal actions of whatever kind and nature arising from the breach of this Agreement.

[HN1] A trial court's grant of a motion for summary disposition is reviewed de novo. *Pinckney Community Schools v Continental Casualty Co*, 213 Mich. App. 521, 525; 540 N.W.2d 748 (1995). All the evidence and reasonable inferences therefrom must be construed in favor of the nonmoving party. *Skinner v Square D Co*, 445 Mich. 153, 161-162; 516 N.W.2d 475 (1994).

The rules of construction with respect to indemnity contracts are set forth in *Pritts v J I Case Co*, 108 Mich. App. 22; 310 N.W.2d 261 (1981).

> [HN2] An indemnity contract is construed in accordance [*3] with the rules for the construction of contracts generally. The cardinal rule in the construction of indemnity contracts is to enforce them so as to effectuate the intention of the parties. Intention is determined by considering not only the language of the contract but also the situation of the parties and the circumstances surrounding the contract. Indemnity contracts are construed most strictly against the party who drafts them and against the party who is the indemnitee. [*Id.*, 29.]

However, rules of construction are resorted to only when a contract is ambiguous. *Barner v City of Lansing*, 27 Mich. App. 669, 671; 183 N.W.2d 877 (1970). An unambiguous contract is not subject to construction and must be enforced according to its terms. *Id*. A contract is not ambiguous if it admits of but one interpretation. *Auto Owners Ins Co v Zimmerman*, 162 Mich. App. 459, 461; 412 N.W.2d 925 (1987). A mistake in the wording of a

Page 2

contract is not an ambiguity. *Goodwin, Inc v Orson E Coe Pontiac, Inc,* 43 Mich. App. 640, 645; 204 N.W.2d 749 (1972), rev'd on other grounds 392 Mich. 195, 220 N.W.2d 664 (1974). [*4] If the contract's terms are clear and have a definite meaning, the court may not rewrite the contract, in effect making a new contract. *Id.*

In granting GRAA's motion for summary disposition, the trial court stated,

> I think I know what Wheels intended, what the drafter intended, but it's not really what they wrote. What they intended, I assume, is probably to say "arising from this agreement" and not "from the breach of this agreement," but that's not what they wrote. They wrote "arising from the breach of this agreement." So there is -- from what I think is the clear language, there has to be a breach of the agreement. There has to be insurance coverage, adequate insurance coverage, of Wheels's vehicles to cover any loss, theft or damage or injury to

person, but there is no claim that there isn't, and there is no indication that there is a breach of the agreement.

We regard the trial court's decision as well supported by the above-cited rules for contract construction. While it is true that when a court construes a contract, it must consider, in addition to the contract language, the "situation of the parties and the circumstances surrounding the contract," *Pritts, supra,* 29, [*5] as noted, rules of construction are resorted to only when a contract is ambiguous, and an unambiguous contract must be enforced as it is written, *Barner, supra,* 27 Mich. App. 671. The contract language is not ambiguous; thus, the trial court did not err in granting GRAA summary disposition.

Affirmed.

/s/ Jane E. Markey

/s/ Michael J. Kelly

/s/ Michael J. Talbot

LEXSEE

**DEREK J. OATWAY, Plaintiff, v. AMERICAN INT'L GROUP, INC., Plan Administrator of Stock Option Plan, AMERICAN INT'L GROUP, INC., a Delaware Corporation, and 1987 EMPLOYEE STOCK OPTION PLAN, an Employee Welfare Benefit Plan, Defendants.**

**C.A. No. 01-033-GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2002 U.S. Dist. LEXIS 1771; 27 Employee Benefits Cas. (BNA) 2404**

**February 5, 2002, Decided**

**SUBSEQUENT HISTORY:** Affirmed by Oatway v. Am. Int'l Group, 2003 U.S. App. LEXIS 7051 (3d Cir. Del., Apr. 14, 2003)

**DISPOSITION:** [*1] Defendants' Motion to Dismiss GRANTED; and Plaintiff's Motion for Summary Judgment declared MOOT.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants moved to dismiss plaintiff's amended complaint on the ground that the complaint failed to state a claim under § 502(a)(1)(B) of the Employee Retirement Income Security Act. Plaintiff moved for summary judgment.

**OVERVIEW:** Plaintiff was given stock options as performance incentives. The stock options were good for 10 years. Plaintiff resigned and was told that the stock options had to be exercised by a certain date, well before the 10 year period. Plaintiff failed to exercise the stock option by the new deadline, but attempted to exercise within the 10 year period. However, defendants declined to honor the stock option, so plaintiff brought suit under § 502(a)(1)(B) of the Employee Retirement Income Security Act. Defendants moved to dismiss and plaintiff moved for summary judgment. The court granted defendants' motion to dismiss because under the plain language of the plan, the purpose of the stock plan was not to provide severance, retirement, or disability benefits. Instead, its purpose was to provide a financial incentive for plaintiff to remain with defendants and to improve his work performance. Furthermore, the express

purpose of the stock plan was a bonus plan. While plaintiff may have been individually permitted to exercise his options subsequent to retirement, the primary purpose of the stock plan was to provide additional benefits during the course of employment.

**OUTCOME:** Defendants' motion to dismiss was granted. Plaintiff's motion for summary judgment was declared moot.

**CORE TERMS:** retirement, motion to dismiss, employee welfare benefit plan, disability, stock option, employee pension benefit plan, purpose of providing, summary judgment, pension, retirement income, subject matter jurisdiction, employee benefit plan, fiduciary duties, state law, stock, bonus, per share, termination, subsidiary, training, supplemental jurisdiction, method of calculating, statutory definition, breach of contract, covered employment, express purpose, welfare benefit, systematically, administrator, incidentally

**LexisNexis(R) Headnotes**

***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims***
[HN1] A motion to dismiss pursuant to the provisions of Fed. R. Civ. P. 12(b)(6) should not be granted unless, accepting all allegations in the complaint as true and viewing them in a light most favorable to the plaintiff, the court rules that the plaintiff is not entitled to relief as a matter of law. A complaint should be dismissed only if, after accepting as true all of the facts alleged in the

Case 1:06-cv-00627-GMS-LPS     Document 11-3     Filed 12/04/2006     Page 40 of 56

2002 U.S. Dist. LEXIS 1771, *1; 27 Employee Benefits Cas. (BNA) 2404

complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > General Overview*
*Pensions & Benefits Law > Employee Benefit Plans > Welfare Benefit Plans*
*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies > Federal Jurisdiction & Removal*
[HN2] The Employee Retirement Income Security Act (ERISA) gives federal courts subject matter jurisdiction over claims brought pursuant to 29 U.S.C.S. § 1132(a)(1)(B). This section authorizes a cause of action for benefits due under an employee benefit plan. Because an ERISA plan is necessary before ERISA's provisions apply, the court must first determine whether an employer's plan is, in fact, an ERISA employee welfare benefit plan. If the answer to this threshold question is no, then the court may dismiss the plaintiff's claims that he is entitled to benefits under ERISA.

*Pensions & Benefits Law > Employee Benefit Plans > Welfare Benefit Plans*
*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Participation & Vesting > General Overview*
[HN3] See 29 U.S.C.S. § 1002(1).

*Labor & Employment Law > Employment Relationships > At-Will Employment > Employees*
*Pensions & Benefits Law > Employee Benefit Plans > Welfare Benefit Plans*
*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Participation & Vesting > Qualified Domestic Relations Orders*
[HN4] 29 U.S.C.S. § 186(c) includes within the definition of "employee welfare plan" those plans which provide holiday and severance benefits, and benefits which are similar. 29 C.F.R. § 2510.3-1(a)(3).

*Labor & Employment Law > Disability & Unemployment Insurance > Disability Benefits >*

*General Overview*
*Pensions & Benefits Law > Employee Benefit Plans > Welfare Benefit Plans*
*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Participation & Vesting > Qualified Domestic Relations Orders*
[HN5] To constitute an employee welfare plan, a plan must be designed specifically to provide employees with medical, unemployment, disability, death, vacation, or other specified benefits or to provide income following retirement in order to come within the purview of the Employee Retirement Income Security Act. The statutory definition does not embrace plans that may incidentally result in payment of benefits after retirement, death or disability. Thus, merely because a plan may in some circumstances continue to pay proceeds after an employee's death or disability does not make it a welfare benefit plan.

*Pensions & Benefits Law > Employee Benefit Plans > Welfare Benefit Plans*
*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Participation & Vesting > Qualified Domestic Relations Orders*
[HN6] The Employee Retirement Income Security Act applies only to an employee welfare benefit plan or to an employee pension benefit plan or a plan which is both.

*Labor & Employment Law > Disability & Unemployment Insurance > Disability Benefits > General Overview*
*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Participation & Vesting > Qualified Domestic Relations Orders*
[HN7] Plans that might incidentally result in payment of benefits after retirement, death or disability only fall under the Employee Retirement Income Security Act if they were established or maintained for the express purpose of doing so.

*Pensions & Benefits Law > Employee Benefit Plans > Pension Benefit Plans*
*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Participation & Vesting > Qualified Domestic Relations Orders*
[HN8] The Employee Retirement Income Security Act pension plans include any plan established or maintained by an employer that, by its express terms results in a

Case 1:06-cv-00627-GMS-LPS    Document 11-3    Filed 12/04/2006    Page 41 of 56

2002 U.S. Dist. LEXIS 1771, *1; 27 Employee Benefits Cas. (BNA) 2404

deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan. 29 U.S.C.S. § 1002(2)(A)(ii).

*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Participation & Vesting > Qualified Domestic Relations Orders*
[HN9] The Employee Retirement Income Security Act pension plans exclude bonuses for work performed, unless such bonuses are systematically deferred to termination of covered employment or beyond, or so as to provide retirement income to employees. 29 C.F.R. § 2510.3-2(c).

**COUNSEL:** For DEREK J. OATWAY, plaintiff: Richard R. Wier, Jr., Law Offices of Richard R. Wier, Jr., Wilmington, DE.

For AMERICAN INTERNATIONAL GROUP, INC., AMERICAN INTERNATIONAL GROUP, INC., 1987 EMPLOYEE STOCK OPTION PLAN, defendants: Regina A. Iorii, Stephen E. Jenkins, Carolyn Shelly Hake, Ashby & Geddes, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

**MEMORANDUM AND ORDER**

**I. INTRODUCTION**

On January 17, 2001, the plaintiff, Derek J. Oatway ("Oatway"), filed a complaint in the above-captioned action. He amended his complaint on February 13, 2001. In his amended complaint, he alleges that American International Group, Inc. ("AIG") wrongfully denied him benefits under the 1987 Employee Stock Option Plan (the "Plan"). He now seeks to recover those benefits pursuant to section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* 29 U.S.C. § 1132(a)(1)(B). He further claims that AIG, as the Plan administrator, breached its fiduciary duties by failing to [*2] properly administer the Plan in violation of 29

U.S.C. § 1133. Finally, Oatway asserts state law claims against AIG based on breach of contract and estoppel.

Presently before the court are the defendants' motion to dismiss Oatway's amended complaint on the grounds that it fails to state a claim under ERISA and Oatway's motion for summary judgment. For the following reasons, the court will grant the defendants' motion to dismiss.

**II. BACKGROUND**

Oatway was employed by AIG until approximately August 26, 1992. On various occasions from 1983 through 1990, AIG and Oatway entered into written Incentive Stock Option Agreements (the "Agreements"). These Agreements granted Oatway the right to purchase certain numbers of shares of AIG common stock at set exercise prices per share. Specifically, on January 18, 1990, AIG granted Oatway an Incentive Stock Option to purchase 200 shares at $ 96 per share. On October 11, 1990, AIG granted Oatway an Incentive Stock Option to purchase 200 shares at $ 58.625 per share. n1 These options were granted under the AIG Plan in consideration of Oatway's performance as an employee of AIG.

> n1 Oatway refers to the terms of the January 18, 1990 and October 11, 1990 Incentive Stock Option Agreements and the 1987 Employee Stock Option Plan throughout his Amended Complaint. He has therefore incorporated these documents by reference into his pleading. The court may rely on such documents in deciding a motion to dismiss. *See In re Rockefeller Ctr. Properties, Inc. Securities Litig., 184 F.3d 280, 287 (3d Cir. 1999)* (noting that, on a motion to dismiss, "a court can consider a document integral to or explicitly relied upon in the complaint."). Neither party objects to the court relying on these documents.

[*3]

AIG's Plan provides selected employees of AIG, including its parent or subsidiary corporations, with the options to purchase shares of AIG common stock. The purpose of the Plan is:

To advance the interests of American International Group, Inc. ("AIG") by providing certain of the key employees of AIG and of any parent or subsidiary corporation of AIG, upon whose judgment, initiative and efforts the successful conduct of the business of AIG largely depends, with an additional incentive to continue their efforts on behalf of such corporations, as well as to attract to such corporations people of training, experience and ability.

Options granted under the Plan may normally be exercised beginning one year after they are granted, in set installments. AIG's board of directors determine the amount of the installments at the time of the grant. To the extent that an optionee does not purchase the maximum number of shares permitted under an option in any one year, he or she may purchase such shares in a subsequent year during the term of the option. Each of the option grants at issue provided that it expired ten years from the date of its issuance. Each of the option grants further [*4] specified that, in the event of termination of employment prior to the normal retirement age, the option must be exercised within three months after such termination.

On or about August 26, 1992, Oatway retired from AIG. Since he retired prior to the normal retirement age, AIG advised him that he was required to exercise all his remaining stock options by November 1992. Oatway alleges that after he complained about being denied the ten-year period to exercise his options, AIG agreed to allow him to exercise the options over the ten-year period, rather than within three months of his retirement.

On or about January 25, 2000, Oatway discovered that the option exercise date under the January 18, 1990 Incentive Stock Agreement had already expired. He claims that he immediately notified AIG via facsimile of his "intention and desire" to exercise this grant. AIG refused to allow him to do so.

On October 1, 2000, Oatway finally "exercised" the options under both the January 18, 1990 and October 11, 1990 Incentive Stock Option Agreements, but AIG refused to accept either exercise. He asserts that he appealed the denial to AIG as the "Plan Administrator." AIG rejected his appeal.

Oatway [*5] subsequently filed this complaint on January 17, 2001. On March 13, 2001, the defendants filed a motion to dismiss Oatway's Amended Complaint. On April 10, 2001, Oatway filed a motion for summary judgment.

## III. STANDARD OF REVIEW: MOTION TO DISMISS

[HN1] A motion to dismiss pursuant to the provisions of Rule 12(b)(6) should not be granted unless, accepting all allegations in the complaint as true and viewing them in a light most favorable to the plaintiff, the court rules that the plaintiff is not entitled to relief as a matter of law. *In re Fruehauf Trailer Corp., 250 B.R. 168, 183 (D. Del 2000)* (citing *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1420 (3d Cir. 1997);* see also *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998)* ("A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint."). "The issue is not whether a plaintiff will ultimately prevail but whether [*6] the claimant is entitled to offer evidence to support the claims." *In re Burlington,* 114 F.3d at 1420.

## IV. DISCUSSION

[HN2] ERISA gives federal courts subject matter jurisdiction over claims brought pursuant to 29 U.S.C. § 1132(a)(1)(B). This section authorizes a cause of action for benefits due under an employee benefit plan. *See* 29 U.S.C. § 1132(a)(1)(B). Because an ERISA "plan" is necessary before ERISA's provisions apply, the court must first determine whether AIG's 1987 Plan is, in fact, an ERISA "employee welfare benefit plan." *See Long v. Excel Telecommunications Corp.,* 2000 U.S. Dist. LEXIS 15479, 2000 WL 1562808, at *2 (N.D. Tex. Oct. 18, 2000). If the answer to this threshold question is no, then the court may dismiss the plaintiff's claims that he is entitled to benefits under ERISA. *See Henglein v. Informal Plan for Plant Shutdown Benefits for Salaried Employees,* 974 F.2d 391, 395 (3d Cir. 1992) (noting that a plaintiff's failure to prove the existence of an employee benefit plan, though it results in the dismissal of the claim, does not deprive the district court of subject matter jurisdiction [*7] to enter a judgment on the merits.")

### A. Is the 1987 Plan an Employee Welfare Benefit

**Plan Under ERISA?**

Oatway contends that the 1987 Plan is an "employee welfare benefit plan" under which he is entitled to benefits pursuant to 29 U.S.C. § 1132(a)(1)(B). The court disagrees.

[HN3] ERISA defines an "employee welfare benefit plan" as:

> Any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care, or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions). n2

> n2 [HN4] Section 186(c) includes within the definition of "employee welfare plan" those plans which provide holiday and severance benefits, and benefits which are similar. *See* 29 C.F.R. § 2510.3-1(a)(3).

[*8]

*See* 29 U.S.C. § 1002(1).

[HN5] To constitute an employee welfare plan, a plan "must be designed specifically to provide employees with medical, unemployment, disability, death, vacation, or other specified benefits or to provide income following retirement in order to come within the purview of ERISA." *Long, 2000 U.S. Dist. LEXIS 15479, 2000 WL 1562808*, at *4; *see also* 29 U.S.C. § 1002(1) (requiring that an ERISA plan be "established or maintained . . . for

the purpose of providing" the benefits listed in the statute.). The statutory definition does not embrace plans that may incidentally result in payment of benefits after retirement, death or disability. *See Long, 2000 U.S. Dist. LEXIS 15479, 2000 WL 1562808*, at *2; *Hagel v. United Land Co., 759 F. Supp. 1199, 1203 (E.D. Va. 1991)*. Thus, merely because a plan "may in some circumstances continue to pay . . . proceeds after an employee's death or disability does not make it a welfare benefit plan." *Murphy v. Inexco Oil Co., 611 F.2d 570, 574 (5th Cir. 1980)*.

Furthermore, these holdings are consistent with congressional findings and the declaration of policy that supported [*9] ERISA's enactment. In enacting ERISA, Congress did not intend "to control every aspect of the employer-employee relationship or every promise made to employees." *Murphy, 611 F.2d at 574*. Rather, Congress "intended to protect employees with many years of service who were losing anticipated retirement benefits because of inadequate vesting provisions, lack of funding, or other problems." *Long, 2000 U.S. Dist. LEXIS 15479, 2000 WL 1562808*, *2. Because Congress "sought only to deal with those types of plans that had created the problems it sought to remedy . . . by its terms, [HN6] ERISA applies only to "an employee welfare benefit plan or to an employee pension benefit plan or a plan which is both." *See Murphy, 611 F.2d at 574* (quoting 29 U.S.C. § 1002(3)).

Although the Third Circuit has not addressed the issue of whether an incentive stock option plan is an employee benefit plan within the meaning of ERISA, other courts that have considered the question have uniformly held that it is not. *See Long, 2000 U.S. Dist. LEXIS 15479, 2000 WL 1562808*, at *3-4; *Hahn v. National Westminster Bank, N.A., 99 F. Supp. 2d 275, 279-280 (E.D.N.Y. 2000)*; [*10] *Goodrich v. CML Fiberoptics, Inc., 990 F. Supp. 48, 49-50 (D. Mass. 1998)*. In *Long*, a former employee claimed that his employer terminated him for the purpose of depriving him of benefits under the company's stock option plan in violation of ERISA. *Long, 2000 U.S. Dist. LEXIS 15479, 2000 WL 1562808*, at *2. The court granted the former employer's motion for summary judgment, holding that the company's stock plan was not a benefit plan under ERISA. *See 2000 U.S. Dist. LEXIS 15479,* [WL] at *3-4. In its holding, the court examined the purpose of the company's stock option plan, which was:

Case 1:06-cv-00627-GMS-LPS   Document 11-3   Filed 12/04/2006   Page 44 of 56

2002 U.S. Dist. LEXIS 1771, *10; 27 Employee Benefits Cas. (BNA) 2404

to provide a means by which selected Employees of and Consultants to the Company and its Affiliates may be given an opportunity to purchase stock of the Company. The Company, by means of the Plan, seeks to retain the services of the persons who are now Employees of or Consultants to the Company and its Affiliates, to secure and retain the services of new Employees and Consultants, and to provide incentives for such persons to exert maximum efforts for the success of the Company and its Affiliates.

See 2000 U.S. Dist. LEXIS 15479, *9 [WL] at *3. The court further noted that, "nowhere does [the company's] Stock Option Plan indicate that its [*11] purpose is to defer compensation. In fact, the plan itself indicated that it was intended to operate as an incentive and bonus program. See id.

Finally, the Department of Labor, which is the agency charged with interpreting and enforcing ERISA, has also recognized that stock option plans are not necessarily employee welfare benefit plans. See U.S. Dep't of Labor Opinion Letter 79-80 A, 1979 WL 7016 (Nov. 13, 1979) (stating that stock option plans were not employee welfare benefit plans within the meaning of ERISA § 3(1) because they were not established or maintained for the purpose of providing any of the benefits listed in § 3(1) or 302(c) of the Labor Management Relations Act, 1947).

The court finds that the Plan at issue here does not meet the statutory definition of an employee welfare plan. The Plan was not created for the purpose of providing retirement income. Rather, the stated purpose of the 1987 Plan is:

to advance the interests of American International Group, Inc. ("AIG") by providing certain of the key employees of AIG and of any parent or subsidiary corporation of AIG, upon whose judgment, initiative and efforts the successful conduct [*12] of the business of AIG largely depends, with an additional incentive to continue their efforts on

behalf of such corporations, as well as to attract to such corporations people of training, experience and ability.

Therefore, under the plain language of the Plan, its purpose is not to provide severance, retirement, death or disability benefits. Instead, its purpose is to provide a financial incentive for employees to remain with AIG and to improve their performance at AIG. Although the Plan provided that upon retirement, death, or disability, the option could still be exercised, subject to time restrictions, any payment of benefits at that time were merely incidental. Furthermore, it is clear that " [HN7] plans that might incidentally result in payment of benefits after retirement, death or disability . . . only fall under ERISA if they were established or maintained for the express purpose of doing so." Long, 2000 U.S. Dist. LEXIS 15479, 2000 WL 1562808, at *2 (citing Murphy, 611 F.2d at 574-75).

Accordingly, because the Plan itself is clearly an incentive plan, it is not an employee welfare benefit plan within the meaning of ERISA.

**B. Is the 1987 Plan an Employee Pension Benefit [*13] Plan Under ERISA?**

Oatway suggests that the Plan "can also be characterized under ERISA as a pension plan or an employee pension benefit plan." [HN8] ERISA pension plans include any plan established or maintained by an employer that, by its express terms "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan." 29 U.S.C. § 1002(2)(A)(ii).

The Department of Labor has interpreted [HN9] ERISA pension plans to exclude bonuses for work performed, unless such bonuses are "systematically deferred to termination of covered employment or beyond, or so as to provide retirement income to employees." 29 C.F.R. § 2510.3-2(c). By the express purpose of the Plan itself, it is clear that this is a bonus plan. Although Oatway alleges that his ability to exercise his options continued after his retirement from AIG, this does not transform the bonus plan into "one whose payments are systematically deferred to the termination [*14] of employment or one whose purpose is to provide

2002 U.S. Dist. LEXIS 1771, *14; 27 Employee Benefits Cas. (BNA) 2404

retirement income." *See Hahn v. National Westminster Bank, N.A., 99 F. Supp. 2d 275, 276 (E.D.N.Y. 2000).* Rather, this is a plan were "post-retirement payments [are] only incidental to the goal of providing current compensation." *See Hahn, 99 F. Supp. 2d at 279.* Thus, the court recognizes that, while Oatway may have been individually permitted to exercise his options subsequent to retirement, the primary purpose of the Plan as a whole was to provide additional benefits to employees during the course of their employment. *See Lafian v. Electronic Data Systems Corp., 856 F. Supp. 339, 345 (E.D. Mich. 1994).*

Accordingly, the court finds that the Plan at issue here is not an employee pension benefit plan within the meaning of ERISA.

### C. Does the Plan Administrator Owe Oatway a Fiduciary Duty Under ERISA?

Oatway next alleges that AIG, as the Plan's administrator, breached its fiduciary duties under ERISA § 503. *See 29 U.S.C. § 1133.* The basis for this claim is that AIG failed to set forth adequate factual reasons why it denied his benefits appeal. Oatway [*15] further claims that AIG failed to advise him of what further information he needed to meet options pay status requirements under the Plan.

As the court discussed at some length above, the Plan does not fall within the definition of a qualified ERISA plan. Therefore, the court finds that AIG could not owe Oatway any ERISA fiduciary duties under the Plan.

### D. State Law Claims

Oatway next asserts state law claims for breach of contract and estoppel. He notes that, "if the court were to determine that there is an ERISA plan, then this court's supplemental jurisdiction over Count III is appropriate." However, because this Plan is not covered by ERISA, there is no federal question jurisdiction under ERISA. Moreover, the court has merely focused on the jurisdictional issues presented by these claims, and has not devoted any resources to the merits of the claims. *See Voege v. The Magnavox, Co., 439 F. Supp. 935, 943 (D. Del. 1977).* The court, therefore, declines to exercise supplemental jurisdiction over Oatway's remaining state law claims. *See 28 U.S.C. § 1367(c)(3).* Accordingly, the court will dismiss them for lack of subject matter jurisdiction. [*16]

### V. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. The Defendants' Motion to Dismiss (D.I. 7) is GRANTED; and

2. Oatway's Motion for Summary Judgment (D.I. 10) is declared MOOT.

Date: February 5, 2002

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

LEXSEE 1996 US DIST LEXIS 8158

**PURSUIT ATHLETIC FOOTWEAR, INC., Plaintiff, v. SAVE POWER LIMITED, EXTRAVEST HOLDINGS LIMITED, SILVER EAGLE HOLDINGS LIMITED, and THE GRANDE HOLDINGS LIMITED, Defendants.**

**Civil Action No. 96-40 MMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1996 U.S. Dist. LEXIS 8158*

**June 7, 1996, Decided**

**NOTICE:** [*1]  NOT FOR PUBLICATION

**DISPOSITION:** Defendants' Motion to Transfer will be granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, creditor, collection agent, owner of creditor (owner), and controlling shareholder of owner (shareholder), filed a motion to transfer venue of plaintiff debtor's adversary bankruptcy proceeding pursuant to *28 U.S.C.S. § § 1404*(a), 1412.

**OVERVIEW:** Debtor, creditor, and collection agent entered into a finance agreement. Both debtor and creditor alleged that the other party had breached this agreement, and debtor filed an action against creditor, collection agent, owner, and shareholder in Texas. Creditor then filed a complaint against directors and officers of debtor in Texas. Debtor filed for bankruptcy in Delaware under *11 U.S.C.S. § 101* et seq. and filed the present adversary proceeding contemporaneously. The parties stipulated to withdraw the reference of the adversary proceeding to the bankruptcy court. The court granted the motion to transfer the adversary proceeding to Texas because (1) debtor's, and collection agent's, principal places of business were in Texas. (2) The overwhelming majority of witnesses were in Texas, and Delaware would not be any more convenient than Texas as to those witnesses who resided in Hong Kong. (3) The issues in the Texas actions were identical to those in the present case, and a denial of transfer would result in duplicative proceedings and a waste of judicial resources. And (4) the possibility of inconsistent verdicts between the Delaware and Texas courts weighed in favor of transfer.

**OUTCOME:** The court granted the motion to transfer venue.

**CORE TERMS:** adversary proceeding, convenience, bankruptcy proceeding, principal place of business, shoe, athletic, convenient, declaration, collateral, reside, venue, working capital, civil action, indebtedness, financing, foreclose, resident, weighs, memorandum, transferred, litigating, pendency, customer, default, transferee, fora, breach of contract, security interest, choice of forum, similarity

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Practice & Proceedings > Venue > Change of Venue*
*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
*Civil Procedure > Venue > Motions to Transfer > General Overview*
[HN1]  *28 U.S.C.S. § § 1404*(a), 1412 both provide for transfer of venue upon fulfillment of certain conditions.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN2] See *28 U.S.C.S. § 1404*(a).

*Bankruptcy Law > Practice & Proceedings > Venue > Change of Venue*
*Civil Procedure > Venue > Motions to Transfer > General Overview*
[HN3] See *28 U.S.C.S. § 1412.*

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*

1996 U.S. Dist. LEXIS 8158, *

*Civil Procedure > Venue > Motions to Transfer > Convenience of Witnesses*
*Civil Procedure > Venue > Special Venue*
[HN4] The decision to transfer venue under either *28 U.S.C.S. § 1404 or 28 U.S.C.S. § 1412* has been determined to turn on the same issues. The only factor not expressly listed in § 1412 is the convenience of witnesses factor. However, courts which use § 1412 to determine the transfer motion subsume the convenience of witnesses inquiry into the convenience of the parties inquiry.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN5] In ruling on motions, under *28 U.S.C.S. § 1404*(a), courts have not limited their consideration to the three enumerated factors in § 1404(a), which are convenience of parties, convenience of witnesses, or interests of justice. Courts should consider all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum. While there is no definitive formula or list of factors to consider, courts have considered many variants of the private and public interests protected by the language of § 1404(a).

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN6] The private interests that are protected by the language of *28 U.S.C.S. § 1404*(a) include plaintiff's forum preference as manifested in the original choice, the defendant's preference, whether the claim arose elsewhere, the convenience of the parties as indicated by their relative physical and financial condition, the convenience of the witnesses, but only to the extent that witnesses may actually be unavailable for trial in one of the fora, and the location of books and records, similarly limited to the extent that the files cannot be produced in the alternative forum.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
*Civil Procedure > Judgments > Entry of Judgments > Enforcement & Execution > General Overview*
[HN7] The public interests that are protected by the language of *28 U.S.C.S. § 1404*(a) include the enforceability of the judgment, practical considerations that could make the trial easy, expeditious, or inexpensive, the relative administrative difficulty in the two fora resulting from court congestion, the local interest in deciding local

controversies at home, the public policies of the fora, and the familiarity of the trial judge with the applicable state law in diversity cases.

COUNSEL: Edward M. McNally, Esq., Kent A. Jordan, Esq., and John D. Demmy, Esq., of Morris, James, Hitchens & Williams, Wilmington, Delaware; attorneys for plaintiff.

Laura Davis Jones, Esq., and Janet Z. Charlton, Esq., of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware; Of Counsel: Alan W. Harris, Esq., and John C. Wynne, Esq., of Andrews & Kurth L.L.P.. Dallas, Texas; attorneys for defendants.

JUDGES: Murray M. Schwartz, Senior District Judge

OPINION BY: Murray M. Schwartz

OPINION:

### MEMORANDUM OPINION

Dated: June 7, 1996
Wilmington, Delaware

### Murray M. Schwartz, Senior District Judge

#### I. Introduction

Before the Court is the motion of defendants Save Power Limited ("Save Power"), Silver Eagle Holdings Limited ("Silver Eagle"), Extravest Holdings Limited ("Extravest"), and The Grande Holdings Limited ("Grande") (collectively, "defendants") to transfer venue ("Motion to Transfer") of the pending Adversary Proceeding which has been filed by plaintiff Pursuit Athletic Footwear, Inc. ("Pursuit" or "plaintiff"). Docket Item ("D.I.") 6. Defendants have moved to transfer this Adversary Proceeding [*2] to the Northern District of Texas pursuant to *28 U.S.C. § 1404*(a), the general transfer statute, and *28 U.S.C. § 1412,* the transfer statute specifically applicable to proceedings under Chapter 11 of the Bankruptcy Code. The Court has jurisdiction pursuant to *28 U.S.C. §§ 1334* and 157, and venue is proper in the District of Delaware pursuant to *28 U.S.C. § 1409*(a). For the reasons set forth below, defendants' Motion to Transfer will be granted.

#### II. The Parties

Pursuit is a Delaware corporation with its principal place of business in Tarrant County, Texas. D.I. 13 at P 1 (First Amended Complaint ("Complaint")), P 1; D.I. 8, Exhibit ("Exh.") 6, at P 2. Pursuit is engaged in the business of selling athletic footwear. D.I. 13 at PP 8-9. Riddell Athletic Footwear, Inc. ("Riddell") is Pursuit's affiliated, non-operating holding company, and while not a

1996 U.S. Dist. LEXIS 8158, *

party to this Adversary Proceeding, filed for bankruptcy protection simultaneously with Pursuit in the Bankruptcy Court for the District of Delaware, the court in which this Adversary Proceeding was initially filed. Riddell is a Nevada corporation with its principal place of business in Texas. Riddell is a leading manufacturer of [*3] football helmets. *Id.* P 8. Pursuit is wholly owned by Riddell, and is the licensee of the "Riddell" trademark (the "Riddell License"), which has been fundamental to Pursuit's business. *Id.* Pursuit's business plan was to combine the valuable Riddell trademark with moderately priced athletic shoes for ultimate use by consumers. *Id.* PP 8-9.

Save Power is a Hong Kong corporation with its principal place of business in Kowloon, Hong Kong. Save Power is engaged in the business of manufacturing and supplying athletic shoes, and conducts its business throughout the United States. *Id.* P 2. Extravest is a Nevada corporation with its principal place of business in Farmers Branch, Texas. *Id.* P 3. Extravest serves as a collection agent on behalf of Save Power under the agreement which has spawned the dispute between the parties to this litigation. D.I. 13, Exh. A. Silver Eagle is a Bermuda corporation with its principal place of business in Hong Kong. Complaint, P 4. Silver Eagle owns 100% of the stock of Save Power and Extravest. *Id.* P 4. Grande is a Cayman Islands corporation with its principal place of business in Hong Kong. *Id.* P 5. Grande owns a controlling interest [*4] in Silver Eagle. *Id.*

**III. Factual Background**

The controversy between the parties has its genesis in a Finance and Security Agreement (the "Finance Agreement"), entered into by Pursuit, Save Power and Extravest, dated February 15, 1994. D.I. 13, Exh. A. Under the terms of the Finance Agreement, Save Power contracted to provide both working capital and athletic footwear to Pursuit. *Id.* Pursuit acknowledged indebtedness to Save Power of $ 23 million, and received an additional loan of approximately $ 5 million, the total amount of indebtedness never to exceed $ 28 million without Save Power's consent. *Id.* The proceeds from the sales of Pursuit's shoes were to be paid to any "Senior Lender," as defined, who would then pay Save Power through its collection agent, Extravest. *Id.* In return for the financing commitment, Save Power received a senior lien on the Riddell License and a second lien on Pursuit's accounts receivable and inventory. *Id.*

Contemporaneously with the execution of the Finance Agreement, Save Power, Pursuit and Heller Financial, Inc. ("Heller"), a California-based commercial lender, entered into an agreement whereby further financing would be [*5] provided to Pursuit from Heller in return for a senior lien on Pursuit's accounts receivable and inventory (the "Subordination Agreement"). D.I. 13,

Exh. B. Save Power agreed to subordinate $ 20 million of its outstanding indebtedness and its security interest in the collateral in order to facilitate further funding of Pursuit by Heller. *Id.* Under the Subordination Agreement, Save Power may not exercise its rights of foreclosure as long as any "Senior Debt," as defined therein, remains unpaid. *Id.* Pursuit's customers were to pay Heller directly, and Heller, in turn, was to apply a portion of the payments to Pursuit's indebtedness, and the remainder to Extravest on behalf of Save Power. *Id.*

Troubles began, however, even before the Finance Agreement was executed and implemented. Because the parties dispute the facts surrounding the breaches of contract alleged by each, both accounts will be given. Pursuit alleges that labor difficulties at the Save Power/Silver Eagle production facilities caused a disruption in the production of shoes. Complaint, P 11. At the same time, Pursuit alleges that defendants were of questionable financial stability, which seriously impaired their [*6] ability to provide working capital according to the Finance Agreement. *Id.* P 12. Notwithstanding these alleged impediments, Save Power entered into the Finance Agreement without disclosing them to Pursuit, and a short time thereafter, Save Power failed to deliver shoes to Pursuit in accordance with the Finance Agreement, and of the shoes Save Power did deliver, many were of dubious quality. *Id.* PP 11-15. Pursuit alleges that defendants began to assume control over the Pursuit operations with the intent to cause Pursuit to default on its royalty obligations to Riddell, at which point, defendants would foreclose upon the Riddell License. *Id.* PP 16-19. However, the Finance Agreement contained a provision precluding Save Power from foreclosing on the Riddell License when any Senior Lender remains unpaid. *Id.* P 20. Pursuit alleges that Heller, as Senior Lender, was still owed money from Pursuit, and thus foreclosure was an unavailable option for Save Power. Pursuit further alleges that defendants exerted pressure on Heller to not renew the financing arrangement with Pursuit. Heller acceded to that pressure. *Id.* PP 21-22. Left without financing, Pursuit was forced to [*7] seek financing elsewhere, and was able to obtain refinancing of the loan with Syntek Finance Corporation ("Syntek"), a commercial lender, whereby Syntek purportedly assumed the rights and obligations of Heller as Senior Lender under the Subordination Agreement. *Id.* P 23.

Defendants present a different version of the facts. Defendants' position is that Pursuit exceeded the maximum indebtedness of $ 28 million allowable under the Finance Agreement, which had the effect of terminating Save Power's obligations to provide working capital and supply shoes. D.I. 8, Exh. 6, PP 10-11. n1 Defendants also take the position that Heller, as Senior Lender, had been fully repaid and therefore, under the Finance

Agreement, all customer payments were to be paid directly to Extravest on behalf of Save Power. *Id.* P 13. Rather than allow the customer payments to go to Save Power through Extravest, as provided in the Finance Agreement, Pursuit wrongfully diverted the payments to itself. *Id.* This act, among others, constituted a default under the Finance Agreement, which triggered the rights of Save Power to foreclose on its collateral. *Id.* PP 16-18.

n1 Save Power stated its position in a prior filing with the United States District Court for the Northern District of Texas, in a counterclaim to an action brought by Pursuit. *See infra.* The Court has set forth Save Power's contentions solely to provide context for this Adversary Proceeding.

[*8]

Pursuit and Riddell brought a state civil action in the 236th Judicial District Court of Tarrant County, Texas on May 26, 1995, raising several claims against Save Power, Extravest, Silver Eagle and Grande. n2 The complaint alleged the following causes of action: (1) a declaration that the financing provided by Syntek is Senior Debt, as that term is defined in the Finance Agreement, that Syntek is a Senior Lender under the Finance Agreement, and that Save Power's liens are subordinated to the indebtedness resulting from the refinancing of the loan by Syntek; (2) breach of contract by reason of Save Power's failure to provide adequate working capital, failure to timely deliver athletic shoes, and delivering of defective athletic shoes; (3) tortious interference with contractual and business relations among Pursuit, Riddell and Heller; (4) economic duress and breach of duty of good faith and fair dealing; and (5) attorneys' fees.

n2 Because none of the parties included the complaint in the state court action as part of the record, the Court takes judicial notice, pursuant to *Federal Rule of Evidence 201*, of the complaint, filed on May 26, 1995, in the 236th Judicial District in the District Court of Tarrant County, Texas; removed to the Northern District of Texas, Fort Worth Division, on August 11, 1995. *See Riddell Athletic Footwear, Inc. v. Save Power Ltd.,* Civil Action No. 4-95-CV-594-Y.

[*9]

Save Power removed the action to the Northern District of Texas, Fort Worth Division, on the grounds of diversity jurisdiction (the "Fort Worth Action"). n3 Save Power also filed a counterclaim after removal. D.I. 8, Exh. 6. Save Power sought (1) damages for breach of

contract due to Pursuit's failure to pay amounts owed and failure to recognize Save Power's security interests under the Finance Agreement; (2) injunctive relief prohibiting Pursuit from selling, transferring or otherwise disposing of its assets and from collecting or converting Save Power's collateral; and (3) a declaration that Pursuit is in default of the Agreement, which default allows Save Power to take possession of its secured collateral. Finally, Save Power sought the right to judicially foreclose on that collateral. *See id.*

n3 Pursuit and Riddell promptly filed a motion to remand the action to state court on the ground that the district court did not have diversity jurisdiction over the parties. D.I. 8, Exh. 20. Briefing on the motion to remand has been completed, but no disposition of the motion had occurred before the case was administratively closed on November 22, 1995, due to the pendency of the Bankruptcy Proceeding. *See* D.I. 8, Exh. 5.

[*10]

On August 21, 1995, Save Power filed a complaint in the Northern District of Texas, Dallas Division, against Ernest Wood, Jr., Harry D. Wood, Linda B. Wood, Stanley Wood, High Five Athletic, Inc., Stan's Sports Center, Inc. and E. Wood & Associates, Inc. *See Save Power Ltd. v. Wood,* Civil Action No. 3-95-CV-1811-H (the "Wood Action"); D.I. 8, Exh. 7. The action was brought against these defendants who were acting as directors and officers of Pursuit and other related sporting goods retailers. The gravamen of the complaint was a claim for breach of fiduciary duty, fraudulent conveyances from Pursuit to the sports retailers, and other equitable grounds. *See id.* Save Power's theory centered on the alleged misappropriation and diversion of funds from Pursuit by its directors and officers, facilitated by their positions as directors and officers, to the detriment of Save Power, who continued to provide funding pursuant to the Finance Agreement. This action was transferred from the Dallas Division to the Fort Worth Division of the Northern District of Texas by Order dated August 28, 1995, D.I. 8, Exh. 12, because of the pendency of the Fort Worth Action. Judge Terry R. Means, before [*11] whom the Fort Worth Action was pending, ordered consolidation of the cases by Order of August 31, 1995. D.I. 8, Exh. 14.

On September 11, 1995, Save Power filed a complaint in the Fort Worth Division of the Northern District of Texas against Syntek, requesting a declaration that Save Power holds a perfected security interest under the Finance Agreement that is superior to that of Syntek; that

1996 U.S. Dist. LEXIS 8158, *

Save Power is entitled to foreclose on its security interest in the Pursuit assets; and that Syntek does not possess any rights under the Subordination Agreement. D.I. 8, Exh. 17. *See Save Power Ltd. v. Syntek Finance Corp.,* Civil Action No. 495-CV-665-A (the "Syntek Action").

On November 3, 1995, Pursuit and Riddell filed voluntary petitions for protection pursuant to Chapter 11 of *11 U.S.C. § 101 et seq.* in the Bankruptcy Court for the District of Delaware (the "Bankruptcy Proceeding"), and continued to operate the business as debtors in possession under *11 U.S.C. § § 1107* and 1108. D.I. 20, Exh. 2 at P 1. Pursuit contemporaneously filed the present Adversary Proceeding, Adv. Pro. No. A-95-100, in the Bankruptcy Court, naming Save Power, Extravest, Silver Eagle and Grande as defendants. [*12] *See* Complaint. By joint stipulation, the parties agreed to Withdraw the Reference of the Adversary Proceeding to the Bankruptcy Court, and an Order Withdrawing the Reference was entered on February 20, 1996. D.I. 3.

In its complaint, Pursuit alleges that Save Power (1) breached its contractual obligations to provide adequate working capital and supply products; (2) made false statements and omitted material facts during the negotiations of the Finance Agreement, thereby fraudulently inducing Pursuit to enter into the Finance Agreement; (3) made misrepresentations which caused Pursuit to enter into the Finance Agreement; (4) exercised dominion and control over Pursuit, assuming fiduciary obligations to Pursuit which it breached; (5) affiliates aided and abetted the breach of fiduciary duties; (6) engaged in inequitable conduct for which equitable subordination of Save Power's liens is appropriate; (7) tortiously interfered with the Subordination Agreement between Heller and Pursuit, as well as contracts between Pursuit and its customers; (8) tortiously interfered with prospective economic advantage; (9) benefitted from a lien fraudulently conveyed, in that Pursuit did not receive [*13] adequate consideration therefor; and finally, Pursuit sought a declaration that Save Power may not foreclose on the Riddell License or any other asset so long as any Senior Debt remains outstanding.

Defendants filed the present Motion to Transfer the Adversary Proceeding to the Fort Worth Division of the Northern District of Texas. Defendants argue that (1) all parties, except those in the Far East, are located in Texas, while none have any substantive connection with Delaware; (2) the vast majority of relevant witnesses and documents are located in Texas, not Delaware; and (3) the Adversary Proceeding raises claims which arise out of the same facts and circumstances that are the subject of the Fort Worth Action, which has already been significantly advanced. D.I. 7. Pursuit has opposed the Motion to Transfer, arguing that the interests of justice disfavor transfer in that (1) there is a presumption against

transfer in a bankruptcy case; (2) Pursuit is financially unable to retain Texas counsel; (3) Save Power unnecessarily delayed in filing this motion; (4) the balance of convenience does not favor Texas because (a) the locations of witnesses and documents are not in Texas; (b) plaintiff's [*14] choice of forum should be accorded deference; and (c) and the situs of the events giving rise to the claims and applicable law does not favor Texas; and finally, (5) the Texas District Court lacks jurisdiction over the Fort Worth Action, which was removed from state court, and thus the pendency of that case does not warrant transfer. D.I. 12.

**IV. Analysis**

This analysis begins with the language of the transfer statutes, [HN1] *28 U.S.C. § § 1404*(a) and 1412, both of which provide for transfer of venue upon fulfillment of certain conditions. The general transfer statute found at [HN2] section 1404(a) provides:

> For the convenience of the parties and the witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it may have been brought.

The transfer statute governing bankruptcy matters, found at [HN3] *28 U.S.C. § 1412,* provides:

> A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties.

[HN4] The decision to transfer venue under either section 1404 and 1412 has been determined to turn on the [*15] same issues. *In re Emerson Radio Corp., 52 F.3d 50, 55 (3d Cir. 1995)* ("Section 1412 largely include[s] the same criteria for transfer of cases as section 1404[a], *i.e.,* 'the interest of justice' or 'the convenience of the parties' . . . ."). The only factor not expressly listed in section 1412 is the convenience of witnesses factor. n4 However, courts which use section 1412 to determine the transfer motion subsume the convenience of witnesses inquiry into the convenience of the parties inquiry. *See, e.g., In re Oklahoma City Assocs., 98 Bankr. 194, 199 (Bankr. E.D. Pa. 1989); In re Indus. Pollution Control, Inc., 137 Bankr. 176, 181 (Bankr. W.D. Pa. 1992).* n5

n4 Also absent from section 1412 is a requirement that the proposed transferee forum be one in which the original action could have initially been brought. In this case, the petition for bankruptcy could have been filed in the Bankruptcy Court for the Northern District of Texas pursuant to *28 U.S.C. § 1408*(1), and this Adversary Proceeding would similarly have been properly filed in that court pursuant to *28 U.S.C. § § 1334* and 157. Accordingly, this difference between the statutes will not be further addressed.

[*16]

n5 Defendants have moved to transfer this action pursuant to both sections 1404(a) and 1412, although they argue that the appropriate transfer statute to be applied is section 1404(a). As authority for this proposition, defendants cite *Goldberg Holding Corp. v. NEP Prods., Inc., 93 Bankr. 33, 34 (Bankr. S.D.N.Y. 1988),* where the Bankruptcy Court for the Southern District of New York held that section 1404 governs transfer motions for *"related to"* actions, since section 1412, by its own terms, only governs actions *arising under* title 11. Defendants argue that this Adversary Proceeding is non-core, and therefore is a "related to" proceeding within the meaning of the Bankruptcy Code. Pursuit has not contested the transfer provision preference of defendants. Since the Third Circuit Court of Appeals has expressly held that the inquiry under both provisions is largely the same, the Court declines to address whether the action is a "core" or "related to" proceeding.

In *Jumara v. State Farm Ins. Co., 55 F.3d 873 (3d Cir. 1995),* the Third Circuit Court of Appeals listed a number of [*17] factors which have been deemed relevant to this inquiry, beyond those enumerated in the statute itself. The factors listed by the *Jumara* court are set forth as follows:

[HN5]
In ruling on § 1404(a) motions, courts have not limited their consideration to the three enumerated factors in § 1404(a) (convenience of parties, convenience of witnesses, or interests of justice), and, indeed, commentators have called on the courts to "consider all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served

by transfer to a different forum." While there is no definitive formula or list of factors to consider, courts have considered many variants of the private and public interests protected by the language of § 1404(a).

[HN6]
The private interests have included: plaintiff's forum preference as manifested in the original choice, the defendant's preference, whether the claim arose elsewhere, the convenience of the parties as indicated by their relative physical and financial condition, the convenience of the witnesses -- but only to the extent that witnesses may actually be unavailable for trial in [*18] one of the fora, and the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum).
[HN7]
The public interests have included: the enforceability of the judgment, practical considerations that could make the trial easy, expeditious, or inexpensive, the relative administrative difficulty in the two fora resulting from court congestion, the local interest in deciding local controversies at home, the public policies of the fora, and the familiarity of the trial judge with the applicable state law in diversity cases.

*Id. at 879-80* (citations omitted). For analytical clarity, those factors set forth by the Third Circuit appellate court which are found in the statute itself will be discussed under separate headings. All other relevant considerations will be addressed under the broad interests of justice inquiry.

### A. Convenience of Parties

A brief review of the parties and their respective citizen ships indicates a preference for this litigation to proceed in the Northern District of Texas. Pursuit maintains its principal place of business in Tarrant County, Texas. The fact that Texas is Pursuit's "home turf" [*19] suggests that it would be a more appropriate forum for the litigation, given that all its officers, directors, employees and other individuals with pertinent knowledge are located in the same state. D.I. 8 at A-2-3 (Declaration of John C. Wynne ("Wynne Decl.")). Defendants Save Power, Silver Eagle and Grande all maintain their princi-

pal places of business in Hong Kong, a location geographically remote from both Texas and Delaware. Litigation in the United States, regardless of the location, would presumably be inconvenient for the Hong Kong defendants in all respects: thus, the convenience of the parties factor with respect to these defendants does not cut strongly in either direction. However, defendant Extravest maintains its principal place of business in Dallas County, Texas. With respect to Extravest officers, directors and employees acting on behalf of the company, Texas would be a more convenient forum. Therefore, on balance, the convenience of the parties factor weighs somewhat in favor of transfer to Texas.

B. *Convenience of Witnesses*

The convenience of witnesses factor overwhelmingly favors transfer of this action to Texas. The witnesses with information from Pursuit [*20] include Ernest Wood, Chairman of the Board of Directors; Harry Wood, President; Linda Wood, former Vice President; Jeffrey Mattich, Chief Financial Officer; Joe McCarthy, Credit Manager; Michael Cahill, Vice President of Operations; Herman Franke, collections manager; Holly Ramone, financial assistant; and Sandy Aguilar, accounts payable. D.I. 8 at A-3 (Wynne Decl.). All of these witnesses are located in Texas. Other Pursuit witnesses are Stanley Wood, who resides in Oklahoma; Fred Brooks, a consultant who resides in Connecticut; and Arthur Tse, a Director, who resides in Hong Kong. *Id.* As to the majority of these witnesses, litigation in Texas would be vastly more convenient.

In addition to Messrs. Wood, Mattich, McCarthy and Cahill, Save Power's witnesses may include the following witnesses residing in Hong Kong: Yvonne Ho, Silver Eagle Managing Director; Charles Chan, assistant financial controller; and S.Y. Lee, Silver Eagle Board Member. *See, e.g.,* D.I. 8, Exh. 15. Additionally, Christopher Ho, Silver Eagle Chairman of the Board, and Rose Kong, Senior Manager of Special Projects, both of whom will be witnesses, reside in Singapore. *See id.* By Pursuit's own admission, [*21] Rose Kong, who will likely be an important witness for Save Power, maintains an apartment in Dallas and spends most of her time there. D.I. 8, Exh. 10 at 3. With respect to these witnesses, with the exception of Rose Kong, litigation in Delaware would not be any more or less convenient than in Texas.

Third party witnesses likely to be called include the following witnesses located in Texas: Terry Schumate, an officer of International Health Products, the one-third owner of Pursuit's parent and Syntek; Scott Miller, former Syntek officer; Gene Philips, a principal behind International Health Products and Syntek; Steve Winarcyzk, former Vice President of Finance for Extravest; and Anita Stacey, former product development manager

for Pursuit. Additional third party witnesses include Joe Grosz, from New York; Rob Christy, located in Hong Kong; and Harry Friedman of Heller, located in California. D.I. 8 at A-3 (Wynne Decl.). As to the majority of these third party witnesses, litigation in Texas would be more convenient.

The overwhelming majority of these witnesses are in Texas. It is beyond dispute that litigating this matter in Texas will be more convenient for these Texas-based witnesses. [*22] Pursuit dismisses this fact with the self-serving statement that "no witness will be more inconvenienced by trying this case [in Delaware], except possibly Mr. E. Wood and other Pursuit employees. That, however, is not Save Power's problem." D.I. 12 at 22. Whether Save Power need concern itself with Pursuit's witnesses is not the issue: the Court must determine whether the convenience to *all* witnesses weighs strongly in favor of a transfer. The Court finds that it does.

The Court also notes that at least at some point, Pursuit was in agreement with this Court's belief that the convenience of witnesses factor favors the Northern District of Texas. On the issue of proper forum in the Fort Worth Action, Judge Means had requested briefing on the applicability of the forum selection clause of the Finance Agreement, which provided that New York would be the appropriate forum. *See* D.I. 8, Exh. 10. Pursuit submitted a memorandum arguing that the forum selection clause should not be enforced for "compelling" and "countervailing" reasons, stating that "all of the Plaintiffs' choice of forum is the Northern District of Texas, and the convenience of the parties and witnesses require [*23] the forum to be the Northern District of Texas." D.I. 8, Exh. 10 at 2. The claims in the Fort Worth Action, which has been administratively closed due to the pendency of the Bankruptcy Proceeding, and the claims in this Adversary Proceeding are, for all intents and purposes, identical. n6 *Compare,* Complaint, D.I. 13 at B-1, *with* Fort Worth Action Complaint. Thus, many of the witnesses will also be identical. With respect to the Fort Worth Action, Pursuit observed:

> In the Riddell case, n7 the witnesses for Plaintiffs will be Ernest Wood, Jr., Jeffrey Mattich, Harry Wood, Frederic Brooks, Joseph McCarthy, David Sheridan and possibly Linda Wood. All of these individuals with the exception of Frederic Brooks are residents of Dallas County, Texas. Frederic Brooks is a resident of Connecticut.
>
> The main witnesses for Defendants in the Riddell case will be Rose Kong, Yvonne

Ho and Carmen Eggleston. Carmen Eggleston is an expert witness for Defendants and she resides in Texas. Yvonne Ho is a resident of Hong Kong. Rose Kong, although legally a resident of Hong Kong, maintains an apartment in Dallas and spends most of her time in Dallas.

Extravest Holdings Limited, [*24] one of the Defendants in the Riddell case, is a Nevada corporation with its principal place of business in Dallas, Texas.

...

In the case brought by Save Power n8, Defendants Linda Wood, Ernest Wood and Harry Wood reside in the Northern District of Texas. Defendant Stanley Wood is a resident of Tulsa, Oklahoma. Defendant High Five Athletic Shoe Warehouse, Inc. is located in Dallas, and Defendant Stan's Sports Center, Inc. is located in Tulsa.

D.I. 8, Exh. 10 at 2-3.

n6 This Court is not the first to recognize the virtually identical nature of the claims raised in the Fort Worth Action with those raised in the present action. In ruling on motions filed in connection with the Bankruptcy Proceeding, Bankruptcy Judge Balick made the following observations about the similarity of the claims:

>...Pursuit has filed an adversary proceeding here with *allegations that are substantially identical to those in the [Fort Worth] action.* The complaint seeks damages based on breach of contract, fraud, breach of fiduciary duty, tortious interference. *The complaint seeks identical declaratory relief as the [Fort Worth] action.* In addition, the complaint seeks to avoid the security interest as a fraudulent conveyance, and equitably subordinate the defendants' claims, liens and interests.

D.I. 8, Exh. 1 at 9 (Memorandum Opinion of Bankruptcy Judge Balick) (emphasis supplied).

[*25]

n7 Pursuit's reference to the "Riddell case" refers to the Fort Worth Action, the original action filed by Pursuit and Riddell against defendants in Texas state court, subsequently removed to the Northern District of Texas.

n8 Pursuit's reference to the "case brought by Save Power" refers to the Wood Action, which has been transferred and consolidated with the Fort Worth Action.

Pursuit continued in its argument by stating that it would be more convenient for the witnesses for *both* parties to the Fort Worth Action, as well as the Wood Action, if the case were tried in Texas:

>Since all of Plaintiffs' major witnesses in the Riddell case, with the exception of Frederic Brooks, live in the Northern District of Texas, *obviously, the convenience of Plaintiffs' witnesses would be best served by leaving the case in the Northern District of Texas.*

>In the suit brought by Save Power, all of the individual defendants, with the exception of Stanley Wood who lives in Oklahoma, live in Texas. *Obviously, the convenience of these Defendants would be served by leaving the case* [*26] *in Texas.*

>Additionally, Rose Kong, the most important witness for both Save Power and the other Defendants in the Riddell case, maintains an apartment in Dallas. The office of Defendant Extravest Holdings Limited in also located in Dallas.

*Id.* at 5-6 (emphasis supplied). Pursuit concluded its memorandum by capaciously stating:

>Since there is absolutely no connection between the State of New York and either the Riddell case or the case brought by Save Power, and *since all parties and*

*witnesses would be greatly inconvenienced rather than convenienced by transfer of this case to New York, the case should remain in the Northern District of Texas. Also, to require Riddell and Pursuit whose officers, directors, employees, warehouse and office are alllocated in Tarrant County and Dallas County, to go to New York to lid gate this matter would be unjust and unreasonable.*

*Id.* at 6-7 (emphasis supplied).

Pursuit's argument has been quoted extensively to illustrate that the concerns about the virtual absence of a connection of the Fort Worth Action to any forum *other* than the Northern District of Texas, and the correlative inconvenience and expense [*27] of having to travel out-of-state, are concerns which are equally weighty in the present Adversary Proceeding. Pursuit has not provided any reason why the same concerns which prompted its desire to remain in Texas in the Fort Worth Action would not also be present in litigating this matter in Delaware. The only difference which Pursuit highlights allegedly favoring litigating the matter in Delaware is the fact that at this point, Pursuit's documents are located in Delaware, pursuant to Save Power's document request, an allegation Save Power denies. *See* D.I. 20 at C-3, P 3 ("The fact of the matter is that Save Power never requested that the documents be shipped to Delaware and, indeed, would not have done so, as the counsel handling the Bankruptcy Proceeding and [this action] are in Texas.") (Second Declaration of John C. Wynne ("Second Wynne Decl.")).

This factor, assuming *arguendo* that it is true, does not overcome the substantial inconvenience to the parties and witnesses so carefully laid out in Pursuit's memorandum submitted in connection with the Fort Worth Action. With respect to convenience of witnesses, Pursuit merely argues that defendants failed to show that any [*28] key witnesses "will fail to appear in Delaware" and failed to explain "what exactly it is that the Save Power witnesses who live in Texas will say that is so important." D.I. 20 at 21. In a footnote, Pursuit obliquely notes that "the Pursuit witnesses will all come to Delaware to testify." *Id.* at n.11. Pursuit, however, confuses the issue of convenience with that of compulsory attendance: that the witnesses will appear does *not* mean that their appearance is convenient, or more convenient in one location than in another. At any rate, Pursuit certainly appeared to appreciate the nature of Save Power's witnesses' testimony when it authored its memorandum in the Fort Worth Action. To the extent that Pursuit still remains unclear, defendants have provided explicit record evidence detailing the subject matter of each of their witnesses' proposed testimony. *See* D.I. 13, Exh. 15 (Rule 26(a)(1) Initial Disclosures) n9; D.I. 20 at C-9, PP 21-23 (Second Wynne Decl.).

> n9 The Court acknowledges that the Initial Disclosures were filed in connection with the Fort Worth Action rather than with the Adversary Proceeding. While these persons were not named in connection with this matter, given the similarity of the claims between this Adversary Proceeding and the Fort Worth Action, it is reasonable to assume that most, if not all, of these same parties will also have knowledge pertinent to the present action. *See also* D.I. 8 at A-3 (Wynne Decl.); D.I. 20 at C-9-10, PP 21-23 (Second Wynne Decl.). The Court also notes that both parties exhibit substantial agreement as to which persons will be integral to resolution of this dispute.

[*29]

C. *Interests of Justice*

Defendants argue that the interests of justice factor weighs in favor of transfer. Defendants argue that plaintiffs' first choice of forum, i.e. the situs of the Fort Worth Action, was in the Northern District of Texas, and therefore, plaintiffs' choice of forum in this action, raising substantially similar claims, deserves little weight. Defendants also argue that this litigation has no connection with Delaware, whereas the interest in litigating in Texas is substantial, given the fact that related actions are pending in Texas. The Court agrees. The Fort Worth Action had been pending in the Northern District of Texas since August, 1995, a period of time in which several motions were filed, orders were entered and hearings were held. As Bankruptcy Judge Balick noted, "Judge Means has already heard testimony on the merits of the allegations and issued a 15 page decision. He has thus advanced significantly along the judicial learning curve." D.I. 8, Exh. 1 at 10. As noted above, the issues before Judge Means in the Fort Worth Action are virtually indistinguishable from those in the present case.

Further supporting this conclusion is the fact that the related [*30] Syntek Action was transferred to Judge Means, who then ordered the two actions consolidated, because of the similarity of parties and issues and resultant savings of judicial resources. Denying this Motion to Transfer would necessarily result in duplicative proceedings and a waste of judicial resources. *See Continental Grain Co. v. Barge FBL-585, 364 U.S. 19, 26, 80 S. Ct. 1470, 4 L. Ed. 2d 1540 (1960)* ("To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads

to the wastefulness of time, energy and money that § 1404(a) was designed to prevent."); *see also SmithKline Corp. v. Sterling Drug, Inc., 406 F. Supp. 52, 55 (D. Del. 1975)* ("One of the prime components of the 'interest of justice' is the maintenance of sound judicial administration. Central to efficient and effective judicial administration is a policy, implied in section 1404(a), of proper conservation and utilization of judicial resources.") (citations omitted). Another consideration motivating this conclusion is the specter of inconsistent judgments. There is a very real possibility that the claims raised in the Fort Worth Action could yield a certain result, while [*31] those very same claims could yield a different result in this Court. The possibility of inconsistent verdicts further weighs in favor of transfer.

Pursuit argues that the interests of justice would not be served by transfer to Texas because it would be unable to retain counsel in Texas to litigate this matter there, as it lacks the funds necessary to pay such counsel. However, over $ 800,000 of attorneys' fees have already been expended in connection with the Fort Worth Action. *See* D.I. 8 at A-1-2 (Wynne Decl.). Further, Pursuit has applied in the Bankruptcy Court for authorization to retain different Texas counsel. Save Power has not objected to Pursuit's retention of Texas counsel, but opposes the use of collateral to pay that counsel. In answer to Pursuit's argument, this Court is confident that the Bankruptcy Court will rule on Pursuit's request for authorization to retain Texas counsel in a manner consistent with the merits as presented to that court.

Pursuit also argues that defendants delayed in filing the Motion to Transfer, which prejudiced Pursuit to an extent where it would be "just plain unfair" to transfer the case to Texas. *See* D.I. 12 at 19. Defendants respond [*32] that they made it clear "from the outset of the filing made in this [Action] that [they] considered Delaware to be an improper, inconvenient forum and that Save Power would soon be filing a Motion to Transfer."

D.I. 20, at C-3, P 5 (Second Wynne Decl.). Furthermore, nothing in the record indicates that defendants engaged in any dilatory tactics which would make it inequitable to transfer this action to Texas.

Pursuit argues that because Save Power has only moved for transfer of the Adversary Proceeding, rather than the entire Bankruptcy Proceeding, which is still pending in the Bankruptcy Court, there is a presumption against transfer and in favor of keeping the entire case in the same locus of the Bankruptcy Proceeding. However, at present, the Bankruptcy Proceeding and the Adversary Proceeding are already separate and distinct. Pursuit agreed to Withdraw the Reference to the Bankruptcy Court for this Adversary Proceeding. Thus, Pursuit has already agreed to litigate these matters separately, and there are now two courts which must familiarize themselves with the issues and facts presented and render decisions on the merits. Secondly, to the extent there exists a "presumption" [*33] against transfer of an adversary proceeding away from the district where the bankruptcy proceeding is pending, the analysis is quite different where related proceedings are pending in the proposed transferee forum, and most of the relevant witnesses are located in that forum. *See In re Leedy Mortgage Co., 62 Bankr. 303 (Bankr. E.D. Pa. 1986)* (adversary proceeding transferred away from district in which bankruptcy proceeding was pending because most of the witnesses were situated in the proposed transferee forum). In conclusion, the Court finds that the interests of justice favor transfer to the Northern District of Texas.

### V. Conclusion

The balance of considerations relevant to this transfer of venue issue weighs in favor of transfer to the Northern District of Texas. Accordingly, defendants' Motion to Transfer will be granted. An appropriate order will be entered.