IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VALEO SISTEMAS ELECTRICOS S.A. DE C.V. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-627 (***) |
| | ) | |
| CIF LICENSING, LLC, D/B/A GE LICENSING | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STMICROELECTRONICS, INC. | ) | |
| | ) | |
| Cross-Claim Defendant. | ) | |

## STMICROELECTRONICS, INC.'S REPLY
## BRIEF IN SUPPORT OF ITS MOTION TO
## DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

YOUNG CONAWAY STARGATT & TAYLOR, LLP
John W. Shaw (No. 3362)
Adam W. Poff (No. 3990)
Monté T. Squire (No. 4764)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
apoff@ycst.com
*Attorneys for STMicroelectronics, Inc.*

Dated: February 12, 2007

## TABLE OF CONTENTS

                                                                          **Page**

TABLE OF AUTHORITIES ................................................................................................ ii

ARGUMENT

      A.     The Texas Complaint Does Not Accuse
           Voltage Regulators........................................................................................ 1

      B.     Any Indemnification Provision That Might
           Apply Does Not Provide for Indemnification
           In These Circumstances. ............................................................................ 4

CONCLUSION.................................................................................................................... 9

DB02:5766472.1 065770.1001

## TABLE OF AUTHORITIES

**Page**

**Cases**

*ALA, Inc. v. CCAIR, Inc.,*
  29 F.3d 855 (3d Cir. 1994) ................................................................................ 4

*Andrews v. Metro N.C.R. Co.,*
  882 F.2d 705 (2d Cir. 1989) ............................................................................... 3

*Chemtron, Inc. v. Aqua Products, Inc.,*
  830 F. Supp. 314 (E.D. Va. 1993) ............................................................... 6, 7, 8

*Dardovitch v. Haltzman,*
  190 F.3d 125 (3d Cir. 1999) ............................................................................... 5

*Enex Resources Corp. v. Texas Crude, Inc.,*
  No. 05-94-00641-CV, 1994 Tex. App.
  LEXIS 4112 (Tex. App. Dec. 30, 1994) .............................................................. 6

*Gonzalez v. Mission American Ins. Co.,*
  795 S.W.2d 734 (Tex. 1990) ............................................................................... 5

*Gooley v. Mobil Oil Co.,*
  851 F.2d 513 (1st Cir. 1988) .............................................................................. 2

*Lambers v. Wheels, Inc.,*
  No. 187787, 1996 Mich. App. LEXIS 2230
  (Mich. App. Dec. 6, 1996) .............................................................................. 6, 7

*Mirocha v. TRW, Inc.,*
  805 F. Supp. 663 (S.D. Ind. 1992) ...................................................................... 2

*Phoenix Elec. Contracting v. Lovece,*
  No. 93 Civ. 4340 (LMM), 1993 U.S. Dist.
  LEXIS 17376 (S.D.N.Y. Dec. 9, 1993) ................................................................ 2

*Raulie v. United States,*
  400 F.2d 487 (10th Cir. 1968) ............................................................................ 3

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ......................................................... 1, 7, 9

**Other Authorities**

11 Samuel A. Williston, *Williston On
  Contracts* § 32:12 (4th ed. 2006) ...................................................................... 6

5C Wright & Miller, *Federal Practice
  and Procedure* § 1363 (3d ed. 2006) ................................................................. 4

UCC § 2-312(3) ............................................................................................... 6, 7

If there is one overriding theme in VSE's Answering Brief in response to STMicroelectronics' motion to dismiss, it is VSE's repeated assertions that key documents do not mean what they say. VSE argues that the Amended Texas Complaint, which accuses only VSE's alternators of infringement (directly, by inducement and/or by contribution), really means to accuse voltage regulator chips and not VSE's alternators. VSE further argues that the indemnification provision of its Terms and Conditions, which by its language is limited in scope to claims against the STMicroelectronics chip alone, really means to encompass not just claims against the chip alone, but also claims against any other products of which the chip is a mere component.

VSE's position is wholly contrary to the plain meaning of the applicable language and ought to be rejected for the reasons detailed below. Because VSE cannot state a viable claim without relying upon these factual distortions (which the Court may consider even in the context of a motion to dismiss), VSE's indemnification claim against STMicroelectronics should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

## ARGUMENT

### A.    The Texas Complaint Does Not Accuse Voltage Regulators.

VSE contends repeatedly in its Answering Brief that the First Amended Complaint in the Texas action (the "Amended Texas Complaint") asserts infringement claims against voltage regulator chips due to the nature of the patent-in-suit. (Ans. Br. 1-4) VSE does so notwithstanding the fact that the plain language of the Amended Texas Complaint unambiguously accuses <u>alternators</u>, not voltage regulator chips, of infringement. The Amended Texas Complaint specifically alleges:

> [VSE] operates as a manufacturer of automotive motor vehicle parts, including <u>alternators</u> containing voltage regulator units. [VSE] sells such parts to entities engaged in the automobile industry, consisting of various divisions of vehicle manufacturers in North America and Europe ... . [T]he above-mentioned activities by [VSE] have amounted to infringement ... .

(Ex. A, Amend. Tex. Compl. ¶¶ 32-33 (emphasis added)).

The limitation to alternators in the Amended Texas Complaint could hardly be more clear, and the Court is obligated, as a matter of law, to construe its allegations in accordance with that plain meaning. *See, e.g., Mirocha v. TRW, Inc.*, 805 F. Supp. 663, 671 (S.D. Ind. 1992) (stating that "the [c]ourt has no authority to rewrite the [c]omplaint or construe it beyond the plain meaning of its words"); *cf. Phoenix Elec. Contracting v. Lovece*, No. 93 Civ. 4340 (LMM), 1993 U.S. Dist. LEXIS 17376, at *7 (S.D.N.Y. Dec. 9, 1993) (refusing to adopt plaintiff's interpretation of a claim in the complaint that is at odds with the plain meaning of the language); *Gooley v. Mobil Oil Co.*, 851 F.2d 513, 514 (1st Cir. 1988) (noting that courts are not permitted to "conjure up unpled allegations" in order to bolster the plaintiff's chances of surviving a 12(b)(6) motion to dismiss). [1]

In addition to focusing on VSE alternators, the Amended Texas Complaint does not mention STMicroelectronics, much less assert a claim against it or its voltage regulator chips. (Nor did the original Texas complaint.)  This fact is particularly significant given that the Amended Texas Complaint (October 20, 2006) was filed <u>after</u> VSE brought the present action (October 10, 2006) against STMicroelectronics and GE Licensing, the Texas plaintiff.  GE Licensing was therefore well aware of VSE's position on STMicroelectronics' purported

---

[1]    The asserted patent in the Texas action does relate to a voltage regulator, but the Texas plaintiff, possibly for strategic reasons, did not assert a claim against voltage regulators. VSE may wish that the Texas claims were broader so as to potentially trigger its indemnification rights, but that does not make it so.

involvement in the alleged infringement and still opted not to name STMicroelectronics as a defendant in the Texas action. GE Licensing's purposeful decision not to assert its patent against STMicroelectronics or its chip, even after the filing of the present action, further evidences the limited scope of the Texas action.

Moreover, VSE has already acknowledged that the STMicroelectronics chip was not accused in Texas. As detailed in STMicroelectronics' Opening Brief, VSE conceded in its Original Complaint that <u>VSE</u> "makes and sells the product accused of infringement in the Texas suit," i.e., "alternators." (Original Delaware Compl. (D.I. 1) ¶¶ 5, 7) It also conceded that STMicroelectronics supplied only a part of the product specifically accused of infringement in Texas. (*Id.* ¶ 11) Both allegations are factually correct. Indeed, it was only after STMicroelectronics moved to dismiss VSE's indemnification claim that VSE changed its stripes to assert that the STMicroelectronics chip alone is accused of infringement in Texas. VSE cannot as a matter of law now divorce itself from its earlier representations. *See Andrews v. Metro N.C.R. Co.*, 882 F.2d 705, 707 (2d Cir. 1989) ("[A] party … cannot advance one version of the facts in [his] pleadings, conclude that [his] interests would be better served by a different version, and amend his pleadings to incorporate that version safe in the belief that the trier of fact will never learn of the change in stories.") (citation omitted); *Raulie v. United States*, 400 F.2d 487, 526 (10th Cir. 1968) (concluding that when a pleading is amended or withdrawn, the superseded portion still remains as a statement made by an authorized agent, and as such it is competent evidence of the factual reality stated, like any other extrajudicial admission made by a party or his agent).

Finally, notwithstanding all of the foregoing, VSE contends that the Court must, in all events, presume all of VSE's stated facts are true in resolving the motion to dismiss. (Ans.

3

Br. 4) A court cannot do so blindly, however, and where, as here, the amended allegations are contradicted by both documents referenced in the amended complaint and the plaintiff's very own prior allegations, the presumption of truth VSE now seeks to rely upon cannot hold. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 (3d ed. 2006) ("The district court will not accept as true pleading allegations that are contradicted by facts that can be judicially noticed or by other allegations or exhibits attached to or incorporated in the pleading."). *See also, ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 n.8 (3d Cir. 1994) (noting that "[w]here there is a disparity between a written instrument annexed to a pleading and an allegation in the pleading based thereon, the written instrument will control").

For all of these reasons, there can be no reasoned dispute that the Texas Complaint asserts claims against VSE alternators, not STMicroelectronics' chip alone. [2]

**B.    Any Indemnification Provision That Might Apply Does Not Provide for Indemnification In These Circumstances.**

STMicroelectronics also explained in its Opening Brief that VSE's indemnification claim fails under any contract or law that might govern the parties' commercial relationship because each such contract and law provides for indemnification only if the product transferred is specifically accused of infringement. (Op. Br. 11) In response, VSE repeats its familiar (and erroneous) refrain. VSE argues that the indemnification provision in STMicroelectronics' terms and conditions, which is expressly limited to the product "by itself and not in combination with other items," provides for indemnification of the Texas claims

---

[2]    Although not material to this motion, it is worth noting that STMicroelectronics did not provide VSE with the voltage regulators in the accused alternators. It provided only the chips to be incorporated into the voltage regulators. A chip is just one component of a voltage regulator. Therefore, even if one assumes for purposes of this motion that the accused alternators include voltage regulators that include STMicroelectronics chips, STMicorelectronics' product is only a component of a component of the accused alternators.

because they are really asserted against voltage regulator chips, not alternators that contain those chips and other components, as the Texas claims allege. (Ans. Br. 3)  For the same reasons stated above, that argument should fail.

VSE then argues that the indemnification provision in its own Terms and Conditions would apply to the infringement claims, and in doing so, it again asks the Court to conclude that plain language does not mean what it says.  The VSE provision states:

> [STMicroelectronics] shall indemnify … losses, damages, and expenses … asserted by a third party regarding the [STMicroelectronics product] based on the third party's industrial or intellectual property rights.

(Ex. B, VSE's General Terms and Conditions of Purchase, ¶ 4).  The plain language of the provision makes clear that it is limited to third party claims against the STMicroelectronics chip. VSE nonetheless now argues that it really means to also include any and all forms and uses of the product including combinations in which the product is a mere component and modifications of the product. (Ans. Br. 5)  The plain language of the provision, however, does not and cannot bear the weight of such a broad interpretation – it refers to claims against the STMicroelectronics chip only – and the Amended Texas Complaint does not make such an accusation.

Nor should the VSE provision be interpreted to have some implicit broader scope. This is a VSE form contract, and as such, any ambiguity in the provision must, as a matter of law, be construed against VSE.  *See Dardovitch v. Haltzman*, 190 F.3d 125, 141 (3d Cir. 1999) ("[I]n choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds."); *Gonzalez v. Mission American Ins. Co.*, 795 S.W.2d 734, 737 (Tex. 1990) (stating that "[i]t is well-established law that where an ambiguity exists in a contract, the contract language will be construed strictly against the party who drafted it since the

drafter is responsible for the language used") (citations omitted); 11 Samuel A. Williston, *Williston On Contracts* § 32:12 (4th ed. 2006). Had VSE wanted to seek to impose the broad indemnification coverage it now asserts, it could have simply drafted and transmitted a broader indemnification provision. There was nothing to prevent it from doing so. It did not, however, and it should not be permitted to recast the plain meaning of the provision now that it is the subject of a dispute.

With respect to the potentially applicable UCC provision, UCC § 2-312(3), VSE appears to concede that the provision does not require indemnification if the infringement claims at issue were not asserted against STMicroelectronics' "goods." (Ans. Br. 6) To the extent VSE has not conceded as much, it certainly should because the plain language of the provision focuses on claims against only the goods provided. UCC § 2-312(3) ("[A] seller, who is a merchant regularly dealing in goods of the kind, warrants that the goods shall be delivered free of the rightful claim of any third person by way of infringement" (emphasis added)) Because the Texas infringement claims were asserted against VSE's alternators, not STMicroelectronics' "goods" (as detailed above), there can be no indemnification right under the UCC.

As to each of these provisions, STMicroelectronics provided ample authority in its Opening Brief to demonstrate that dismissal is appropriate under each standard and applicable state law. *See Chemtron, Inc. v. Aqua Products, Inc.*, 830 F. Supp. 314, 316 (E.D. Va. 1993) (dismissing indemnification claim under UCC § 2-312(3) where there was no possibility of recovery); *Lambers v. Wheels, Inc.*, No. 187787, 1996 Mich. App. LEXIS 2230, at *5 (Mich. App. Dec. 6, 1996) (applying Michigan law and affirming dismissal of indemnity claim based on unambiguous contract language); *Enex Resources Corp. v. Texas Crude, Inc.*, No. 05-94-00641-CV, 1994 Tex. App. LEXIS 4112, at *6-7 (Tex. App. Dec. 30, 1994) (applying Texas law and

concluding that appellee was not entitled to indemnification because it could not recover based on clear and unambiguous language of indemnity provision).

VSE, in contrast, offers no case law authority to support the result it seeks here. VSE instead seeks to distinguish the authority cited by STMicroelectronics based on the same faulty premise that the Texas Complaint somehow asserts infringement claims against STMicroelectronics' chip alone.[3]    (Ans. Br. 6)  VSE implies that no case concerning liability on the part of a component manufacturer can therefore be relevant here because the STMicroelectronics chip is not a component of the accused product, but is itself the accused product.  That is wrong for all of the reasons set forth above, and so the only potential distinction put forth by VSE is not a distinction at all.

Indeed, the cases cited by STM in the Opening Brief are highly relevant.  This is particularly true of the *Chemtron* case.  The Court will recall from the Opening Brief that in *Chemtron*, third-party defendant Viking sold products to defendant Aqua for use as part of Aqua's combination detergent dispenser/container.  830 F. Supp. at 315  Aqua's product was subsequently accused of infringement, and Aqua asserted an indemnification claim against Viking based on that action.  In dismissing Aqua's claim on Fed. R. Civ. P. 12(b)(6) grounds, the Court applied UCC § 2-312(3) , the functional equivalent of the indemnification provisions at issue here, and concluded:

---

[3]  VSE's attempts to distinguish the *Caddy Prods.* and *Lambers* cases on other grounds are of no effect.  With respect to the *Caddy Prods.*, VSE simply recites certain facts of the case and then states conclusively that the case has no relevance here.  VSE, however, fails to address the proposition for which the case was actually cited – that a clear and ambiguous indemnification provision will be construed in accordance with its plain meaning under Michigan law.  The same is true of the *Lambers* case, which was cited for the same proposition.  VSE's purported distinction has nothing to do with the proposition for which the case is cited.

7

> At the time of the sale [the Viking products] were delivered free
> from any third-party complaints against infringement.  Aqua was
> sued by [plaintiff] for direct infringement of the [patent] and for
> inducement of infringement based upon its infringing apparatus,
> which was assembled from non-infringing component parts, some
> of which were obtained from Viking .... [T]he UCC's warranty
> against infringement should not apply in such a situation.

*Id.* at 316 (internal citations omitted). As detailed in the Opening Brief, the circumstances of

*Chemtron* are virtually the same as the present circumstances, and the result here should be no

different. (Op. Br. 14)  VSE's indemnification claim ought to be dismissed.

8

## CONCLUSION

For the reasons set forth above and in the Opening Brief, it is clear that VSE cannot allege facts sufficient to state a claim without misstating the nature of the Texas Action and distorting the meanings of the relevant indemnification provisions. STMicroelectronics therefore respectfully requests that the Court dismiss VSE's indemnification claim pursuant to Fed. R. Civ. P. 12(b)(6).

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____
John W. Shaw (No. 3362)
Adam W. Poff (No. 3990)
Monté T. Squire (No. 4764)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
apoff@ycst.com
*Attorneys for STMicroelectronics, Inc.*

Dated: February 12, 2007

9

## CERTIFICATE OF SERVICE

I, Adam W. Poff, hereby certify that on February 12, 2007, a true and correct copy of the

foreging document was filed with the Clerk of the Court using CM/ECF which will send

notification that such filing is available for viewing and downloading to the following counsel of

record:

Jack B. Blumenfeld, Esquire
Karen Jacobs Louden, Esquire
MORRIS NICHOLS ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE 19801

Steven J. Balick, Esquire
John G. Day, Esquire
ASHBY & GEDDES
222 Delaware Avenue, 17th Floor
Wilmington, DE 19801

I further certify that on February 12, 2007, I caused copies of the foregoing document to

be served by hand delivery on the above-listed counsel and on the following counsel of record as

indicated.

BY E-MAIL

Arthur I. Neustadt
OBLON, SPIVAK, MCCLELLAND, MAIER
    & NEUSTADT, P.C.
1940 Duke Street
Alexandria, VA 22314

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____
Adam W. Poff (No. 3990)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
*msquire@ycst.com*

Attorneys for STMicroelectronics, Inc.

# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| CIF Licensing, LLC, d/b/a GE Licensing, | § § § | |
| Plaintiff, | § § | Case No. 2:06cv345  DF |
| v. | § § | JURY TRIAL DEMANDED |
| DENSO CORPORATION, Remy International Inc., Valeo, Inc., and Valeo Sistemas Electricos S.A. DE C.V. | § § § § | |
| Defendants. | § § § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff CIF Licensing, LLC, d/b/a GE Licensing ("GE Licensing"), brings this action

against Defendants DENSO CORPORATION ("DENSO"), Remy International, Inc. ("Remy"),

Valeo, Inc. ("Valeo Inc"), and Valeo Sistemas Electricos S.A. de C.V. ("Valeo CV"), alleging as

follows:

### The Parties

1.     Plaintiff GE Licensing is a limited liability company organized and existing under

the laws of the State of Delaware, with its principal place of business in Princeton, New Jersey

08540. GE Licensing is the owner of all right, title, and interest in and to United States patent

No. 4,733,159 (the "Patent") by assignment, with the right to recover damages for all past

infringement of the Patent. The Patent was duly and legally issued on March 22, 1988 by the

United States Patent and Trademark Office. The invention of the Patent contains a voltage

regulator system for automobile alternators, including a unique high frequency charge pump. A

copy of the Patent is attached hereto as Exhibit A.

2.     Upon information and belief, Defendant DENSO is a Japanese corporation with its principal place of business and home office at 1-1 Showa-cho, Kariya Aichi 448-8661, Japan. Although DENSO does business in Texas by, among other things, committing acts that constitute the tort of infringement of the Patent (*see*, TEX. CIV. PRAC. & REM. CODE § 17.042), upon information and belief, DENSO does not maintain a regular place of business in Texas, has not registered to do business in Texas, and does not maintain a designated agent for service of process in Texas. Therefore, DENSO may be served with process by serving the Texas Secretary of State, who is deemed to be DENSO's agent for service of process. TEX. CIV. PRAC. & REM. CODE § 17.044.

3.     Upon information and belief, Defendant Remy is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business and home office at 2902 Enterprise Drive, Anderson, Indiana 46013.. Although Remy does business in Texas by, among other things, committing acts that constitute the tort of infringement of the Patent (*see*, TEX. CIV. PRAC. & REM. CODE § 17.042), upon information and belief, Remy does not maintain a regular place of business in Texas, has not registered to do business in Texas, and does not maintain a designated agent for service of process in Texas. Therefore, Remy may be served with process by serving the Texas Secretary of State, who is deemed to be Remy's agent for service of process. TEX. CIV. PRAC. & REM. CODE § 17.044.

4.     Upon information and belief, Defendant Valeo Inc is a corporation organized and existing under the laws of the state of New York, with its principal place of business and home office at 3000 University Drive, Auburn Hills, Michigan 48326. Upon information and belief, Valeo Inc maintains branch offices in El Paso, TX, Fort Worth, TX, and Pharr, TX. Valeo Inc also does business in Texas by, among other things, committing acts that constitute the tort of

2

infringement of the Patent and recruiting Texas residents for employment (*see*, TEX. CIV. PRAC. & REM. CODE § 17.042).Valeo Inc has not registered to do business in Texas, and does not maintain a designated agent for service of process in Texas. Therefore, Valeo Inc may be served with process by serving the person in charge of its business in Texas. TEX. CIV. PRAC. & REM. CODE § 17.043.

     5.    Upon information and belief, Defendant Valeo CV is a Mexican corporation with its principal place of business and home office at Avenida Circuito Mexico No. 160, Z.I. Parque Tres Naciones, 78395 San Luis Potosi, Mexico. Although Valeo CV does business in Texas by, among other things, committing acts that constitute the tort of infringement of the Patent (see, TEX. CIV. PRAC. & REM. CODE § 17.042), upon information and belief, Valeo CV does not maintain a regular place of business in Texas, has not registered to do business in Texas, and does not maintain a designated agent for service of process in Texas. Therefore, Valeo CV may be served with process by serving the Texas Secretary of State, who is deemed to be Valeo CV's agent for service of process. TEX. CIV. PRAC. & REM. CODE § 17.044.

### Jurisdiction and Venue

     6.    This action for infringement arises under the patent laws of the United States, Title 35, United States Code, including § 271. This Court has exclusive jurisdiction under Title 28, United States Code, particularly § 1338(a).

     7.    Defendant DENSO has committed the tort of patent infringement in the Eastern District. Defendant DENSO has sold and shipped into the Eastern District products that infringe on Plaintiff GE Licensing's Patent and/or has sold such products under circumstances in which it was reasonably foreseeable that the products would be shipped into the Eastern District. Accordingly, Defendant DENSO resides in the Eastern District as the term "reside" is defined in

3

28 U.S.C. § 1391(c), and, therefore, venue in the Eastern District is proper under 28 U.S.C. §§ 1391(b) and 1400(b).

    8.    Defendant DENSO is subject to personal jurisdiction in Texas and this District.

    9.    Defendant Remy has committed the tort of patent infringement in the Eastern District. Defendant Remy has sold and shipped into the Eastern District products that infringe on Plaintiff GE Licensing's Patent and/or has sold such products under circumstances in which it was reasonably foreseeable that the products would be shipped into the Eastern District. Accordingly, Defendant Remy resides in the Eastern District as the term "reside" is defined in 28 U.S.C. § 1391(c), and, therefore, venue in the Eastern District is proper under 28 U.S.C. §§ 1391(b) and 1400(b).

    10.    Defendant Remy is subject to personal jurisdiction in Texas and this District.

    11.    Defendant Valeo Inc has committed the tort of patent infringement in the Eastern District. Defendant Valeo Inc has sold and shipped into the Eastern District products that infringe on Plaintiff GE Licensing's Patent and/or has sold such products under circumstances in which it was reasonably foreseeable that the products would be shipped into the Eastern District. Accordingly, Defendant Valeo Inc resides in the Eastern District as the term "reside" is defined in 28 U.S.C. § 1391(c), and, therefore, venue in the Eastern District is proper under 28 U.S.C. §§ 1391(b) and (c), and 1400(b).

    12.    Defendant Valeo Inc is subject to personal jurisdiction in Texas and this District.

    13.    Defendant Valeo CV has committed the tort of patent infringement in the Eastern District. Defendant Valeo CV has sold and shipped into the Eastern District products that infringe on Plaintiff GE Licensing's Patent and/or has sold such products under circumstances in which it was reasonably foreseeable that the products would be shipped into the Eastern District.

4

Accordingly, Defendant Valeo CV resides in the Eastern District as the term "reside" is defined

in 28 U.S.C. § 1391(c), and, therefore, venue in the Eastern District is proper under 28 U.S.C. §§

1391(b) and (c), and 1400(b).

      14.     Defendant Valeo CV is subject to personal jurisdiction in Texas and this District.

## COUNT I
### (Patent Infringement – DENSO)

### Defendant DENSO's Activities

1-14.    Plaintiff hereby repeats and incorporates by reference ¶1-14 as ¶1-14 of this

Count I.

      15.     Defendant DENSO operates as a manufacturer and wholesaler of automotive

motor vehicle supplies and parts, including alternators containing voltage regulator units.

Defendant DENSO sells such supplies and parts to entities engaged in the automobile industry in

North America.

      16.     On information and belief, the above-mentioned activities by Defendant DENSO

have amounted to infringement, directly, by inducement, and/or by contributing to the

infringement, of the Patent.

      17.     Plaintiff GE Licensing is the owner of all right, title and interest in and to the

Patent with the right to recover damages for all past infringement of the Patent.

      18.     On information and belief, DENSO is infringing the Patent willfully and with

knowledge.  On information and belief, DENSO will continue infringing the Patent unless

enjoined by this Court.

      19.     As a result of DENSO's infringing conduct, GE Licensing has been damaged and

will continue to suffer irreparable harm without the issuance of an injunction by this Court.

20.    DENSO's willful infringement of the Patent and other conduct make this an exceptional case under 35 U.S.C. § 285.

## COUNT II
(Patent Infringement – Remy)

### Defendant Remy's Activities

1-20.    Plaintiff hereby repeats and incorporates by reference ¶1-20 of Count I as ¶1-20 of this Count II.

21.    Defendant Remy operates as a manufacturer and re-manufacturer of original equipment and aftermarket electrical components for automobiles, light trucks, medium and heavy duty trucks and other heavy duty vehicles, including alternators containing voltage regulator units. Defendant Remy sells such components to original equipment manufacturers and dealers, automotive retail chains and warehouse distributors in North America, Europe, Latin America, and Asia-Pacific.

22.    On information and belief, the above-mentioned activities by Defendant Remy have amounted to infringement, directly, by inducement, and/or by contributing to the infringement, of the Patent.

23.    On information and belief, Remy is infringing the Patent willfully and with knowledge. On information and belief, Remy will continue infringing the Patent unless enjoined by this Court.

24.    As a result of Remy's infringing conduct, GE Licensing has been damaged and will continue to suffer irreparable harm without the issuance of an injunction by this Court.

25.    Remy's willful infringement of the Patent and other conduct make this an exceptional case under 35 U.S.C. § 285.

<u>**COUNT III**</u>
(Patent Infringement – Valeo Inc)

<u>**Defendant Valeo Inc's Activities**</u>

1-25.    Plaintiff hereby repeats and incorporates by reference ¶1-25 of Count II as ¶1-25 of this Count III.

26.    Defendant Valeo Inc operates as a manufacturer of automotive motor vehicle parts, including alternators containing voltage regulator units. Valeo Inc sells such parts to entities engaged in the automobile industry, consisting of various divisions of vehicle manufacturers in North America and Europe.

27.    On information and belief, the above-mentioned activities by Defendant Valeo Inc have amounted to infringement, directly, by inducement, and/or by contributing to the infringement, of the Patent.

28.    On information and belief, Valeo Inc is infringing the Patent willfully and with knowledge. On information and belief, Valeo Inc will continue infringing the Patent unless enjoined by this Court.

29.    As a result of Valeo Inc's infringing conduct, GE Licensing has been damaged and will continue to suffer irreparable harm without the issuance of an injunction by this Court.

30.    Valeo Inc's willful infringement of the Patent and other conduct make this an exceptional case under 35 U.S.C. § 285.

<u>**Count IV**</u>
(Patent Infringement Valeo CV)

<u>**Defendant Valeo CV's Activities**</u>

31.    Plaintiff hereby repeats and incorporates by reference 1-31 of Count III as 1-31 of this Count IV.

7

32.    Defendant Valeo CV operates as a manufacturer of automotive motor vehicle parts, including alternators containing voltage regulator units. Valeo CV sells such parts to entities engaged in the automobile industry, consisting of various divisions of vehicle manufacturers in North America and Europe.

33.    On information and belief, the above-mentioned activities by Defendant Valeo CV have amounted to infringement, directly, by inducement, and/or by contributing to the infringement of the Patent.

34.    On information and belief, Valeo CV is infringing the Patent willfully and with knowledge. On information and belief, Valeo CV will continue infringing the Patent unless enjoined by this Court.

35.    As a result of Valeo CV's infringing conduct, GE Licensing has been damaged and will continue to suffer irreparable harm without the issuance of an injunction by this Court.

36.    Valeo CV's willful infringement of the Patent and other conduct make this an exceptional case under 35 U.S.C. § 285.

<u>**Requested Relief**</u>

WHEREFORE, Plaintiff GE Licensing prays that this Court enter judgment.

a.    Finding that Defendants DENSO, Remy, Valeo Inc, and Valeo CV have infringed, induced others to infringe and/or committed acts of contributing infringement of the Patent under 35 U.S.C. § 271.

b.    Enjoining Defendants DENSO, Remy, Valeo Inc, and Valeo CV and their subsidiaries, agents, officers and employees, and all others acting in concert with them, from infringing, inducing infringement, and contributing to the infringement of the Patent.

c.    Ordering Defendants DENSO, Remy, Valeo, and Valeo CV to award GE Licensing an amount that adequately compensates GE Licensing for Defendants' infringement,

including lost profits (and/or a reasonably royalty), treble damages, court costs, pre-judgment

interest, post-judgment interest and attorney's fees under 35 U.S.C. §§ 284 and 285.

      d.      Granting GE Licensing such other and further relief as is just.

### Demand for Jury Trial

Plaintiff GE Licensing hereby demands a jury trial on all claims and issues triable of right

by a jury.

      Dated October 17, 2006

                                Respectfully submitted,

                                /s/ Bradford P. Lyerla (by permission Otis Carroll)
                                Bradford P. Lyerla, **Lead Attorney**
                                Marshall, Gerstein & Borun LLP
                                6300 Sears Tower
                                233 South Wacker Drive
                                Chicago, IL 60606-6357
                                Tel: (312) 474-6300
                                Fax: (312) 474-0448
                                E-mail: blyerla@marshallip.com

OF COUNSEL:

Anthony G. Sitko
Marshall, Gerstein & Borun LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6357
Tel: (312) 474-6300
Fax: (312) 474-0448
E-Mail: asitko@marshallip.com

Jeffrey H. Dean
Marshall, Gerstein & Borun LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6357
Tel: (312) 474-6300
Fax: (312) 474-0448
E-Mail: jdean@marshallip.com

Anthony S. Hind
Marshall, Gerstein & Borun LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6357
Tel: (312) 474-6300
Fax: (312) 474-0448
E-Mail: ahind@marshallip.com

Otis W. Carroll
Texas Bar No. 03895700
IRELAND, CARROLL & KELLEY, P.C.
6101 South Broadway
Suite 500
Tyler, Texas  75703
Tel: (903) 561-1600
Fax: (903) 581-1070

ATTORNEYS FOR PLAINTIFF

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have

consented to electronic service are being served with a copy of this document via the Court's

CM/ECF system per Local Rule CV-5(a)(3).  Any other counsel of record will be served by

facsimile transmission and/or first class mail this 20th day of October, 2006.


/s/ Otis Carroll_____

10

# Exhibit B

General Terms and Conditions of Purchase

Scope

1.1 These General Terms and Conditions are applicable to all purchases made by Valeo Sistemas Electricos, S.A. de C.V., subsidiaries divisions ("Valeo") from the supplier indicated on the purchase order (the "Supplier") whether for tooling, machines, parts, raw materials, other various products, goods or services (hereinafter individual or collectively called "Supply").

1.2 These General Terms and Conditions shall constitute the only agreement applicable to all purchases of Supply by Valeo and expressly exclude the application of the Suppliers general terms of sale as well as any documents now or in future issued by the Supplier in relation to purchase order or the Supply.

1.3 Any additional or different terms in the Suppliers form are hereby deemed to be material alterations and Valeo hereby gives notice of objection to them and rejection.

1.4 These Terms and Conditions may only be modified by an express written provision signed by Valeo.

Order

2.1 All purchases made by Valeo shall take the form of a purchase order issued by Valeo.

2.2 In the event of an emergency, the Supply can be delivered or furnished against a collection note issued by Valeo or against a purchase order number provided by Valeo.

2.3 The Supplier shall acknowledge receipt of the purchase order within five (5) calendar days of the date of the purchase order by mail or fax, by returning a duly signed copy of the purchase order to Valeo. Where no such acknowledgement of receipt is issued, the commencement of the completion of the purchase order shall be evidenced an acceptance of these General Terms and Conditions by the Supplier.

2.4 When deliveries are specified to be in accordance with Valeo's written releases, the Supplier will not fabricate, assembly or ship any Supply, or procure required materials, except to the extent authorized by a written release issued Valeo or provisions of the purchase order specifying fabrication or delivery quantities.

Compliance

3.1 Without prejudice to the provisions of article 3.2, the Supply shall be in compliance with all drawings and specifications. Characteristics of the Supply not detailed shall be in compliance with samples or typical parts which have been accepted by Valeo.

3.2 Technical modification, however minor, shall be made without the prior consent of Valeo in the form of a numbered addendum issued by Valeo.

3.3 In providing the Supply the Supplier will comply with any and all applicable federal, state and local laws, regulations and standards in force in the United States and in the country of manufacture and sale, including but not limited to the occupational Safety and Health Act, the Fair Labor Standards Act and any law or order pertaining to administration, the National Traffic and Motor Vehicle Safety Act all hygiene and safety constraints on materials and laws of hazardous materials and provisions pertaining to environmental, electrical and electromagnetic considerations.

3.4 Quotations or prices established in reference to the Supply shall be in compliance with all applicable laws and governmental regulations.

3.5 The Supplier shall defend, indemnify and hold Valeo harmless from and against any and all claims, losses, damages, costs and expenses, including attorney fees, resulting from or arising out of any failure of the Supplier to comply with any applicable governmental laws, regulations or standards.

3.6 If at the request of Valeo, the Supplier will provide an appropriate certificate stating the country of manufacture of the Supply.

3.7 The Supplier shall strictly adhere to the requirements of the Valeo Quality System plan, a copy of which the Supplier hereby acknowledges receipt and the Supplier will comply with all current QS-9000 quality requirements.

Industrial and Intellectual property rights

4.1 The Supplier shall be responsible for confirming the validity of its industrial and or intellectual property rights relates to the manufacture and the sale of the Supply. The Supplier shall specifically identify in writing to Valeo any patented component or processes, tooling, machines or equipment used in the manufacture of the Supply.

4.2 The Supplier shall indemnify, defend and hold harmless Valeo from and against any and all claims, losses damages and expenses, including reasonable attorney fees, asserted by a third party regarding the Supply based on the Suppliers industrial or intellectual property rights.

4.3 The Supplier or a third party asserts a claim against Valeo for alleged infringement of intellectual or industrial property rights, Valeo may immediately terminate all orders in progress by written notice, without prejudice to Valeo's rights or any legal action Valeo may take against the Supplier.

4.4 The Supplier authorizes Valeo to finalize and produce the Supply, including any tooling or equipment upon a breach by the Supplier of these General Terms and Conditions of the purchase order, even where the Suppliers intellectual and/or industrial property rights are utilized for the design and manufacture of tool in or equipment, the Supplier shall provide to Valeo all information necessary for the manufacture of the tooling or equipment upon such breach and grants to Valeo a royalty free license on the intellectual or industrial property rights in order to finalize or produce the Supply.

Delivery

5.1 Time and quantity are of the essence. Delivery shall be at the Valeo facility, unless otherwise specified on the purchase order, or as specified by the Valeo facilities where the delivery is to be made. Delivery terms may be modified from time to time.

5.2 The Supplier shall take all measures necessary to meet 100% the deliveries date for the Supply and comply with all chemical, administrative and shipping documents.

5.3 The Supplier shall not be entitled to deliver the Supply before the due date without Valeo's written authorization, and will bear all costs related to any unauthorized advance delivery, including return shipping costs.

5.4 In the event of late delivery, all damages suffered by Valeo and any transportation or other costs incurred by Valeo to meet the specified delivery schedule will be paid by the Supplier. The Supplier will be responsible for any discrepancy cost incurred by Valeo from its customer due to late delivery of the Supply by the Supplier. Valeo may apply late delivery penalties as specified in the purchase order.

5.5 In the event of late delivery, Valeo may purchase the Supply from a third party immediately without notice. Any extra cost arising from this repayments order shall be borne by the defaulting Supplier.

5.6 The Supplier will notify to Valeo immediately of any actual or potential labor dispute delaying or threatening to delay timely performance of the purchase order, and will provide Valeo with all relevant information. The Supplier will notify Valeo six (6) months in advance of the expiration of any current labor contract(s). Prior to the expiration of any such labor contract the Supplier will store, at its expense, a minimum thirty (30) day inventory of finished Supply at a warehouse unaffected by the labor contract.

5.7 For deliveries where a written release is required, the Supplier shall adhere to the Valeo Production System Plan, a copy of which shall be made available to the Supplier. The Supplier shall harmonize its administrative and production scheme to correspond to the requirements of the Valeo Production System Plan. The Supplier shall acknowledge receipt of the Valeo Production System Plan in writing.

5.8 The Supply shall be subject to inspection by Valeo for a reasonable period, which shall in no event be less than thirty (30) days after receipt thereof by Valeo, except that Valeo may reject the goods and hold the Supplier in default at any time after Valeo has inspected the goods. Valeo discovers a defect not normally discoverable by visual inspection or Valeo or its customer discovers a defect upon integration of the Supply into production. Payment shall not constitute final acceptance of the Supply nor waiver of Valeo's right to inspect and reject the Supply.

Price, Invoicing and Condition of Payment

6.1 All prices as shall be as stated in the purchase order. The Supplier shall be solely responsible for all transport and handling costs, customs charges, taxes and insurance costs, unless otherwise specified on the purchase order.

6.2 The invoice and bill of lading shall include all the information appearing on the purchase order necessary for the identification and the control of the Supply. The invoice shall be sent to the invoicing address written on the face of the purchase order.

6.3 Unless otherwise stated on the purchase order, the invoice shall be payable on the last Friday sixty (60) days from the date of delivery of the Supply to Valeo.

6.4 In addition to any right of setoff provided by law, Valeo may automatically deduct from payments to made to the Supplier any and all sums due or to become due by the Supplier to Valeo for whatever reason.

6.5 The Supplier may not assign any accounts receivable from Valeo to third parties without Valeo's prior written approval.

6.6 The Supplier warrants that the prices for the Supply sold to Valeo are no less favorable than those that the Supplier currently extends to any other customer for the same or similar Supply in similar quantities. If the Supplier reduces its prices to third parties during the term of the purchase order for the Supply, the Supplier will correspondingly reduce the prices charged to Valeo. The Supplier warrants that the prices on the purchase order are complete and that no other charges will be added without Valeo's written consent.

7. Packaging and Delivery Documents

7.1 The Supply shall be packed in accordance with Valeo purchasing and packaging specifications or purchase orders, and also in accordance with the norms and standards of common carriers in the United States, unless otherwise requested by Valeo. Valeo shall have the right at any time to change any purchase order as to specifications, delivery, packaging or means of shipment.

7.2 The Supplier will provide all necessary Material Safety Data Sheets and ensure that all hazardous material fully meets federal, state and local shipping requirements.

Supplier shall be responsible for any damage to the Supply arising from packaging.

7.2 The exterior of each unit of packaging shall bear in a clearly conspicuous and legible manner the markings required under federal and state regulations in force in the United States, any special conditions for storage, the Valeo purchase order number, a description of the Supply, the quantity delivered and the gross or net weight in accordance with AIAG standards.

7.3 The Supplier shall attach to the shipment a bill of lading consisting of a detailed delivery order together with the information appearing on the purchase order necessary to identify the Supply and to facilitate quantitative control.

8. Receipt - Warranty

8.1 Unless otherwise stated on the purchase order or requested in writing by the receiving Valeo facility, Valeo will only accept delivery to the premises of Valeo on working days during normal business hours.

Both Valeo and its customers reserve the right to inspect the Supply and manufacturing process used at the Suppliers premises prior to delivery and at Valeo premises after delivery. Any inspection shall not limit the warranties pertaining to the Supply.

8.2 Valeo reserves the right to reject or revoke acceptance of a non-conforming Supply, which includes but is not limited to non-compliance with the purchase order or non-compliance with the date and hours of delivery.

8.3 At its option, Valeo may return non-conforming Supply to the Supplier at the Supplier's own risk and expense.

Alternatively, at Valeo's instruction, the Supplier shall retrieve the non-conforming Supply at its expense within eight (8) days of notification of rejection or revocation of acceptance. Valeo shall be permitted to dispose of the Supply upon the Suppliers failure to retrieve the non-conforming Supply.

The Supplier shall be liable for all costs (including scrap, storage, sorting out alterations, test breaks, breakdowns, production stoppage, local campaigns and administrative costs) incurred by Valeo as a result of the non-conformity of the Supply.

In the event of delivery of non-conforming Supply, Valeo may terminate the purchase order pursuant to article 14 below and/or purchase the Supply from a third party. The Supplier shall be responsible for any additional cost incurred by Valeo under this paragraph.

8.4 The Supplier shall be responsible for the design and/or manufacture of the Supply to the extent designated in the purchase order or as agreed to in writing, regardless of any assistance provided by Valeo throughout the development phase or approved by Valeo during initial sample review.

8.5 The Supplier warrants that the Supply shall be free from defects in material, design, workmanship, operating defects or title and will be merchantable and fit for the intended purpose. The Supplier will indemnify, defend and hold harmless Valeo for all claims, losses, damages costs and expenses, including attorney fees, arising from defects in proportion to its liability and for the duration of Valeo's warranty obligations to the purchaser of the products in which the Supply is integrated, provided that such limitation as to time shall not apply to concealed defects.

At its option, Valeo may provide additional governing warranty terms.

8.6 If Valeo its customer recalls the Supply or a product incorporating the Supply, the Supplier shall reimburse Valeo in proportion to the Supplier's responsibility, for actual expenses borne by Valeo.

8.7 The Supplier shall obtain comprehensive general liability insurance in amounts and scope to cover all claims under this article 8 and shall provide proof of insurance and proof of payment of insurance premiums upon the request of Valeo. Such insurance shall provide thirty (30) prior written notice to Valeo of cancellation or material change.

9. Risk of losses

Risk of loss with respect to the Supply delivered shall not be transferred to Valeo until the actual receipt of the Supply at the places indicated on the purchase order.

10. Subcontractors

10.1 The purchase order shall not be assigned, in whole or in part by the Supplier to a subcontractor without Valeo's prior written approval.

10.2 If Valeo agrees to the assignment of the purchase order, in whole or in part, to a subcontractor, the Supplier shall remain solely liable to Valeo for the adherence of the subcontractor to these General Terms and Conditions.

11. Confidentiality

All information provided to the Supplier by Valeo under its purchase order and for the Supply not publicly available shall be considered confidential by the Supplier. The Supplier shall take all necessary measures to ensure that neither the Supplier or its employees, agents, suppliers or authorized subcontractors, communicate such confidential information to any third party and that the information is used only for the purpose submitted.

These confidentiality requirements shall be maintained for the duration of performance under the purchase order and for a period of five (5) years thereafter.

Immediately upon completion of the performance of the purchase order, any termination of the purchase order or upon request of Valeo, the Supplier agrees to return to Valeo all information, including all copies thereof, confidential or otherwise, related to the purchase order.

12. The Supplier Employees and Agents

With respect to the performance of any purchase order, the Supplier shall be responsible for the acts and omissions of the Supplier and or employees, agents or representatives and shall indemnify, defend and hold harmless Valeo from liability for any property damage or personal injuries, including death arising out of any act or omission of the Supplier, its employees, agents or representatives.

13. Ownership

13.1 Notwithstanding article 7 above, ownership of the Supply shall be transferred to Valeo immediately upon its identification to the purchase order on the premises of the Supplier. The Supplier agrees to acknowledge and defend Valeo's property interests at all times.

13.2 The Supplier shall not impose nor permit to be imposed any lien, or encumbrance or security interest or similar reservation of title on the Supply.

3 If Valeo finances all or part of the raw Materials or semi-finished products to be procured by the Supplier for incorporation into the Supply, the raw materials and semi-finished products will become the property of Valeo immediately upon payment. The Supplier, as below, will identify the raw materials and semi-finished products by plainly marking Valeo ownership.

4 Molds, tooling or machines made by the Supplier on behalf of Valeo, together with the intellectual or industrial property rights related thereto, will become the property of Valeo, regardless of whether payment is received and as they are made and shall be neither withheld by the Supplier or pledged to any third party. The Supplier, as below, will plainly mark all such molds, tooling and machines, with a metal label stating "Non Transferable, Property of Valeo". The Supplier shall provide Valeo with equipment and tooling drawings, technical specifications, FMEAs and control plans for each component and for the purchase of capital equipment.

5 If Valeo deposits molds, tooling or machines with the Supplier in connection with a subcontracting agreement:

- The molds, tooling and machines shall remain the exclusive property of Valeo, which may recover the molds, tooling and machines at any time; and,

- The molds, tooling and machines shall be exclusively used for the performance of Valeo orders; and,

- The Supplier shall be responsible for the preventive or curative maintenance necessary for the correct operation of the molds, tooling and machines; and,

- Except as otherwise agreed, the Supplier shall be liable for all damages included in connection with the molds, tooling and machines or well as all damages arising from their use. The Supplier shall insure the molds, tooling and machines for damage or loss (including theft) in an amount not less than replacement value and shall maintain general liability insurance regarding the operation of the molds, tooling and machines in amounts and coverage reasonable in the circumstances and acceptable to Valeo. the Supplier shall also comply with the provisions listed in section 8.7 regarding insurance.

. Termination

he Supplier fails to perform any of its contractual obligations under these General Terms and Conditions, Valeo may ancel any and all purchase orders upon eight (8) days written notice, without prejudice to any damages Valeo may aim.

. Year "2000" Bug

llor, and any goods and services supplied by the seller, under take to be Year "2000" compliant and compatible, nd shall function without error or fault in the processing of dates and date-related for the year 2000 and beyond cluding, without being exhaustive, as to calculating, manipulating, managing, comparing and sequencing).

. Applicable Law and Jurisdiction

ese General Terms and Conditions of Purchase shall be governed by the laws of the State of Michigan without gard to rules pertaining to conflicts of law. The federal, state and local courts located in the State of Michigan shall ve exclusive jurisdiction of any dispute relating to these General Terms and Conditions of Purchase. The United ations Convention on Contracts for the International Sale of Goods shall not apply to these General Terms and onditions of Purchase or any transaction pursuant hereto.

any provision herein is or becomes invalid or unenforceable under any law of mandatory application, such provision l be deemed severed and omitted. The remaining provisions will remain in full force and effect or written.

o action or inaction taken pursuant to these General Terms and Conditions shall constitute a waiver of compliance ith any covenants or agreements herein.

# UNREPORTED CASES

LEXSEE 1994 TEX APP LEXIS 4112


**ENEX RESOURCES CORPORATION AND ENEX PROGRAM I PARTNERS,
L.P., Appellants v. TEXAS CRUDE, INC., Appellee**

**No. 05-94-00641-CV**

**COURT OF APPEALS OF TEXAS, FIFTH DISTRICT, DALLAS**

*1994 Tex. App. LEXIS 4112*

**December 30, 1994, Opinion Filed**

**NOTICE:** [*1] PURSUANT TO THE TEXAS RULES OF APPELLATE PROCEDURE, UNPUBLISHED OPINIONS SHALL NOT BE CITED AS AUTHORITY BY COUNSEL OR BY A COURT.

**SUBSEQUENT HISTORY:**

Petition for Review Denied May 20, 1999.

**PRIOR HISTORY:** On Appeal from the 101st Judicial District Court. Dallas County, Texas. Trial Court Cause No. 89-15431.

**DISPOSITION:** REVERSED and RENDERED.

**CASE SUMMARY:**


**PROCEDURAL POSTURE:** Both appellee oil and gas operator and appellant working interest owners appealed the decision of the 101st Judicial District Court, Dallas County (Texas), that netted out the damage awards to both parties under the jury's verdict and rendered judgment for appellee in a contract dispute with appellants.

**OVERVIEW:** Appellee oil and gas operator sought indemnity from appellant working interest owners. Appellants counterclaimed for funds it claimed were wrongfully withheld by appellee. A jury found both appellants and appellee liable for damages. The trial court netted out the damage awards under the jury verdict and rendered judgment for appellee. Appellants sought review on multiple grounds, including that appellee was not entitled to indemnity as a matter of law and that the jury question on indemnity contained an impermissible comment on the evidence. Appellee contended in its cross-point that the trial court erred in sustaining appellants' objections to the testimony of appellee's experts. Giving

effect to the intentions of the parties as expressed in their contract, the court held that appellee was not entitled to indemnity. Accordingly, the court reversed the judgment of the trial court and rendered judgment for appellants.

**OUTCOME:** The court reversed the judgment of the trial court and rendered judgment that appellee oil and gas operator take nothing on its claim for indemnity. The court also rendered judgment that appellant working interest owners recover from appellee the sum awarded as an offset.

**CORE TERMS:** letter agreement, settlement, withheld, net income, indemnity, working interest, lawsuit, entitled to indemnity, modification, fees incurred, matter of law, royalty, oil, one year, preponderance, contingency fund, render judgment, counterclaim, cross-point, reimburse, obligate, complains, withhold, oral agreement, entire record, great weight, accounting, unambiguous, conceivably, cease

**LexisNexis(R) Headnotes**


*Contracts Law > Contract Conditions & Provisions > Indemnity*
*Contracts Law > Contract Interpretation > General Overview*
[HN1] A contract for indemnity is read as any other contract. Under principles of contract law, courts must ascertain and give effect to the intentions of the parties as expressed in the instrument. When the contract is unambiguous, courts must determine the rights and liabilities of the parties by giving legal effect to the contract as written. Courts may not expand the parties' rights or responsibilities beyond the limits agreed upon by them in the contract.

1994 Tex. App. LEXIS 4112, *

*Contracts Law > Contract Modifications > General Overview*
[HN2] When parties to a contract make a valid modification of their contract and exchange consideration, the terms of the latest contract control.

*Civil Procedure > Appeals > Standards of Review > Substantial Evidence > General Overview*
[HN3] If an appellant is attacking the legal sufficiency of an adverse finding on an issue on which he had the burden of proof, he must demonstrate on appeal that the evidence conclusively established all vital facts in support of the issue. In reviewing such a "matter of law" challenge, the appellate court first examines the record for evidence that supports the finding, while ignoring all evidence to the contrary. If there is no evidence to support the finding, it will then examine the entire record to determine if the contrary proposition is established as a matter of law.

*Contracts Law > Contract Modifications > Oral Modifications*
*Contracts Law > Statutes of Frauds > Requirements > Performance*
[HN4] Oral modification of a contract does not violate the statute of frauds, *Tex. Bus. & Com. Code Ann. § 26.01*, if neither the portion of the written contract affected by the subsequent modification, nor the matter encompassed by the modification itself is required to be in writing.

*Contracts Law > Statutes of Frauds > General Overview*
[HN5] Under *Tex. Bus. & Com. Code Ann. § 26.01*, an operating agreement need not be in writing if it can be performed within one year.

*Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review*
[HN6] In reviewing a challenge that the jury's failure to give an award is against the great weight and preponderance of the evidence, the appellate court considers and weighs the entire record, and sets aside the verdict only if it is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust.

*Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review*
[HN7] Appellate courts are not free to substitute their judgment for that of the jury simply because they may disagree with the jury's verdict. When considering great weight points complaining of a jury's failure to find a fact, courts of appeals should be mindful that a jury was not convinced by a preponderance of the evidence.

*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
[HN8] It is the jury's province to reconcile the conflicting or contradictory evidence of the witnesses, or to give a greater degree of credit to one or more of the witnesses.

**JUDGES:** Before Chief Justice McGarry and Justices Thomas and Whitham. n1 Opinion by Chief Justice McGarry

> n1 The Honorable Warren Whitham, Justice, Court of Appeals, Fifth District of Texas at Dallas, Retired, sitting by assignment.

**OPINION BY:** CHARLES W. McGARRY

**OPINION:** OPINION

Opinion by Chief Justice McGarry

Texas Crude, Inc. ("Texas Crude"), an oil and gas operator, sought indemnity from working interest owners Enex Resources Corporation and Enex Program I Partners, L.P. (collectively referred to as "Enex"). Enex counterclaimed for funds it alleged were wrongfully withheld by Texas Crude. A jury found both Enex and Texas Crude liable for damages. Based on the jury verdict, the trial court netted out the damage awards and rendered judgment for Texas Crude. In eleven points of error, Enex argues that Texas Crude is not entitled to indemnity as a matter of law. Enex also complains the jury question [*2] on indemnity contained an impermissible comment on the evidence. Regarding its counterclaim, Enex complains that the jury's award should have included additional sums withheld by Texas Crude for in-house personnel fees. Texas Crude contends in a single cross-point that the trial court erred in sustaining Enex's objections to the testimony of certain Texas Crude experts. We agree with Enex that Texas Crude is not entitled to indemnity. Accordingly, we reverse the judgment of the trial court and render judgment for Enex.

**BACKGROUND**

Texas Crude is the operator of certain oil and gas properties in Cherokee County, Texas. Enex acquired an ownership interest in the same properties from the Schlensker Drilling Corporation. Schlensker reserved a share of the net proceeds from future production and required Enex to pay Schlensker a "net income payment." Schlensker later assigned the net income payment to BancTexas, which then assigned it to Community Credit Union.

In 1985, Texas Crude filed suit against a gas purchaser, Delhi Gas Pipeline ("Delhi"), alleging breach of contract. Texas Crude sought recovery against Delhi on behalf of all working interest owners. Enex signed a [*3] Letter of Instruction and Authorization that ratified the actions taken by Texas Crude in pursuing the claims against Delhi. The case went to trial, and Texas Crude obtained a judgment against Delhi. While the case was on appeal, Texas Crude and Delhi settled the litigation for approximately $ 33.4 million.

Prior to the settlement between Texas Crude and Delhi, Enex attempted to obtain a release of the net income payment from BancTexas. Because Enex was unable to settle BancTexas' claim to the net income payment, Texas Crude and Delhi required Enex to enter into an agreement ("the letter agreement") in which Enex authorized Texas Crude to withhold $ 1,576,977 (the unpaid balance of the net income payment) out of Enex's share of the settlement. The letter agreement permitted Enex to later substitute an irrevocable letter of credit for the withheld funds. The letter of credit was to reimburse Texas Crude if it paid a judgment attributable to the net income payment. Enex also agreed to retain counsel to defend Texas Crude in event of a claim and to pay all legal expenses, fees and costs of such counsel.

In 1989, the then owner of the net income payment, Community Credit Union, filed [*4] suit against Enex, Texas Crude, and Delhi. Community Credit Union claimed Enex had breached its contractual obligation to make the net income payment, and that the other defendants had tortiously caused or contributed to Enex's breach. In January 1990, Texas Crude notified Enex it was being sued by Community Credit Union and asked Enex to defend the lawsuit on behalf of Texas Crude. Enex's counsel filed an answer on behalf of Texas Crude. Two months later, Texas Crude claimed the attorney retained by Enex had a conflict of interest, and instructed him to stop all work on behalf of Texas Crude and to relinquish the defense to new counsel.

In November 1991, Texas Crude settled with Community Credit Union for $ 150,000. No judgment was entered against Texas Crude. Following its settlement with Community Credit Union, Texas Crude pursued a cross-action against Enex to indemnify it for the $

150,000 paid in settlement, plus $ 450,122.78 in attorney's fees incurred after Texas Crude hired its own counsel.

Enex asserted a counterclaim against Texas Crude for money withheld by Texas Crude from Enex's share of the Delhi settlement. Texas Crude had set aside 3.75 percent of the settlement [*5] as a contingency fund for royalty owner claims. After those claims were resolved, Enex's share of the amount remaining in the contingency fund was $ 163,019.15. Texas Crude also withheld $ 145,751 from Enex for the cost of Texas Crude's legal staff and other office employees. These funds were withheld in addition to the $ 1,576,977 withheld pursuant to the letter agreement.

The jury found that Enex owed Texas Crude $ 600,122.78, representing $ 150,000 settlement plus the attorneys' fees incurred by Texas Crude in defending the Community Credit Union lawsuit. The jury also found Texas Crude had improperly withheld $ 163,019.50 (the remainder of the contingency fund) from Enex. After netting out the two amounts, the trial court entered judgment in favor of Texas Crude. n2

> n2 Texas Crude agreed to a remittitur of $ 22,900.44, for attorney's fees incurred after the settlement with Community Credit Union.

## INDEMNITY

Enex's first two points of error contend that, as a matter of law, Texas Crude is not [*6] entitled to indemnity under either the letter agreement or the operating agreements. We agree.

[HN1] A contract for indemnity is read as any other contract. *Safeco Ins. Co. of Am. v. Gaubert, 829 S.W.2d 274, 281* (Tex. App.--Dallas 1992, writ denied). Under principles of contract law, courts must ascertain and give effect to the intentions of the parties as expressed in the instrument. *Ideal Lease Serv. v. Amoco Prod. Co., 662 S.W.2d 951, 953 (Tex. 1983).* When the contract is unambiguous, we must determine the rights and liabilities of the parties by giving legal effect to the contract as written. *Id.* We may not expand the parties' rights or responsibilities beyond the limits agreed upon by them in the contract. *Id.*

Texas Crude argues that it may seek indemnity from Enex under either the letter agreement or its operating agreements with the working interest owners. We disagree. Assuming that both the operating agreements and the letter agreement address Texas Crude's indemnity rights, the letter agreement more specifically addresses

indemnity for claims by, through or under BancTexas. The letter agreement, being later in time and more specific, constitutes a modification of [*7] the original agreement. Thus, the letter agreement controls. *Lake LBJ Mun. Util. Dist. v. Coulson, 839 S.W.2d 880* (Tex. App.--Austin 1992, no writ) ([HN2] When parties to a contract make a valid modification of their contract and exchange consideration, the terms of the latest contract control.)

*Letter Agreement*

Texas Crude relies upon the following language in the letter agreement to support its claim for reimbursement of the S 150,000 paid in settlement to Community Credit Union:

The letter of credit shall name Texas Crude, Delhi, and TXO Production Corp. as beneficiaries, and shall be available to reimburse Texas Crude, Delhi, and/or TXO Production if they pay, satisfy or respond to a judgment in favor of BancTexas Dallas, or anyone claiming by, through or under them, for any claim attributable to the Net Income Payment describe above.

Texas Crude paid S 150,000 to settle Community Credit Union's claims. It did not pay, satisfy or respond to a judgment. Community Credit Union's claims were dismissed with prejudice by an order that did not award damages. Under the unambiguous terms of the letter agreement, Texas Crude is not entitled to indemnity for a voluntary settlement. [*8] Texas Crude also argues that the letter agreement, even if insufficient to permit recovery of the S 150,000 settlement, still entitles Texas Crude to indemnification for the attorney's fees incurred in defending the Community Credit Union lawsuit. The last paragraph of the letter agreement obligates Enex to "provide a defense to Texas Crude, Delhi and/or TXO Production in the event they are named by BancTexas Dallas (or anyone claiming by, through, or under them) as defendants in a lawsuit alleging a claim for money owed pursuant to the Net Income Payment described above."

The letter agreement obligates Enex to retain counsel to defend Texas Crude and pay the fees and costs incurred by such counsel. It does not obligate Enex to pay all legal expenses, fees and costs of counsel retained by Texas Crude. *See Ingram Exploration Co. v. Wild Well Control, Inc., 838 S.W.2d 317, 319* (Tex. App.--El Paso 1992, no writ). Enex honored its obligation to Texas Crude. When Texas Crude notified Enex it was being sued by Community Credit Union, Enex's counsel filed an answer on behalf of Texas Crude. Texas Crude then instructed counsel to take no further action on the part of Texas Crude, and [*9] retained different counsel. Enex has no obligation to reimburse Texas Crude for

attorney's fees incurred by counsel retained by Texas Crude.

*Joint Operating Agreements*

In the alternative, if both the letter agreement and the joint operating agreements provide a basis for indemnification, the joint operating agreement would not be applicable to this indemnity claim. Texas Crude relies upon the following language from the operating agreements concerning royalty burdens:

Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Unit Area, exclusive of production which may be used in development and producing operations and in preparing and treating oil for marketing purposes and production unavoidably lost. Each party shall pay or deliver, or cause to be paid or delivered, all royalties, overriding royalties, or other payments due on its share of such production, and shall hold the other parties free from any liability therefor.

This language appears in a section of the operating agreements entitled "Right to Take Production in Kind." That section applies where a working interest owner takes its share of [*10] production in-kind and owes a royalty or production payment on the production taken. The defense of the lawsuit by Community Credit Union against Texas Crude did not involve such a situation. Texas Crude sold Enex's gas and then paid Enex its share. Because Enex was not taking production in-kind, Texas Crude is not entitled to indemnity for the settlement with Community Credit Union or for attorney's fees associated with that lawsuit under the joint operating agreements.

Texas Crude is not entitled to indemnity for the settlement or attorney's fees under either the letter agreement or the joint operating agreements. Points of error one and two are sustained. It is therefore unnecessary to address Enex's points of error three through eight.

**DELHI ATTORNEY FEES**

In its counterclaim against Texas Crude, Enex sought recovery of its share of the S 950,506.15 Texas Crude withheld from the settlement for litigation expenses incurred by Texas Crude during the Delhi lawsuit. Enex's ninth and eleventh points of error contend that it was entitled to additional damages for its share of these expenses as a matter of law.

[HN3] If an appellant is attacking the legal sufficiency of an adverse [*11] finding on an issue on which he had the burden of proof, he must demonstrate on appeal that the evidence conclusively established all vital

facts in support of the issue. *Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989)*. In reviewing such a "matter of law" challenge, we first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Id.* If there is no evidence to support the finding, we will then examine the entire record to determine if the contrary proposition is established as a matter of law. *Id.* Enex contends that the S 950,056.15 (of which Enex's share is S 145, 751) was withheld in violation of the "Accounting Procedure Joint Operation" section of the Joint Operating Agreements. Enex maintains it did not consent to the S 950,056.15 in litigation expenses as required by the accounting procedures section. Texas Crude maintains that the operating agreement required the agreement of only a majority of the owners.

Enex claims the approval amounted to an oral modification of the contract barred by the Statute of Frauds. *See TEX. BUS. & COM. CODE ANN. § 26.01*. Thus, Enex contends the plain language of the [*12] operating agreements should be enforced, and judgment rendered for Enex for the S 145,751 withheld by Texas Crude for in-house personnel fees.

[HN4] Oral modification of a contract does not violate the Statute of Frauds if neither the portion of the written contract affected by the subsequent modification, nor the matter encompassed by the modification itself is required to be in writing. *See Lone Star Steel Co. v. Scott, 759 S.W.2d 144, 153 (Tex. App.--Texarkana 1988, writ denied)*. Operating agreements can conceivably be performed within one year in accordance with the agreements. When oil production ceases, the operating agreements cease. [HN5] Under section 26.01, an operating agreement need not be in writing if it can be performed within one year. *Hardin Assoc., Inc. v. Brummett, 613 S.W.2d 4, 7 (Tex. Civ. App.--Texarkana 1980, no writ); Hondo Oil & Gas Co. v. Texas Crude Operator, Inc., 970 F.2d 1433, 1438 (5th Cir. 1992)*. Because the operating agreements could conceivably be performed within one year, a modification to the accounting section need not be in writing.

The jury had before it copies of all the operating agreements relevant to this dispute. The testimony of Helen [*13] Crowder, vice-president of finance for Texas Crude, indicates Texas Crude obtained the consent of a majority of the non-operators to withhold the money for litigation expenses. The record also contains her testimony regarding how the costs were determined. This constitutes some evidence that Texas Crude properly withheld the money for litigation expenses. Thus, our inquiry need go no further. Points of error nine and eleven are overruled.

In point of error ten, Enex attacks the jury's failure to award the S 145,751 to Enex as being against the great weight and preponderance of the evidence. [HN6] In reviewing this challenge, we consider and weigh the entire record, and set aside the verdict only if it is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Cropper v. Caterpillar Tractor Co., 754 S.W.2d 646, 651 (Tex. 1988); Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam)*.

[HN7] Appellate courts are not free to substitute their judgment for that of the jury simply because they may disagree with the jury's verdict. *Herbert v. Herbert, 754 S.W.2d 141, 144 (Tex. 1988)*. When considering great weight points [*14] complaining of a jury's failure to find a fact, courts of appeals should be mindful that a jury was not convinced by a preponderance of the evidence. *Id.*

Enex argues there is no evidence of an oral agreement among the working interest owners to allow Texas Crude to charge for litigation expense. They contend Crowder's testimony is insufficient to prove an oral agreement because she failed to specify the individual working interest owners who agreed to the expenses. The record supports the jury finding. Crowder testified that she obtained the consent of a majority of the working interest owners to withhold the money. [HN8] It is the jury's province to reconcile the conflicting or contradictory evidence of the witnesses, or to give a greater degree of credit to one or more of the witnesses. *Herbert, 754 S.W.2d at 144 (citing Jones v. Williams, 41 Tex. 390 (1874)*. The record does not contain evidence to the contrary. Point of error ten is overruled.

## TEXAS CRUDE'S CROSS-POINT

In a single cross-point, Texas Crude complains that the trial court erroneously excluded the testimony of three expert witnesses for failure to properly identify them and the subject of their testimony [*15] in response to interrogatories. However, none of the excluded testimony is material to our disposition of this appeal. The cross-point is therefore overruled. *See City of Corpus Christi v. Corpus Christi Police Officers Ass'n, 557 S.W.2d 182, 186 (Tex. Civ. App.--Corpus Christi 1977, writ ref'd n.r.e.) (points of error overruled as immaterial to disposition of appeal)*.

Accordingly, we reverse the judgment of the trial court awarding Texas Crude damages and render judgment that Texas Crude take nothing on its claim for indemnity. We render judgment that Enex have and recover from Texas Crude the sum previously awarded by the trial court as an offset.

1994 Tex. App. LEXIS 4112, *

CHARLES W. McGARRY                                    CHIEF JUSTICE

LEXSEE 1996 MICH APP LEXIS 2230

**KATHY L. LAMBERS and BARRY H. LAMBERS, Plaintiffs, v WHEELS, INC., a foreign corporation, Defendant/Third-Party Plaintiff-Appellant, v GRAND RAPIDS AUTO AUCTION, Third-Party Defendant-Appellee.**

No. 187787

**COURT OF APPEALS OF MICHIGAN**

*1996 Mich. App. LEXIS 2230*

**December 6, 1996, Decided**

**NOTICE:** [*1]   IN ACCORDANCE WITH THE MICHIGAN COURT OF APPEALS RULES. UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**PRIOR HISTORY:** LC No. 93-19149-NI.

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant corporation appealed as of right from the judgment of the trial court (Michigan) that granted summary disposition in favor of third-party defendant auctioneer. The corporation had filed a third-party complaint against the auctioneer that was based on an indemnification provision contained in a contract.

**OVERVIEW:** The corporation filed a third-party complaint against the auctioneer, asserting contractual indemnification. On appeal, the court affirmed the trial court's judgment that granted summary disposition in the auctioneer's favor. The court held that the trial court properly found that the contract was unambiguous. As such it was not subject to construction and enforcement in accordance with the contract terms was appropriate. The clear language of the contract provided that the auctioneer only had a duty to indemnify the corporation if the auctioneer breached the contract. The corporation admitted that the auctioneer had not breached the contract. As the trial court observed, what was written in the contract may not have been what the corporation, as the drafter, intended. However, what was written was capable of only one interpretation. The court held that a mistake in the wording was not an ambiguity. Because the

contract's terms were clear and had a definite meaning the trial court did not err in granting the auctioneer summary disposition.

**OUTCOME:** The court affirmed the summary disposition that the trial court granted in favor of the auctioneer.

**CORE TERMS:** wheels, ambiguous, rules of construction, indemnity, contract language, unambiguous, resorted, circumstances surrounding, insurance coverage, indemnification, third-party, breached

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Appellate Review > Standards of Review*
*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN1] A trial court's grant of a motion for summary disposition is reviewed de novo. All the evidence and reasonable inferences therefrom must be construed in favor of the nonmoving party.

*Contracts Law > Contract Interpretation > General Overview*
*Contracts Law > Defenses > Ambiguity & Mistake > General Overview*
*Contracts Law > Negotiable Instruments > Enforcement > Duties & Liabilities of Parties > Forgery, Fraud & Mistake*
[HN2] An indemnity contract is construed in accordance with the rules for the construction of contracts generally. The cardinal rule in the construction of indemnity con-

tracts is to enforce them so as to effectuate the intention of the parties. Intention is determined by considering not only the language of the contract but also the situation of the parties and the circumstances surrounding the contract. Indemnity contracts are construed most strictly against the party who drafts them and against the party who is the indemnitee. However, rules of construction are resorted to only when a contract is ambiguous. An unambiguous contract is not subject to construction and must be enforced according to its terms. A contract is not ambiguous if it admits of but one interpretation. A mistake in the wording of a contract is not an ambiguity. If the contract's terms are clear and have a definite meaning, the court may not rewrite the contract, in effect making a new contract.

**JUDGES:** Before: Markey, P.J., and Michael J. Kelly and M.J. Talbot. * JJ.

> * Circuit judge, sitting on the Court of Appeals by assignment.

**OPINION:** PER CURIAM.

Defendant/third-party plaintiff Wheels, Inc. (hereinafter "Wheels") appeals as of right from the trial court's grant of summary disposition to third-party defendant Grand Rapids Auto Auction (hereinafter "GRAA") regarding Wheels' suit against GRAA based on an indemnification provision contained in a contract between these parties. The trial court found that the contract clearly provided that GRAA owed a duty to indemnify Wheels only in the event that GRAA breached the parties' contract. Because Wheels admitted that GRAA had not breached the contract, GRAA was not obligated to indemnify wheels and was, therefore, entitled to summary disposition.

On appeal, Wheels claims that the trial court erred in granting summary disposition to GRAA and that the issue of the parties' intent regarding the contract should have gone to trial for a jury [*2] determination. We disagree.

Wheels' argument for contractual indemnification from GRAA is based upon paragraph nine of the parties' contract, which provides as follows:

> Auctioneer [GRAA] shall indemnify, defend and hold harmless Wheels, its' [sic] affiliates, subsidiaries, officers, directors, employees, successors and assigns from and against any and all loss, damage, liability, claims, causes of action, and expenses of whatever kind and nature including any civil or criminal actions of

whatever kind and nature arising from the breach of this Agreement.

[HN1] A trial court's grant of a motion for summary disposition is reviewed de novo. *Pinckney Community Schools v Continental Casualty Co, 213 Mich. App. 521, 525; 540 N.W.2d 748 (1995).* All the evidence and reasonable inferences therefrom must be construed in favor of the nonmoving party. *Skinner v Square D Co, 445 Mich. 153, 161-162; 516 N.W.2d 475 (1994).*

The rules of construction with respect to indemnity contracts are set forth in *Pritts v J I Case Co, 108 Mich. App. 22; 310 N.W.2d 261 (1981).*

> [HN2] An indemnity contract is construed in accordance [*3] with the rules for the construction of contracts generally. The cardinal rule in the construction of indemnity contracts is to enforce them so as to effectuate the intention of the parties. Intention is determined by considering not only the language of the contract but also the situation of the parties and the circumstances surrounding the contract. Indemnity contracts are construed most strictly against the party who drafts them and against the party who is the indemnitee. [*Id.,* 29.]

However, rules of construction are resorted to only when a contract is ambiguous. *Barner v City of Lansing, 27 Mich. App. 669, 671; 183 N.W.2d 877 (1970).* An unambiguous contract is not subject to construction and must be enforced according to its terms. *Id.* A contract is not ambiguous if it admits of but one interpretation. *Auto Owners Ins Co v Zimmerman, 162 Mich. App. 459, 461; 412 N.W.2d 925 (1987).* A mistake in the wording of a contract is not an ambiguity. *Goodwin, Inc v Orson E Coe Pontiac, Inc, 43 Mich. App. 640, 645; 204 N.W.2d 749 (1972),* rev'd on other grounds *392 Mich. 195, 220 N.W.2d 664 (1974).* [*4] If the contract's terms are clear and have a definite meaning, the court may not rewrite the contract, in effect making a new contract. *Id.*

In granting GRAA's motion for summary disposition, the trial court stated,

> I think I know what Wheels intended, what the drafter intended, but it's not really what they wrote. What they intended, I assume, is probably to say "arising from this agreement" and not "from the breach of this agreement," but that's not what they wrote. They wrote "arising from the breach of this agreement." So there is -- from what I think is the clear

1996 Mich. App. LEXIS 2230, *

language, there has to be a breach of the agreement. There has to be insurance coverage, adequate insurance coverage, of Wheels's vehicles to cover any loss, theft or damage or injury to person, but there is no claim that there isn't, and there is no indication that there is a breach of the agreement.

We regard the trial court's decision as well supported by the above-cited rules for contract construction. While it is true that when a court construes a contract, it must consider, in addition to the contract language, the "situation of the parties and the circumstances surrounding the contract," *Pritts, supra, 29,* [*5] as noted, rules of construction are resorted to only when a contract is ambiguous, and an unambiguous contract must be enforced as it is written, *Barner, supra, 27 Mich. App. 671.* The contract language is not ambiguous; thus, the trial court did not err in granting GRAA summary disposition.

Affirmed.

/s/ Jane E. Markey

/s/ Michael J. Kelly

/s/ Michael J. Talbot

LEXSEE 1993 US DIST LEXIS 17376


PHOENIX ELECTRICAL CONTRACTING, INC. Plaintiff, v. JOSEPH LOVECE, Defendant.

93 Civ. 4340 (LMM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*1993 U.S. Dist. LEXIS 17376*

**December 7, 1993, Decided**
**December 9, 1993, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff debtor filed a motion for remand of its malicious prosecution and prima facie tort action against defendant creditor, pursuant to *28 U.S.C.S. § 1452*(b). In the alternative, the debtor filed a motion for the court to abstain pursuant to either the mandatory abstention doctrine in *28 U.S.C.S. § 1334*(c)(2) or the permissive abstention doctrine in *28 U.S.C.S. § 1334*(c)(1).

**OVERVIEW:** Plaintiff debtor filed suit against defendant creditor alleging claims of malicious prosecution and prima facie tort, arising from the creditor's filing of a claim and his objection to the proposed plan of reorganization in the debtor's bankruptcy case. The creditor removed the action to the federal court. Thereafter, the debtor filed a motion for remand of the action pursuant to *28 U.S.C.S. § 1452*(b). In the alternative, the debtor filed a motion for the court to abstain pursuant to either the mandatory abstention doctrine in *28 U.S.C.S. § 1334*(c)(2) or the permissive abstention doctrine in *28 U.S.C.S. § 1334*(c)(1). The court ruled that the claim represented a collateral attack on the validity of an action taken in a bankruptcy proceeding and, therefore, raised the question whether federal bankruptcy law preempted the claim. Thus, remand was inappropriate. Similarly, the court ruled that neither mandatory nor permissive abstention would be appropriate in this case. The court reasoned that there was a presumption against abstention in light of the federal preemption issues, which the debtor failed to rebut.

**OUTCOME:** The court denied the debtor's motion for remand and its motion to abstain because one of the

claims concerned the legality of an action taken in the debtor's bankruptcy proceedings.

**CORE TERMS:** abstention, creditor claim, bankruptcy proceedings, bankruptcy proceeding, state law, preemption, abstain, injunctive relief, mandatory, confidential information, plan of reorganization, malicious prosecution, prima facie tort, bankruptcy case, permissive, comity, item of damage, pre-petition, efficient administration, exclusive jurisdiction, original jurisdiction, equitable ground, leave to replead, preemption issue, times relevant, existing law, federal law, removal, preempted, invoked

**LexisNexis(R) Headnotes**


*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Federal District Courts*
*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Removal*
*Civil Procedure > Removal > Postremoval Remands > Jurisdictional Defects*
[HN1] An action properly removed pursuant to *28 U.S.C.S. § 1441*, on the ground that the U.S. District Court has original and exclusive jurisdiction over all cases under title 11, cannot properly be remanded, given the exclusive nature of this jurisdiction.


*Bankruptcy Law > Practice & Proceedings > Jurisdiction > General Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*

1993 U.S. Dist. LEXIS 17376, *

[HN2]  *28 U.S.C.S. § 1334*(b) grants the bankruptcy court original jurisdiction over all civil proceedings arising under title 11, or arising in or related to cases under title 11.

*Civil Procedure > Removal > Basis > Claims Related to Bankruptcy*
*Civil Procedure > Trials > Jury Trials > Right to Jury Trial*
*Governments > Courts > Judicial Comity*
[HN3] A proceeding removed pursuant to *28 U.S.C.S. § 1452* may be remanded on any equitable ground. In determining whether an action removed pursuant to *28 U.S.C.S. § 1452*(a) should be remanded, courts have considered a number of factors, including: (1) effect on efficient administration of bankruptcy estate; (2) extent to which issues of state law predominate; (3) difficulty or unsettled nature of state law; (4) comity; (5) degree of relatedness or remoteness of the proceeding to main bankruptcy case; (6) existence or right to jury trial; (7) prejudice to involuntary removed parties; (8) duplicative and uneconomical use of judicial resources; (9) lessened possibility of inconsistent results.

*Bankruptcy Law > Case Administration > Commencement > Abstention*
*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Federal District Courts*
*Civil Procedure > Federal & State Interrelationships > Abstention*
[HN4] The mandatory abstention doctrine for bankruptcy proceedings is codified in *28 U.S.C.S. § 1334* (c)(2), which states that upon timely motion of a party in a proceeding based upon a state law claim or state law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a state forum of appropriate jurisdiction.

*Bankruptcy Law > Case Administration > Commencement > Abstention*
*Bankruptcy Law > Practice & Proceedings > Jurisdiction > General Overview*
*Governments > Courts > Judicial Comity*
[HN5] As regards permissive abstention from bankruptcy proceedings, *28 U.S.C.S. § 1334*(c)(1) provides that nothing in § 1334(c)(1) prevents a district court in the interest of justice, or in the interest of comity with state courts or respect for state law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11. Scarce

debtor resources should not be squandered litigating in state court when such litigation may later be found to have been preempted by federal law. A presumption against abstention when there are preemption issues thus serves the best interests of debtors and their creditors.

**JUDGES:** [*1] McKENNA

**OPINION BY:** LAWRENCE M. McKENNA

**OPINION:**

MEMORANDUM AND ORDER

McKENNA, D.J.

Plaintiff, Phoenix Electrical Contracting, Inc., filed this action on May 25, 1993, in the Supreme Court of the State of New York, County of New York, alleging a claim for malicious prosecution and prima facie tort, both of which are state common law causes of action. Defendant, Joseph Lovece, filed a Notice of Removal on June 25, 1993, on the grounds that this Court has original and exclusive jurisdiction under *28 U.S.C. § 1334*(a), and that the action may be removed pursuant to *28 U.S.C. § 1441*, or, in the alternative, that this Court has original jurisdiction under *28 U.S.C. § 1334*(b), and that the action may be removed pursuant to *28 U.S.C. § 1452*(a). Defendant moves, pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*, for dismissal of Defendant's Complaint on the ground that it fails to state a claim upon which relief can be granted. Plaintiff cross-moves this Court to remand this case, pursuant to *28 U.S.C. § 1452* [*2] (b), or, in the alternative, to abstain from hearing this case, pursuant to either the mandatory abstention doctrine articulated in *28 U.S.C. § 1334*(c)(2) or the permissive abstention doctrine delineated in *28 U.S.C. § 1334*(c)(1). For the reasons stated below, Plaintiff's Motion to Remand and Motion to Abstain are denied; leave to replead, requested in Plaintiff's Reply Memorandum, is granted, on the condition that Plaintiff replead within 30 days; and Defendants' Motion to Dismiss is denied without prejudice to renew at a later date.

I.

Taking the material facts alleged in the Complaint as true, see *Frasier v. General Elec. Co., 930 F.2d 1004, 1007 (2d Cir. 1991),* the facts are as follows. Plaintiff, Phoenix Electrical Contracting, Inc. ("Phoenix"), is a duly organized company, existing under the laws of the State of New York. Defendant, Joseph Lovece, was, at all times relevant to this action, the majority stockholder in North Star Contracting, Inc., a corporation that controlled North Star Electrical Contracting - NYC, Inc. ("NSE"). In addition, Lovece, at all times relevant [*3] to this action, was a director as well as the Chief Execu-

tive Officer and President of NSE. All of the actions taken by NSE that serve as the basis of Plaintiff's Complaint were directed and instigated by Lovece. Prior to March 20, 1987, William T. McSpedon was an employee of NSE; sometime after March 26, 1987, McSpedon caused Plaintiff to be incorporated.

On or about June or July 1987, Defendant caused NSE to bring an action against Plaintiff, alleging, inter alia, that Plaintiff had appropriated and was utilizing trade secrets and confidential information developed by NSE; NSE sought both injunctive relief and damages. Plaintiff alleges that in bringing this action, Defendant

> acted maliciously and with intent to injure plaintiff because [Defendant] knew that no confidential information was being used by defendant [sic], knew that confidential information of the type [NSE] alleged as being used did not exist and never existed and knew or reasonably should have known that plaintiff was not using any trade secret of [NSE's] and knew that the purpose in causing [NSE] to bring the aforesaid action was to harass and cause financial injury to plaintiff.

Compl. P 11. As a [*4] result, NSE obtained a preliminary injunction against Plaintiff, pursuant to which Plaintiff was prevented from using any confidential information and trade secrets that belonged to NSE.

On January 18, 1989, Plaintiff filed a petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code, *11 U.S.C. §§ 1101.* et seq. NSE filed a claim in the Chapter 11 bankruptcy proceedings for S 10,000,000 -- a claim that far exceeded the claims of all of Plaintiff's other creditors. NSE, alone among Plaintiff's creditors, voted against the proposed plan of reorganization. However, because of the size of its claim, NSE's lone negative vote was enough to block implementation of the plan. NSE's vote was subsequently disallowed on the ground that it was made in bad faith; NSE appealed this decision and in so doing continued to block implementation of the plan. NSE's appeal was brought to trial in New York County, pursuant to a stipulation that any verdict obtained against McSpedon, who was a defendant in NSE's action, would also apply to Phoenix. On or about May 27, 1992, judgment was entered in favor of McSpedon, with the result that NSE's claim in [*5] Plaintiff's bankruptcy proceeding was dismissed.

Plaintiff further alleges that as a result of the foregoing actions attributable to Defendant, Plaintiff suffered the following: Plaintiff's reputation was damaged be-

cause of the pre-petition injunction with which Plaintiff was saddled; Plaintiff's credit standing was injured; Plaintiff was forced to expend monies on legal fees; and

> [Plaintiff's] sales were hurt as a result of its inability to have its plan of reorganization to emerge from bankruptcy finally confirmed without further appeal.

Compl. P 15. Consequently, Plaintiff claims, Plaintiff sustained approximately S 500,000 in actual damages. Plaintiff, therefore, seeks judgment in the amount of S 500,000, together with punitive damages in the amount of S 3,000,000, as well as any other relief that this Court deems just and proper.

II.

As a preliminary matter, this Court must determine whether Plaintiff's action is most accurately characterized as alleging one or two claims. In the Complaint, Plaintiff characterized Defendant's actions in the following way:

> Defendant caused [NSE] to interfere with plaintiff's property by obtaining preliminary injunctive relief and by [*6] filing a claim in plaintiff's bankruptcy proceedings, so as to prevent plaintiff from becoming a reorganized company under Chapter 11 of the Bankruptcy Code.

Compl. P 12. Defendant understands this to mean that two of his actions are at issue: the pre-petition injunctive relief obtained against Plaintiff and the filing of the creditor claim in Plaintiff's Chapter 11 proceeding. See Def.'s Mem. of Law Supp. Mot. Dismiss at 1-3. Plaintiff, however, argues that the Complaint alleges only a single claim for malicious prosecution and prima facie tort based on the pre-petition preliminary injunctive relief obtained against Plaintiff by Defendant; Plaintiff characterizes Defendant's filing of a creditor claim as an "item of damage," since it represents one of the ways in which Defendant used the preliminary injunction to Plaintiff's detriment. See Pl.'s Mem. of Law Supp. Mot. to Remand or Abstain and Opp. Mot. Dismiss at 2.

For purposes of deciding the motions at issue, the Court will treat Plaintiff's Complaint as containing two distinct claims against Defendant. The plain meaning of the allegation contained in paragraph 12 of Plaintiff's Complaint, quoted supra, is [*7] that Defendant caused NSE to interfere with Plaintiff's property in two ways:

(1) by obtaining preliminary injunctive relief against Plaintiff, and (2) by filing a claim in Plaintiff's Chapter 11 proceeding. Plaintiff's attempt to recast the second claim as an item of damage is belied not only by the plain language of paragraph 12 of the Complaint, but also by the portion of paragraph 15, quoted supra, wherein Plaintiff alleges that its sales were hurt as a result of its being unable, due to Defendant's creditor claim, to effect the confirmation of its plan of reorganization. The alleged downturn in sales is the damage arising from Defendant's creditor claim; the creditor claim is not itself an item of damage, but an act that precipitated the decline in sales. Moreover, and not insignificantly, Plaintiff, in the face of Defendant's characterization of its Complaint, has not offered to withdraw or amend the disputed claim; instead, Plaintiff urges the Court to adopt an interpretation of the Complaint at odds with the Complaint's language.

III.

Choosing between the alternative jurisdictional bases for removal proffered by Defendant, in order to determine the correct rule of decision [*8] to apply to Plaintiff's Motion for Remand, is unnecessary, because Plaintiff fails to demonstrate that remand would be appropriate under either option. [HN1] An action properly removed pursuant to *28 U.S.C. § 1441*, on the ground that this Court has original and exclusive jurisdiction over "all cases under title 11 [i.e., the Bankruptcy Code]," see *28 U.S.C. § 1334*(a), cannot properly be remanded, given the exclusive nature of this jurisdiction; Defendant, indeed, has asserted that this Court has jurisdiction over this action pursuant to § 1334(a). Plaintiff claims that Defendant's filing of a creditor claim in Plaintiff's bankruptcy proceeding constituted a malicious prosecution and prima facie tort. This claim represents a collateral attack on the validity of an action taken in a bankruptcy proceeding and, therefore, raises the question whether federal bankruptcy law preempts the claim. n1 Defendant argues that the existence of a preemption issue does subject the claim to the jurisdiction of this Court under *28 U.S.C. § 1334*(a), in which case remand is precluded. This [*9] Court need not reach this issue, however, if, as in the case at bar, remand pursuant to *28 U.S.C. § 1452*(b) is also not warranted. Plaintiff, however, has not demonstrated that a sufficient equitable ground exists to justify remand pursuant to *28 U.S.C. § 1452*(b). See infra.

n1 Although resolution of the instant motions does not require this Court to determine whether Plaintiff's claim is in fact preempted by federal law, this Court notes without further comment the existence of extensive authority to support the finding that preemption is indeed at issue in this case. See, e.g., U.S. Const., art. I, § 8, cl. 4 ("[The Congress shall have Power] To establish . . . uniform Laws on the subject of Bankruptcies throughout the United States"); *Taylor v. Freeland & Kronz, 118 L. Ed. 2d 280, 112 S. Ct. 1644, 1648-49 (1992)* (Congress, not the courts, must establish sanctions for improper conduct engaged in by parties to bankruptcy proceeding); *Gonzales v. Parks, 830 F.2d 1033, 1036 (9th Cir. 1987)* ("It is for Congress and the federal courts, not the state courts, to decide what incentives and penalties are appropriate for use in connection with the bankruptcy process and when those incentives or penalties shall be utilized."); *11 U.S.C. § 105*(a) ("The court may issue any order, process, or judgment that is necessary or appropriate . . . . to prevent an abuse of process."); Bankr. Rule 9011, 11 U.S.C.A. (providing for the imposition of sanctions on an attorney or party who signs a petition, pleading, motion, or other paper in a bankruptcy case that is unreasonable or not warranted by existing law or good faith argument for the extension, modification, or reversal of existing law).

[*10]

Defendant also has invoked the jurisdiction of this Court pursuant to [HN2] *28 U.S.C. § 1334*(b), which grants this Court original jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." See *28 U.S.C. § 1334*(b). Plaintiff's state law action concerning Defendant's creditor claim clearly "arises under" the Bankruptcy Code for purposes of *28 U.S.C. § 1334*(b), since such an action cannot be brought in the absence of a bankruptcy case. See *In re New York Int'l Hostel, Inc., 142 Bankr. 90, 94 (Bankr. S.D.N.Y. 1992)*, aff'd in part, rev'd in part on other grounds, *157 Bankr. 748 (S.D.N.Y. 1993)*. This action, therefore, was properly the subject of removal pursuant to *28 U.S.C. § 1452*(a). [HN3] A proceeding so removed may be remanded "on any equitable ground." See *28 U.S.C. § 1452*(b). In determining whether an action removed pursuant to § 1452(a) should be remanded, courts have considered a number [*11] of factors, including: (1) effect on efficient administration of bankruptcy estate; (2) extent to which issues of state law predominate; (3) difficulty or unsettled nature of state law; (4) comity; (5) degree of relatedness or remoteness of the proceeding to main bankruptcy case; (6) existence or right to jury trial; (7) prejudice to involuntary removed parties; (8) duplicative and uneconomical use of judicial resources; (9) lessened possibility of inconsistent results. See *Drexel Burnham Lambert Group, Inc. v. Vigilant Ins. Co., 130 Bankr. 405, 407 (Bankr. S.D.N.Y. 1991)* (factors

1993 U.S. Dist. LEXIS 17376, *

1-7); *Marshall v. Michigan Dep't of Agric., 118 Bankr. 954, 966 (W.D. Mich. 1990)* (factors 3, 4, 7-9).

In light of these factors, remand in the case at bar on equitable grounds would be inappropriate. The existence of a preemption issue implicates a significant number of the enumerated factors. From the viewpoint of judicial economy, the preemption question -- implicating federal policy -- is best addressed in federal court. A finding that collateral state law attacks on bankruptcy proceedings are proper will impact on the efficient administration [*12] of future bankruptcy estates by forcing debtors and creditors to consider the additional risk that they may be subject to litigation in state courts as a result of petitions or claims filed in bankruptcy proceedings. Moreover, a federal court resolution of this issue will lessen the possibility of inconsistent results on a state-by-state basis. The predominance of state law and concerns of comity do not even emerge as issues until the preemption question has been definitively settled -- and then only if it is determined that there is no preemption. Plaintiff, moreover, does not argue that this Complaint implicates state law issues of any great complexity. In addition, this proceeding is closely related to the main bankruptcy proceeding, in that one of the claims in the instant action directly concerns the legality of an action taken in Plaintiff's bankruptcy proceeding.

In light of the foregoing, therefore, remand of the instant action would be inappropriate.

IV.

Neither mandatory nor permissive abstention by this Court would be appropriate in the case at bar. [HN4] The mandatory abstention doctrine for bankruptcy proceedings is codified in *28 U.S.C. § 1334* [*13] (c)(2), which states:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11 . . . the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

*28 U.S.C. § 1334*(c)(2). Because the case at bar involves a claim that arises under title 11, it is not a candidate for mandatory abstention. [HN5] As regards permissive ab-

stention from bankruptcy proceedings, *28 U.S.C. § 1334*(c)(1) provides:

> Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

*28 U.S.C. § 1334*(c)(1). In applying this doctrine, the Second Circuit has held that

> scarce debtor resources should not be squandered litigating in state court when [*14] such litigation may later be found to have been preempted by federal law. A presumption against abstention when there are preemption issues thus serves the best interests of debtors and their creditors.

*In re Pan Am Corp., 950 F.2d 839, 847 (2d Cir. 1991);* accord *Stone & Webster Eng'g Corp. v. Ilsley, 690 F.2d 323, 326 n.2 (2d Cir. 1982),* aff'd sub nom. *Arcudi v. Stone & Webster Eng'g Corp., 463 U.S. 1220, 103 S. Ct. 3564, 77 L. Ed. 2d 1405 (1983)* ("Abstention . . . is not appropriately invoked in a preemption case."). Plaintiff has not advanced, and this Court cannot find, any compelling reason to rebut the presumption against abstention in the case at bar.

V.

For the reasons set forth above, Plaintiff's Motion to Remand and Motion to Abstain are denied. Plaintiff's request for leave to replead is granted on the condition that Plaintiff replead within 30 days. Accordingly, Defendants' Motion to Dismiss is denied without prejudice to renew at a later date.

Dated: New York, New York
December 7, 1993

SO ORDERED.

LAWRENCE M. McKENNA

U.S.D.J.